KAREN JOHNSON-MCKEWAN (State Bar No. 121570)
  kjohnson-mckewan@orrick.com
CHRISTINA VON DER AHE (State Bar No. 255467)
  cvonderahe@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:  (415) 773-5700
Fax:  (415) 773-5759

I. NEEL CHATTERJEE (State Bar No. 173985)
  nchatterjee@orrick.com
MICHAEL C. SPILLNER (State Bar No. 205785)
  mspillner@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 614-7400
Fax:  (650) 614-7401

DEBORAH K. MILLER (State Bar No. 95527)
  deborah.miller@oracle.com
PEGGY E. BRUGGMAN (State Bar No. 184176)
  peggy.bruggman@oracle.com
LESLEY E. KOTHE (State Bar No. 209512)
  lesley.kothe@oracle.com
ORACLE CORPORATION
500 Oracle Parkway
Redwood City, CA 94065
Telephone: (650) 506-5200
Fax: (650) 506-7114

*Attorneys for Plaintiffs and Counterclaim Respondents
Oracle Corporation, Oracle International Corporation, and
Oracle America, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE CORPORATION and ORACLE INTERNATIONAL CORPORATION,<br>             Plaintiffs,<br>    v.<br>DRUGLOGIC, INC.,<br>             Defendant.<br><br>DRUGLOGIC, INC.,<br>             Counterclaimant,<br>    v.<br><br>ORACLE CORPORATION, ORACLE INTERNATIONAL CORPORATION, and ORACLE AMERICA, INC.<br>Counterclaim Defendants. | Case No. C 11-00910 JCS<br><br>**ORACLE'S OPENING BRIEF REGARDING THE CONSTRUCTION OF DISPUTED TERMS IN THE '221 PATENT**<br><br>Date:   July 12, 2012<br>Time:   9:30 a.m.<br><br>The Honorable Joseph C. Spero |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................... 1
II. BACKGROUND ............................................................................................................. 2
    A. Pharmacovigilance and Adverse Event Tracking Generally ................................ 2
    B. Oracle's '221 Patent Created An Integrated Thesaurus Management System and Method .............................................................................................. 4
III. LEGAL STANDARD ..................................................................................................... 6
IV. THE DISPUTED CLAIM TERMS ................................................................................. 6
    A. "Clinical Terms." .................................................................................................. 6
    B. "Defining a Plurality of Clinical Terms for Use in Conjunction with a Clinical Study." ..................................................................................................... 8
    C. "Verbatim Clinical Data." .................................................................................. 11
V. CONCLUSION .............................................................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Augme Technologies v, Yahoo!, Inc.*
  2012 WL 10528 (N.D. Cal. Jan. 3, 2012) ................................................................................ 7

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*
  249 F.3d 1341 (Fed. Cir. 2001) .............................................................................................. 7

*i4i Ltd. P'ship v. Microsoft Corp.*
  598 F.3d 831 (Fed. Cir 2009) ............................................................................................... 11

*Liquid Dynamics Corp. v. Vaughan Co., Inc*
  355 F.3d 1361 (Fed. Cir. 2004) .............................................................................................. 7

*Phillips v. AWH Corp.*
  415 F.3d 1303, 1315 (Fed. Cir. 2005) .................................................................................... 7

*Primos, Inc. v. Hunter's Specialties*
  451 F.3d 841 (Fed. Cir. 2006) ............................................................................................ 8, 9

*Vitronics Corp. v. Conceptronic, Inc.*
  90 F.3d 1576 (Fed. Cir. 1996) ..................................................................................... 8, 9, 10

*Volterra Semiconductor Corp. v. Primarion, Inc.*
  2010 WL653452 (N.D. Cal. 2010) ......................................................................................... 6

*Volterra Semiconductor Corp. v. Primarion, Inc.*
  2009 WL 6357679 (N.D. Cal. 2009) ............................................................................... 11, 13

**OTHER AUTHORITIES**

Barton Cobert, COBERT'S MANUAL OF DRUG SAFETY AND PHARMACOVIGILANCE 1 (2d Ed. 2012) ...................................................................................................................................... 12

Local Rule 4-5 .................................................................................................................................. 1

U.S. Patent No. 6,684,221 ...................................................................................................... passim

Pursuant to the Court's Scheduling Order and Patent Local Rule 4-5, Plaintiffs and Counterclaim Defendants Oracle Corporation, Oracle International Corporation, and Oracle America, Inc. (collectively, "Oracle") respectfully submit this opening claim construction brief on the disputed terms from Oracle's asserted patent, U.S. Patent No. 6,684,221 (the "'221 Patent").[1]

## I. INTRODUCTION

The '221 Patent describes an invention aimed at allowing its users—including pharmaceutical companies, medical researchers, and regulators—to use both standard medical dictionaries and customized medical terms to create an integrated thesaurus for use in tracking the performance of pharmaceutical products. This technology is used in the drug safety field, sometimes called "pharmacovigilance." Pharmacovigilance professionals collect, monitor, and analyze the health effects that people experience following their use of particular drugs to confirm whether drugs are safe.

Creating an integrated thesaurus is essential to pharmacovigilance. When doctors, nurses, or pharmacists report adverse effects that patients experience after taking a medication, they each may use different terminology to refer to a single phenomenon. For example, one may refer to a patient suffering a "heart attack," while others may use "chest pain," or "myocardial infarction." Without a tool to render these terms synonymous, people monitoring the effects of use of a particular drug may not realize that drug is causing an unusual number of heart attacks. Oracle's '221 Patent solves that problem through a system and method of classifying medical terminology, such as a doctor's notes about a suspected side effect, according to a standardized scheme used to organize medical terms.

Oracle has accused DrugLogic of infringing the '221 Patent. Three terms of the '221 Patent are disputed: "clinical terms," "defining a plurality of clinical terms for use in conjunction with a clinical study," and "verbatim clinical data." These terms have commonly understood meanings that are readily understood by lay people, and the Court need not construe them. DrugLogic disagrees, and has proposed constructions at odds with the patent. If the Court is

---

[1] The '221 Patent is attached as Exhibit A to the Declaration of Bryce Baker ("Baker Decl.") for the Court's convenience.

inclined to construe these terms at all, it should adopt Oracle's proposed alternate constructions, because they hew closely to the language of the patent itself, whereas DrugLogic's proposed constructions either exclude the preferred embodiment or improperly add limitations. In so doing, they ignore basic canons of claim construction. Oracle's constructions should be adopted for the reasons set forth below.

## II. BACKGROUND

### A. PHARMACOVIGILANCE AND ADVERSE EVENT TRACKING GENERALLY.

Pharmacovigilance is the study of the effects of drugs before and after they are released to the market. It involves collecting information about health effects people experience following their use of drugs, placing the information into a database, monitoring the information, and analyzing it to ascertain whether there is an unusually high statistical correlation between a particular drug and certain kinds of health effects (sometimes referred to as "adverse events").

Detecting a meaningful statistical correlation between a drug and an adverse event can require the collection and analysis of a large volume of clinical data and many individually-reported health effects. Such data can come from many different sources such as physician reports, drug dispensary logs, or laboratory test results. Adverse health events can be reported by anyone—doctors, nurses, pharmacists, or even patients themselves—by filling out a form and submitting it to the Food and Drug Administration or to the drug manufacturer.

These reports can include widely variable terminology, because different authors may use different clinical terms to refer to the same condition. For example, a physician who sees a patient suffering from a cardiac arrhythmia after taking a drug might note that a patient has a "slow heart rate," while another might call the same event a "slow pulse." The primary difficulty with such data is that terms are often used inconsistently. Different permutations, prefixes, suffixes, and generalities may be favored by individual sources of clinical data or by different reporters. '221 Patent, Col. 1:38-43. Without a tool to identify the words as synonyms, the data may be inaccurately tracked and patterns may not be detected.

Medical dictionaries and thesauruses help to organize these data by assigning various health effects to specific diagnoses and categories. Medical dictionaries such as MedDRA

1  (Medical Dictionary for Regulatory Activities), COSTART (Coding Symbols for a Thesaurus of
2  Adverse Reaction Terms), CPT (Current Procedural Technology), and WHO-Drug (World Health
3  Organization Drug Dictionary) provide a concrete framework that group medical terms into well-
4  defined, standardized hierarchies. *See id.* Col. 4:4-11; Baker Decl. Ex. B at 80.

5  These medical hierarchies provide ways to organize data about drugs and medical
6  conditions. Two illustrations of hierarchies relevant to a pharmacovigilance thesaurus are found
7  in Figures 3a and 3b of the '221 Patent. Figure 3a shows a sample hierarchy for types of aspirin,
8  and Figure 3b describes the relationships among terms describing medical conditions involving
9  the blood and lymphatic systems:



*FIG. 3a*

*FIG. 3b*

19  On the other hand, medical dictionaries and thesauruses like MedDRA, while useful, do
20  not solve all of the problems of classifying clinical data. Among other things, a standard medical
21  dictionary may not contain all of the clinical terms required for the classification of all health
22  effects related to a particular drug. Each standardized medical dictionary contains its own
23  idiosyncratic collection of definitions, or a particular focus (that is, not every dictionary contains
24  every term), and is arranged according to its own particular hierarchical structure, making
25  different medical dictionaries incompatible with one another. Some medical dictionaries only list
26  drugs, while others list only medical conditions. Large pharmaceutical companies might employ
27  their own proprietary medical terms or may have developed novel drugs. Such terms may not
28  appear in the definitions or hierarchies of a standard medical dictionary because they are not

public terms or because the terms are too new. '221 Patent, Col. 5:56-60. Moreover, manually classifying the verbatim data that appear in doctor's notes from patient observations in a way that corresponds with the standardized terminology in a medical dictionary is a time-consuming task prone to error because medical personnel may misspell drug names or health conditions, may use slang or peculiar language to describe a condition, or because language changes over time. Baker Decl. Ex. B at 81; Col. 1:40-47. Accordingly, to conduct pharmacovigilance with respect to a given drug—that is, to ascertain the correlations between a particular drug and reported health effects—it is essential to have a system in place that also correlates medical terminology used in adverse health event reporting to standard terminologies and medical hierarchies.

### B. ORACLE'S '221 PATENT CREATED AN INTEGRATED THESAURUS MANAGEMENT SYSTEM AND METHOD.

The '221 Patent forms the foundation for Oracle's industry-leading product called the "Thesaurus Management System." *See* http://www.oracle.com/us/industries/life-sciences/046763.html. Oracle scientist Kim Rejndrup, the sole inventor of Oracle's '221 Patent, worked in the pharmacovigilance field for several years. He perceived the drawbacks of using standard medical dictionaries in pharmacovigilance and sought to solve them. Broadly speaking, the '221 Patent accomplishes two things. *First,* it provides a centralized, integrated medical thesaurus database that allows researchers to incorporate (a) multiple standard dictionaries and thesauruses, and (b) customized terms that a company may create for itself. *Second,* it automatically scans verbatim clinical records and uses that thesaurus database to assign verbatim clinical terms to precise clinical definitions.

The entirety of claim 1 of the '221 Patent (where two of the three disputed claim terms are found) recites the following:

> A method of storing a thesaurus of <u>clinical terms</u> comprising:
>
> <u>defining a plurality of clinical terms for use in conjunction with a clinical study</u>;
>
> storing the plurality of clinical terms in a memory according to a hierarchy of relations; and

> defining a plurality of relations corresponding to the clinical terms, the relations indicative of an association from a clinical term to at least one other of the plurality of clinical terms.

Claim 1 thus describes the first part of the invention of the '221 Patent, *i.e.*, providing a medical thesaurus database incorporating standardized medical dictionaries and customized terms.

The second part of the invention—having to do with scanning verbatim clinical data and assigning terms in those data to synonyms—is described, *inter alia*, in Claim 12 (where the third claim term in dispute here is found):

> The method of claim 2 wherein providing a match term further comprises:
>
> scanning verbatim clinical data; and
>
> parsing verbatim study terms from the clinical data, wherein the verbatim study terms include the match terms.

The invention of the '221 Patent creates a library of clinical terms in an electronic thesaurus database and defines the hierarchical relations between them. One problem with the field as it existed before the '221 Patent was that there was no way to work effectively with the variety of medical dictionaries such as WHO-Drug, COSTART, and CPT that were in the public domain at the time; a researcher had to use one dictionary to the exclusion of the others. Oracle's invention allows a user simultaneously to use and manage any number of medical dictionaries (or versions thereof) and their corresponding hierarchical structures by loading them into a memory. *See* Col. 3:63 – 4:24. The system and method of the '221 Patent also enable the user to modify the hierarchical structure of the medical dictionary stored in the thesaurus database. For example, a user may assign a place within the hierarchy for custom terms—referred to in the patent as "company" terms ("those specific to a particular company or enterprise") and "domain" terms ("attributed to a particular study, and contain unpublished terms specific to the study")—or to load multiple medical dictionaries with incompatible hierarchical structures and then harmonize their hierarchies so the terms in the otherwise incompatible dictionaries may be used side-by-side. *See* Col. 6:36-47; Col. 7:13-17, 44-49.

## III. LEGAL STANDARD

This court is familiar with the canons of claim construction. *See Volterra Semiconductor Corp. v. Primarion, Inc.*, 2010 WL653452 (N.D. Cal. 2010). The basic law will not be repeated here.

## IV. THE DISPUTED CLAIM TERMS

Three disputed terms from the '221 Patent require the Court's construction. *See* JCCS, Dkt. No. 102. They are: (1) "clinical terms"; (2) "defining a plurality of clinical terms for use in conjunction with a clinical study"; and (3) "verbatim clinical data." The first two terms are used in claim 1:

> A method of storing a thesaurus of <u>clinical terms</u> comprising:
>
> <u>defining a plurality of clinical terms for use in conjunction with a clinical study</u>;
>
> storing the plurality of clinical terms in a memory according to a hierarchy of relations; and
>
> defining a plurality of relations corresponding to the clinical terms, the relations indicative of an association from a clinical term to at least one other of the plurality of clinical terms.

### A. "CLINICAL TERMS."

| Claim Term | Oracle's Construction | DrugLogic's Construction |
|---|---|---|
| **clinical terms** | No construction required.<br><br>*Alternatively, construe as*: Terms pertaining to the study or observation of medical patients, such as terms in a medical dictionary. | Terms pertaining to the study or observation of medical patients. |

"Clinical terms" is a commonly understood phrase that has no peculiar meaning in the context of this patent. It is readily understandable to a jury and does not require further description. Claim terms do not require construction when the ordinary meaning is evident and unambiguous. If a person of ordinary skill in the art would understand the term in its ordinary, everyday sense, there is no need to construe the term. *See, e.g., Liquid Dynamics Corp. v.*

1  *Vaughan Co., Inc*, 355 F.3d 1361, 1368 (Fed. Cir. 2004) (claim was clear and required no
2  construction); *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d
3  1341, 1349 (Fed. Cir. 2001) (court was not required to construe "melting"); *Augme Technologies*
4  *v, Yahoo!, Inc.*, 2012 WL 10528 (N.D. Cal. Jan. 3, 2012) (Spero, J.) ("claim term did not need
5  construction were it was 'neither unfamiliar to the jury, confusing to the jury, nor affected by the
6  specification or prosecution history.'") (citing *Bd. of Trustees of Leland Stanford Jr. Univ. v.*
7  *Roche Molecular Sys., Inc.*, 528 F. Supp. 2d 967,976 (N.D. Cal. 2007)). It therefore requires no
8  construction.

9  If, however, the Court decides that construction is necessary, Oracle's proposed alternate
10 construction is the proper one. The parties agree that "clinical terms" refers to "terms pertaining
11 to the study or observation of medical patients," but disagree as to whether the exemplary
12 language "such as terms in a medical dictionary" is appropriate. At the heart of this dispute is
13 whether terms in a medical dictionary are "clinical terms." Oracle's construction makes clear that
14 terms in medical dictionaries are "clinical terms" within the meaning of the patent, a result
15 DrugLogic opposes.

16 The specification makes clear that clinical terms can come from a medical dictionary. In
17 describing the preferred embodiment, the specification teaches, "[t]he clinical terms are initially
18 transmitted to the thesaurus database **18** from an external media source, such as a CD-ROM."
19 Col. 3:40-43. The specification goes on to describe the typical external media source:

> Typically external media sources are purchased *in the form of a dictionary* on a CD-ROM from an external vendor. Common vendor-supplied dictionaries include WHO-Drug (World Health Organization Drug Dictionary) by the World Health Organization, COSTART (Coding Symbols for a Thesaurus of Adverse Reaction Terms) by the Drug Information Association, and CPT (Current Procedural Terminology) by the American Medical Association. Other vendors and dictionaries are common and known in the industry.

25 Col. 4:2-11.[2]

26 The patent elsewhere refers to terms from these vendor-supplied dictionaries as "clinical
27 terms." (*See, e.g.,* Col. 7:9-11 "Referring to FIG. 7, there are several types of terms which may

28 ---
[2] All emphasis in quoted material herein is added unless otherwise indicated.

1  be stored in the thesaurus database *as clinical terms*"). Figure 7 of the patent—reproduced
2  below—shows that medical dictionary-supplied terms are included among the broader category of
3  "clinical terms" (Fig. 7, item 400).



**FIG. 7**

14  In Figure 7, "[e]xternal terms **402** are loaded from vendor supplied dictionaries," according to the
15  '221 Patent. Col. 7:11-12. (The other forms of "clinical terms," item 400 of Figure 7, include
16  customized "company" terms and "domain" terms. *Id.* Col. 7:13-17.)

17        DrugLogic's proposed construction—as well as its opposition to Oracle's proposed
18  construction—subtly seeks to exclude terms derived from medical dictionaries from the definition
19  of "clinical terms." That construction would exclude the patent's preferred embodiment, as
20  reflected in Figure 7. Constructions that exclude a patent's preferred embodiment are "rarely, if
21  ever correct." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). *See*
22  *also Primos, Inc. v. Hunter's Specialties*, 451 F.3d 841, 848 (Fed. Cir. 2006). Accordingly, if the
23  Court is inclined to construe this term, it should adopt Oracle's alternative construction and
24  DrugLogic's construction should be rejected.

B.  **"DEFINING A PLURALITY OF CLINICAL TERMS FOR USE IN CONJUNCTION WITH A CLINICAL STUDY."**

| Claim Term | Oracle's Construction | DrugLogic's Construction |
| --- | --- | --- |
| defining a plurality of clinical terms for use in conjunction with a clinical study | No construction necessary.<br><br>*Alternatively, construe as*: choosing a plurality of terms pertaining to the study or observation of medical patients for use in conjunction with a clinical study | developing a list of terms pertaining to the study or observation of medical patients used in connection with a particular clinical study |

The principal dispute between the parties is whether the disputed phrase excludes terms loaded into the database from medical dictionaries. This is the same dispute discussed above with respect to "clinical terms." For the same reasons, Druglogic's construction should be rejected. Like the previous term, this nontechnical phrase is understandable to anyone and requires no construction. It uses commonly understood language with no meanings peculiar to this patent or beyond the understanding of lay people.

Should the Court nevertheless believe construction is necessary, however, Oracle's proposed construction is most faithful both to the phrase's ordinary meaning, and the language of the patent itself. Oracle's alternative proposed construction of "defining a plurality of clinical terms" as "*choosing* a plurality of clinical terms" captures the claim's meaning in light of the specification. As discussed above, the patent teaches that clinical terms can be chosen in a variety of ways, including choosing them from a standard medical dictionary. *See, e.g.,* Col. 6:9-24 ("Preparation includes loading the database with *external dictionary terms from a vendor supplied dictionary …*"), as well as using terms customized for a particular study ("domain terms") or in use with a user's company ("company terms"). DrugLogic's proposed construction excludes the patent's preferred embodiment because it excludes loading terms from a medical dictionary. *Vitronics Corp., supra,* 90 F.3d at 1583; *Primos, Inc., supra,* 451 F.3d at 848.

The claim language also supports Oracle's proposed construction. At least one dependent claim makes clear that one of the sources of clinical terms for the thesaurus database is a medical

- 9 -
ORACLE'S OPENING '221 CLAIM CONSTRUCTION BRIEF
CASE NO. 11-cv-00910 JCS

dictionary: claim 43 states "[t]he system of claim 42 wherein the external media source is a medical dictionary." *Id*. Col. 3:62-4:3. The "external media source" in earlier claims is one of the places from which clinical terms are obtained and defined. *See* Col.4:2-4, Claims 14, 16, 17.

DrugLogic's construction is wrong for at least three reasons. First, DrugLogic's introduction of the word "developing," plus the phrase "used in connection with a *particular* clinical study" in construing the first step of Claim 1 ("storing a thesaurus of clinical terms comprising defining a plurality of clinical terms for use in conjunction with a clinical study"), improperly limits the phrase in the second step of Claim 1 ("storing the plurality of clinical terms…") to the user's *creation* of customized clinical terms, to the exclusion of standard terms found in medical dictionaries. DrugLogic's construction thus excludes the preferred embodiment and should be rejected. *Vitronics Corp.,* 90 F.3d at 1583.

Second, DrugLogic's proposed construction is not supported by the intrinsic evidence. Both the patent's claims and its specification refer to a "particular" clinical study only when talking about "domain terms." That makes sense: "domain terms" are, as previously noted, those which are "attributable to a particular study, and contain unpublished terms specific to the study." Col. 7:16-17; *see also* Col. 5:57-58. The claim term under examination here—"defining a plurality of *clinical terms* for use in conjunction with a clinical study"—does not refer only to "domain terms" but to the broader concept of "clinical terms," which includes (but is not limited to) "domain terms."[3]

Third, when the inventor intended to confine the claims to a "particular" study, he knew how to do so and used the phrase "domain terms" limited to a particular study. Claim 38 (which depends from independent Claim 22) is addressed to "a system for accessing a thesaurus of clinical terms used in conjunction with a clinical study," Col. 10:58-59, "wherein the match terms include common global terms and *domain* terms corresponding to *a particular study*." And Claim 15 refers to clinical terms being "enterprise terms corresponding to a company and *domain*

---

[3] As noted elsewhere here, "clinical terms" encompasses three sources of data: "external terms" (obtained from standard medical dictionaries), "company terms" (those specific to a particular company or enterprise) and "domain terms," (derived from "particular studies.") Col. 7:8-17; *see also* Fig. 7.

1  terms corresponding to a *predetermined study*." Because the patentee differentiated clinical
2  studies from "particular" clinical studies elsewhere in the patent, importing this limitation into
3  Claim 1 would be improper. *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir.
4  2005) ("the presence of a dependent claim that adds a particular limitation gives rise to a
5  presumption that the limitation in question is not present in the independent claim"); *i4i Ltd.*
6  *P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir 2009) (the omission of limiting language
7  signifies an intention *not* to so limit the claim).

8        DrugLogic's proposed construction would remove the distinction between external,
9  company, and domain terms, and would render "domain terms" and "clinical terms" synonymous.
10 It is not proper to interpret claims in a way that would conflict with the specification or read out
11 preferred embodiments. *See, e.g.*, *Volterra Semiconductor Corp. v. Primarion, Inc*. 2009 WL
12 6357679, 22 (N.D. Cal. 2009) (Spero, J.) ("Defendants have proposed a construction that reads
13 out the preferred embodiments and have not provided the strong evidentiary basis that is
14 necessary to support such a construction."). It would also render the claims redundant and
15 somewhat nonsensical. Such a construction should be avoided. As the Federal Circuit has
16 explained, "[d]ifferences among claims can also be a useful guide in understanding the meaning
17 of particular claim terms. For example, the presence of a dependent claim that adds a particular
18 limitation gives rise to a presumption that the limitation in question is not present in the
19 independent claim." *Phillips*, 415 F.3d at 1314-1315 (citations omitted).

20       Accordingly, DrugLogic's proposed construction should be rejected.

21     C.    "VERBATIM CLINICAL DATA."

| Claim Term | Oracle's Construction | DrugLogic's Construction |
|---|---|---|
| Verbatim clinical data | No construction necessary. *Alternatively, construe as*: raw information related to the study or observation of medical patients | exact word-for-word raw clinical data from a clinical study |

27       The only place that the phrase "verbatim clinical data" appears in the '221 Patent is in
28 Claim 12:

> The method of claim 2 wherein providing a match term further comprises:
>
> scanning verbatim clinical data; and
>
> parsing verbatim study terms from the clinical data, wherein the verbatim study terms include the match terms.

As with the other two terms, this one does not require construction. A juror does not need to be instructed was about what "verbatim" means, and "clinical data" is also readily understandable by lay jurors. To the extent the Court chooses to construe the term, however, Oracle's alternative proposal should be adopted.

DrugLogic's proposed construction and Oracle's alternative proposed construction differ on (1) whether "verbatim" should mean "raw" (Oracle's proposed construction) or "exact word-for-word raw" (DrugLogic's proposed construction), and (2) whether "clinical data," should mean "information related to the study or observation of medical patients" (Oracle's proposed construction) or "clinical data from a clinical study" (DrugLogic's proposed construction). Oracle's definitions are better supported by the intrinsic evidence and are less confusing.

Oracle's alternative proposed construction of the word "verbatim" is most faithful to the intrinsic record. As used in Claim 12, "verbatim" means the same thing as "raw," meaning the data as it recorded by the individual making a safety report, complete with any inadvertent misspellings, or the use of lay terms. *See* Dkt. No. 102, Joint Claim Construction and Prehearing Statement at 4 (agreed construction of verbatim terms). Throughout the specification, the patent refers to verbatim data as "raw" data. *See, e.g.,* '221 Abstract ("A study term extracted from raw clinical data is presented to determine a corresponding match in the thesaurus of clinical terms."); Col. 2:8-11 ("The system and method classify the terms derived from raw clinical data to effect a consistent clinical term classification throughout the clinical study").[4] Because the parties also agree that "clinical terms" means, at minimum, "pertaining to the study or observation of medical

---

[4] Generally speaking, "[v]erbatim terms are not [medical dictionary] terms but rather the terms used by reporters, patients, and investigators. They may be medical, lay, or slang terms." Baker Decl. Ex. B (Barton Cobert, COBERT'S MANUAL OF DRUG SAFETY AND PHARMACOVIGILANCE 1 (2d Ed. 2012)) at 79.

1  patients," *see* Part IV.A *supra*, Oracle's proposed construction of "verbatim clinical data" as "raw
2  information related to the study or observation of medical patients" merely combines these
3  agreed-upon elements and explains that "data" is "information."
4     DrugLogic's proposed construction of "verbatim" as "exact word-for-word raw" departs
5  from the intrinsic record and apparently is based upon an external dictionary. It should be
6  rejected. DrugLogic's definition creates confusion about whether and to what extent the terms
7  "exact," "word-for-word," and "raw" each mean something different. For example, by using the
8  phrases "exact" and "word-for-word," the definition may imply that the entirety of the raw
9  clinical data needs to be scanned. Consider, for example, a safety report describing a 35-year-old
10 male who suffered a heart attack after taking Tylenol. It is possible within the meaning of Claim
11 12 that a user would choose only to scan the raw data identifying the drug and adverse effect, but
12 not the gender and age information. DrugLogic's proposal confusingly suggests that *all* the raw
13 data must be scanned, a suggestion that has no support in the claims or specification.
14    DrugLogic's definition of "clinical data" as "clinical data from a clinical study" is also
15 improper. By repeating in the proposed definition the words to be defined, and then narrowing
16 those words with additional language, DrugLogic is plainly attempting to tack a limitation onto
17 the claim that does not exist in the claim language itself. It is well-established that this is not
18 appropriate. *Volterra, supra*, 2009 WL 6357679, at *11. Indeed, by suggesting that the only
19 verbatim data relevant here are those derived from clinical studies, DrugLogic would exclude
20 data collected from, *e.g.*, doctors observing patients in their day-to-day clinical practices,
21 pharmacists reporting customer feedback, and patient-initiated reports of adverse effects.
22 Nothing in the language of the patent suggests an intent to exclude such information.
23 //
24 //
25 //
26 //
27 //
28 //

## V. CONCLUSION

For the foregoing reasons, Oracle respectfully requests that the Court adopt Oracle's proposed constructions.

Dated: March 26, 2012

Respectfully submitted,

ORRICK HERRINGTON & SUTCLIFFE LLP
KAREN JOHNSON-MCKEWAN
I. NEEL CHATTERJEE
MICHAEL C. SPILLNER
CHRISTINA VON DER AHE


By: /s/ *I. Neel Chatterjee /s/*
I. NEEL CHATTERJEE
Attorneys for Plaintiffs and Counterclaim
Defendants
ORACLE CORPORATION,
ORACLE INTERNATIONAL CORPORATION,
AND ORACLE AMERICA, INC.