Martin L. Fineman (California State Bar No. 104413)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery St., Suite 800
San Francisco, California 94111-6533
Phone: (415) 276-6500
Fax: (415) 276-6599
E-mail: martinfineman@dwt.com

Peter Davis (*admitted pro hac vice*)
Steven E. Tiller (*admitted pro hac vice*)
Gregory Stone (*admitted pro hac vice*)
Erin O. Millar (*admitted pro hac vice*)
WHITEFORD TAYLOR & PRESTON, LLP
7 St. Paul Street
Baltimore, Maryland 21202-1636
Phone: (410) 347-8700
Fax: (410) 223-4304
Email: pdavis@wtplaw.com
Email: stiller@wtplaw.com
Email: gstone@wtplaw.com
Email: emillar@wtplaw.com

***Attorneys for Defendant and Counter-Claimant
DRUGLOGIC, INC.***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE CORPORATION *et al.*,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>DRUGLOGIC, INC.,<br><br>　　　　　　　　　Defendant.<br><br>DRUGLOGIC, INC.,<br><br>　　　　　　　　　Counterclaimant,<br><br>　　v.<br><br>ORACLE CORPORATION *et al.*<br><br>　　　　　　　　　Counterclaim Defendants. | Case No. C 11-00910 JCS<br><br>**DRUGLOGIC, INC.'S <u>CORRECTED</u> RESPONSIVE CLAIM CONSTRUCTION BRIEF ON UNITED STATES PATENT NO. 6,684,221**<br><br>Date:　July 12, 2012<br>Time:　9:30 a.m.<br><br>The Honorable Joseph C. Spero |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ............................................................................ 1

II.     BACKGROUND ............................................................................. 3

     A.     The Invention ................................................................. 3

     B.     The Prior Art .................................................................. 5

     C.     The Prosecution History ................................................ 7

III.     PRINCIPLES OF CLAIM CONSTRUCTION ............................ 8

IV.     CLAIM CONSTRUCTION OF THE '221 PATENT ................... 8

     A.     "clinical terms" ............................................................. 8

         1.     Contrary to the purpose of the invention, the plain meaning of the claims, and the prosecution history, Oracle improperly attempts to equate "clinical terms" with "terms in a medical dictionary." ................................ 9

         2.     Oracle's construction is barred by prosecution history disclaimer ............................................................. 12

         3.     Oracle's proposed construction would render the claims invalid ......................................................... 16

     B.     "defining a plurality of clinical terms for use in conjunction with a clinical study" ......................................................... 18

         1.     The specification and prosecution history support DrugLogic's construction ....................................... 18

         2.     Claim differentiation cannot overcome the prosecution history ................................................ 19

     C.     "verbatim clinical data" ................................................ 20

V.     CONCLUSION ............................................................................. 22

# TABLE OF AUTHORITIES

**Cases** Page

**FEDERAL CIRCUIT CASES**

*Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007)................................................................. 14,20

*Bell Atl. Network, Inc. v. Covad Communs. Grp., Inc.*, 262 F.3d 1258 (Fed. Cir. 2001)................................................................. 13

*Comark Communs., Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998)................................................................. 9

*Day Int'l, Inc. v. Reeves Bros., Inc.*, 260 F.3d 1343 (Fed. Cir. 2001) .......... 13

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302 (Fed. Cir. 2000)................................................................. 10,11,15,19

*Merck & Co., Inc. v. Teva Pharma. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005)................................................................. 20

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340 (Fed. Cir. 2004)................................................................. 12,13,19

*N. Amer. Container, Inc. v. Plastipak Pkg., Inc.*, 415 F.3d 1335 (Fed. Cir. 2005)................................................................. 15

*Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003)................................................................. 12-16,19

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .............................. 9,10,12,19,22

*Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319 (Fed. Cir. 2002) ........................ 14,15,19

*Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) ........................ 16,20

*Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361 (Fed. Cir. 2005) .......... 12,14,19,20

*Southwall Techs., Inc. v. Cardinal IG, Co.*, 54 F.3d 1570 (Fed. Cir. 1995)................................................................. 12,13,19

**DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION**
**BRIEF ON UNITED STATES PATENT NO. 6,684,221**
CASE NO. 11-CV-00910 JCS

ii

**DISTRICT COURT CASES**

*Sliptrack Sys., Inc. v. Steeler Metals, Inc.*, 2004 U.S. Dist. LEXIS 21569
at *15-16 (N.D. Cal. Oct. 12, 2004)................................................................. 15

Pursuant to Patent Local Rule 4-5(a), DrugLogic, Inc. ("DrugLogic"), by its undersigned counsel, respectfully submits this Brief in support of its proposed construction of the three (3) disputed claim terms[1] of U.S. Patent No. 6,684,221 B1 ("the '221 Patent").[2]

# I. INTRODUCTION

The purpose of the invention claimed in the '221 Patent is to build and use a thesaurus containing "new" clinical terms (*i.e.*, terms and variations not already contained in an existing medical thesaurus) used in conjunction with a clinical study. Oracle argues that "clinical terms" and "defining a plurality of clinical terms for use in conjunction with a clinical study"[3] do not need to be construed. While these terms may appear relatively easy to discern and define on their face, the applicant, during prosecution, narrowed the ordinary meaning of these terms in order to secure allowance of the claims, which must be taken into account when determining their scope. Specifically, the examiner rejected the claims until the applicant added the limitation "for use in conjunction with a clinical study" (the "clinical study limitation").[4] Oracle, however, attempts to regain the claim scope disavowed when the applicant added the clinical study limitation by including the exemplary phrase, "such as a term in a medical dictionary," in

---

[1] Oracle Corporation and Oracle International Corporation (collectively, "Oracle") have asserted Claims 1-7, 12, 14, 16-17, 19, 20-27, 32-36, 39, 40-43, 58-59, and 62-65 of the '221 Patent against DrugLogic. DrugLogic asserted U.S. Patent No. 6,789,091 ("the '091 Patent") against Oracle and Oracle America, Inc., which has been briefed separately. *See* ECF Nos. 55, 83 and 110.

[2] All references to the '221 Patent will be to the patent's column and line numbers in the following format (Column: Line Numbers). For example, the reference to (18:21-23) is to Lines 21-23 in Column No. 18.

[3] The parties have agreed that "clinical study" shall be construed to mean "a research process by which clinical data is gathered in order to answer scientific questions and determine whether certain methods of prevention, diagnosis, and treatment are safe or effective." ECF No. 107, p. 4.

[4] As discussed in Section III(B), there is some minor variation in the language of the clinical study limitation throughout the independent claims. These variations, however, should all be construed in the same manner based on the global arguments made by the applicant during prosecution.

**DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF ON UNITED STATES PATENT NO. 6,684,221**
CASE NO. 11-CV-00910 JCS

1

its proposed construction of "clinical terms." Inclusion of this exemplary phrase would essentially equate the independent claims with prior art medical thesauruses, thus rendering the clinical study limitation a nullity.

Oracle further objects to DrugLogic's construction of the clinical study limitation as pertaining to a *particular clinical study*. Despite Oracle's contentions, however, the specification and prosecution history clearly limit the scope of the invention to adding terms from a particular clinical study to a thesaurus so that those previously undefined terms can be mapped and classified.

DrugLogic's constructions of these terms comport with the ordinary meaning as narrowed by the unequivocal language in the intrinsic record, thus rendering baseless Oracle's contention that DrugLogic's constructions exclude a preferred embodiment. To the contrary, Oracle's constructions conflate the purported embodiment with the prior art and read out limitations that appear in the claims themselves, which were specifically added to overcome rejections by the patent examiner. In such circumstances, the Federal Circuit has made clear that it is appropriate to read out an embodiment that is broader than the narrowed scope argued before the examiner.

Finally, Oracle attempts to remove the word "verbatim" from its construction of "verbatim clinical data." Nothing in the specification signifies that the applicant sought to redefine or remove the term "verbatim" from the scope of the claim. Rather, verbatim must be construed in its ordinary context to mean "exact word-for-word."

For these reasons, as well as those set forth below, this Court should adopt DrugLogic's proposed constructions.

## II.    BACKGROUND

### A.    The Invention

Thesauruses of medical terms have existed since at least the beginning of the 20th century.  *See* Ex. 1 [Excerpt from Wilfred M. Barton & Walter A. Wells, *A Thesaurus of Medical Words and Phrases*, (W.B. Saunders & Co. 1903), which can be found at archive.org/stream/thesaurusofmedic00bartuoft#page/n3/mode/2up].  Medical thesauruses exist because different physicians often refer to the same symptom, condition or illness using different terminology.  For example, one physician may refer to a heart attack as "myocardial infarction," another may use the abbreviation "MI," while another may use the term "cardiac arrest."  According to the '221 Patent, "[t]he use of a thesaurus of terms can be beneficial in the determination of equivalent and related terms.  Such a thesaurus can be queried to find an equivalent term so that consistent term usage can be applied across the industry or company."  ECF No. 109-2 (1:16-22).

The '221 Patent and its parent provisional application identify several prior art medical thesauruses, including WHO-Drug, WHO-Art, COSTART, CPT, MedDRA, ICD-9 and ICD-10.  *See* ECF No. 109-2 (4:4-11); Ex. 2 [Excerpts from Provisional Application No. 60/132,925, filed on May 6, 1999] at p. 7.  Of these (and as described in more detail below), at least WHO-Drug, WHO-Art, COSTART and MedDRA are organized in the same way as the invention claimed in the '221 Patent – in hierarchies according to relationships between and among terms in each hierarchical level.  ECF No. 109-2 (4:4-24), Fig. 2; Ex. 2, p. 7-9; Ex. 3 [The WHO Reaction Terminology – WHO-Art, dated December, 2005, which can be found at the Uppsala Monitoring Centre's website at www.umc-products.com/graphics/3149.pdf] at p. 1; Ex. 4 [Excerpt from the Uppsala Monitoring Center's website, describing WHO-Drug, which can be found at www.umc-

DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION
BRIEF ON UNITED STATES PATENT NO. 6,684,221
CASE NO. 11-CV-00910 JCS

products.com/DynPage.aspx?id=2829]; Ex. 5 [Excerpt from the U.S. National Library of Medicine's website, describing COSTART, which can be found at www.nlm.nih.gov/research/umls/sourcereleasedocs/current/CST/]; Ex. 6 [Excerpt from Introductory Guide MedDRA Version 14, which can be found on the World Health Organization's website at www.who.int/medical_devices/innovation/MedDRAintroguide_version14_0_March2011.pdf]. Each[5] is updated regularly to include new medical terms and variations of existing medical terms arising on a constant basis. ECF No. 109-2 (7:62-65); ECF No. 109-3, p. 5; Ex. 3, p. 1-2; Ex. 4, p. 1-2.

Each separate prior art medical thesaurus has its particular focus, uses, advantages and disadvantages. In this regard, WHO-Drug focuses on coding drug names, active ingredients, and their therapeutic uses, *see* Ex. 4; WHO-Art, COSTART and MedDRA focus on coding adverse reactions terms, *see* Ex. 3, p. 1-2; Ex. 5; Ex. 6, p. 3; CPT focuses on coding medical, surgical, and diagnostic information for billing purposes, *see* Ex. 7 [Excerpt from Wikipedia found at en.wikipedia.org/wiki/Current_Procedural_Terminology]; while ICD-9 and ICD-10 focus on coding information for mortality statistics and has been adapted to code diagnoses associated with medical procedures, *see* Ex. 8 [Excerpt from the Centers for Disease Control and Prevention's website, which can be found at www.cdc.gov/nchs/icd.htm].

In order to avoid the prior art, the applicant had to limit his invention to a particular function or use. In this regard, the '221 Patent focuses on a specific subset of medical terms, namely "clinical terms." Specifically, the '221 Patent provides "a thesaurus database of ***clinical terms employed in conjunction with a clinical study***." ECF No. 109-2 (2:7-8) (emphasis

---

[5] COSTART has been replaced by MedDRA. Ex. 5. Accordingly, COSTART was last updated in 1999. Ex. 5; *see also* ECF No. 109-3, p. 4.

added).   As discussed in the '221 Patent, new clinical terms (or "[d]ifferent permutations, prefixes, suffixes, and generalities") will often be generated during a clinical study that cannot be found in existing medical dictionaries.   ECF No. 109-2 (1:38-39); (5:49-60); (7:1-9).   The patented method attempts to address this issue by creating "[a] system and method to access and update a thesaurus of clinical terms *employed in conjunction with a clinical study* [that] can be used to classify and map the clinical terms to related terms."   ECF No. 109-2 at p. 1 (emphasis added).   The invention allows a user to add new clinical terms from a clinical study to an existing medical thesaurus, to structure the new terms in accordance with a hierarchy, and to define relationships between the added terms and previously loaded terms in the database.

Updating the thesaurus with terms from a particular clinical study is helpful to the user so that the added terms can be mapped and assigned relations within the hierarchy created by the user, so that terms can be used consistently throughout the clinical study and in a logical manner given the terms used generally in the industry.   As Oracle's extrinsic evidence acknowledges, the purpose of the medical thesaurus is to identify relationships so that companies, regulators, and others are able to communicate with each other using the same medical language.   ECF No. 109-3, p. 4.   The goal is that similar terminology be used throughout all cases so that similar cases can easily be retrieved, analyzed, and compared.   ECF No. 109-3, p. 4.   "It is invaluable for signal detection and analysis."   ECF No. 109-3, p. 4.

## B.    The Prior Art

In order to fully appreciate the applicant's disavowal of certain claim scope during prosecution, a brief review of the prior art is warranted.   As noted above, there is no dispute that vendor-supplied thesauruses that have a hierarchical, relational structure, generally similar to the

invention claimed in the '221 Patent existed in the prior art.[6]  ECF No. 109-2 (4:4-11) (stating "[c]ommon vendor-supplied dictionaries include WHO-Drug (World Health Organization Drug Dictionary) by the World Health Organization, COSTART (Coding Symbols for a Thesaurus of Adverse Reaction Terms) by the Drug Information Association, and CPT (Current Procedural Terminology) by the American Medical Association.").  In fact, Oracle concedes that MedDRA (Medical Dictionary for Regulatory Activities), COSTART, CPT and WHO-Drug are organized according to hierarchies.  ECF No. 109, p. 5-6.

The specification describes WHO-Drug as a hierarchical, relational medical thesaurus. ECF No. 109-2 (4:13-16) (stating "[r]eferring to [FIG. 2], the hierarchical structure of the WHO-Drug dictionary 44 is shown."); (4:18-20) ("[r]elations between the clinical terms are also stored in the relation table 22 to define relations between terms on different levels 46, as defined by the hierarchy."); *see also* ECF No. 50, p. 7 (conceding that WHO-Drug is hierarchical and relational).  Figure 2 (at right) depicts the hierarchical, relational structure of the WHO-Drug dictionary and confirms that WHO-Drug includes synonyms, and thus, is a thesaurus. ECF No. 109-2, Fig. 2.



***FIG. 2***

[6]   Indeed, DrugLogic contends that even construing the disputed claim terms as requested by Oracle still leaves the '221 Patent invalid under at least 35 U.S.C. §§101, 102 and/or 103 of the United States Patent Act.

**DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF ON UNITED STATES PATENT NO. 6,684,221**
CASE NO. 11-CV-00910 JCS

In addition, Provisional Application No. 60/132,925 (the "Provisional Application"), filed May 6, 1999, which matured into the '221 Patent, references the hierarchical structure of other prior art references, including MedDRA, WHO-Drug, WHO-Art, ICD 9, ICD 10, and COSTART. *See* Ex. 2, p. 7. The Provisional Application also illustrates the ***hierarchical, relational structure of WHO-Drug and MedDRA***:




Ex. 2, p. 8-9. In addition, MedDRA[7] assigns multiple relationships to certain terms. "This characteristic, called 'multi-axiality,' allows a term to be represented in more than one [level of the hierarchy] and to be grouped by different classifications (e.g. by etiology or manifestation site) . . ." *See* Ex. 6, p. 6. As can be seen from these examples, the prior art clearly included hierarchical, relational medical thesauruses. Accordingly, the need to limit the scope of the '221 Patent is apparent.

### C.     The Prosecution History

The original application included broad claims covering the creation and use of medical thesauruses generally. Accordingly, the examiner rejected each of these claims as anticipated

---

[7]     The Maintenance and Support Services Organization ("MSSO"), the organization that maintains and updates MedDRA, states that the hierarchy of MedDRA provides "degrees or levels of superordination and subordination." Ex. 6, p. 6. "The superordinate term is a broad grouping term applicable to each subordinate descriptor linked to it. Hierarchical levels thus represent vertical links in the terminology." Ex. 6, p. 6.

and/or obvious in light of the prior art.  *See generally* Ex. 9 [Amendment After Final Rejection

Under 37 C.F.R. § 1.116 filed June 13, 2003 by Applicant in Application No. 09/567,162 (the

"Amendment")]; Ex. 10 [Notice of Allowability filed October 20, 2003 by Examiner in

Application No. 09/567,162].  It was only when the applicant narrowed the scope of the

invention by adding the clinical study limitation to each claim and argued that this limitation

distinguished the invention from the prior art that the '221 Patent was allowed.  Ex. 9, p. 2-10;

Ex. 10, p. 2-6.  Accordingly, this amendment, directly related to patentability, must be given

meaning during claim construction.

## III.   PRINCIPLES OF CLAIM CONSTRUCTION

DrugLogic adopts and incorporates the claim construction principles set forth in its

Opening Claim Construction Brief on U.S. Patent No. 6,789,091.  ECF No. 110, Section III.

## IV.   CLAIM CONSTRUCTION OF THE '221 PATENT

### A.   "clinical terms" [Claims 1, 14, 17, 19, 21, 22, 27, 58, 62]

| DrugLogic's Proposed Construction | Oracle's Proposed Construction |
|---|---|
| "terms pertaining to the study or observation of medical patients" | "terms pertaining to the study or observation of medical patients, such as terms in a medical dictionary" |

DrugLogic's proposed construction is consistent with the purpose of the invention, the

plain language of the claims, the specification and prosecution history.  Oracle's proposed

construction of "clinical terms" including the exemplary clause, "such as terms in a medical

dictionary," is inappropriate as the applicant unequivocally disclaimed an invention including

clinical terms derived from sources other than clinical studies, such as existing medical

dictionaries, during prosecution.

**DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION
BRIEF ON UNITED STATES PATENT NO. 6,684,221**
CASE NO. 11-CV-00910 JCS

8

Preliminarily, it must be noted that this exemplary clause was not part of Oracle's original proposed construction of this term. *See e.g.*, Ex. 11, p. 15 [Oracle's Preliminary Claim Constructions and Preliminary Identification of Intrinsic and Extrinsic Evidence]. In fact, DrugLogic adopted the original construction proposed by Oracle, the very construction which DrugLogic advocates for here. Ex. 11. Only after the parties agreed on this construction did Oracle insist that the exemplary clause, "such as terms in a medical dictionary," be included. DrugLogic rejected this proposal because it would incorrectly suggest to a jury that "clinical terms" as used in the claims is synonymous with terms already present in a medical dictionary. This suggestion is incorrect, of course, because it runs contrary to the purpose of the invention, the plain meaning of the claims, and the prosecution history.

1. **Contrary to the purpose of the invention, the plain meaning of the claims, and the prosecution history, Oracle improperly attempts to equate "clinical terms" with "terms in a medical dictionary."**

The starting point for claim construction is "always with the language of the asserted claim itself." *Comark Communs., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Representative Claim 1 provides, in pertinent part: "A method of storing a thesaurus of clinical terms comprising: defining a plurality of *clinical terms for use in conjunction with a clinical study* . . ." ECF No. 109-2 (9:16-17) (emphasis added). In fact, each of the independent claims in the '221 Patent was modified during prosecution to include the clinical study limitation. Ex. 9, p. 2-6; *see also* ECF No. 109-2 (10:40-44) ("A method of maintaining and accessing a thesaurus of terms used in conjunction with a clinical study" and "identifying a plurality of clinical terms for the clinical study"), (10:58-59) ("A system for accessing a thesaurus of clinical terms used in conjunction with a clinical study"), (13:18-19) ("computer program code for providing a plurality of clinical

terms for use in connection with a clinical study"), (14:20-21) ("program code for providing a plurality of clinical terms for a clinical study").[8]

With its proposed construction, Oracle attempts to divorce "clinical terms" from its context within the claims. It is axiomatic, however, that claims must be construed as a whole. *Phillips*, 415 F.3d at 1314 ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."). When the claims are read as a whole, it is clear that the "clinical terms" recited in the claims are ***not just any clinical terms***, for example clinical terms that might be found in a medical dictionary, the claimed clinical terms must be "for use in conjunction with a clinical study." An interpretation which suggests otherwise, like Oracle's proposed construction, fails to give appropriate meaning to the claim as a whole. ECF No. 109-2 (9:16-17).

Oracle relies heavily on language from the specification regarding the addition of clinical terms from an existing medical dictionary on a CD-ROM to a thesaurus database. *See e.g.*, ECF No. 109-2 (3:40-43). The Federal Circuit has held, however, that the language of an amended claim will prevail over inconsistent language in the specification. *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000). In *Elekta*, in order to overcome an obviousness rejection, the patentee amended the claims to add that radiation sources were located "only within a zone extending between latitudes 30 degrees-45 degrees." *Id.* at 1304. The specification, however, disclosed an embodiment with radiation sources between 0 and 45 degrees. *Id.* at 1306. Despite the reference in the specification to the broader

---

[8] Independent Claims 44, 51, 53, and 60 have not been asserted by Oracle in this litigation. Nonetheless, these claims also contain the clinical study limitation. ECF No. 109-2 (12:15) ("defining a plurality of terms for a clinical study"), (12:41) (same), (12:56) (same), (13:43-44) ("a plurality of clinical terms for a clinical study").

**DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF ON UNITED STATES PATENT NO. 6,684,221**
CASE NO. 11-CV-00910 JCS

10

range, the court held that the claim was limited to radiation sources located exclusively between 30 and 45 degrees latitudes and that any other interpretation would render the reference to 30 degrees a nullity. *Id.* at 1307.

Here, while the specification discusses that clinical terms may be initially loaded into the database from a pre-existing external dictionary, *see e.g.,* ECF No. 109-2 (3:40-43), the unambiguous language of the issued claims clearly requires that clinical terms be "for use in conjunction with a clinical study." ECF No. 109-2 (9:16-17). While terms in a prior art medical dictionary may be "clinical" in the sense that they may relate to the treatment of a patient, such terms are not necessarily related in any way to "a clinical study." More importantly, the entire purpose of the invention is to build a thesaurus of clinical terms that are not already contained in an existing medical/clinical thesaurus. Accordingly, construing clinical terms to mean terms already contained in an existing hierarchical, relational medical thesaurus would not serve the purpose of the invention. Because terms already loaded in a medical thesaurus are not specifically for use in conjunction with a clinical study, such terms are not within the scope of the claims in the '221 Patent.[9] Any other interpretation would render the clinical study limitation meaningless. *Elekta*, 214 F.3d at 1307.

By including the clause, "such as terms in a medical dictionary," Oracle is attempting to read out the "for use in conjunction with a clinical study" limitation. The proposed clause has the potential to mislead the jury into believing that "clinical terms" are synonymous with terms

---

[9] This is not to say that terms from a medical dictionary cannot also be added to a thesaurus database. Rather, for purposes of claim construction, the scope of the invention claimed in the '221 Patent does not cover a method or system that **only** adds terms to a medical thesaurus from an external medical dictionary. If a device simply builds a medical thesaurus by including terms from an external, previously existing medical dictionary, the '221 Patent would most certainly read on the prior art. It is for this very reason that the examiner rejected the claims of the '221 Patent before the clinical study limitation was added.

already in a medical dictionary. As used in the claims of the '221 Patent, the term "clinical terms" is modified by the clinical study limitation and thus, should not be construed separate and apart from the remainder of the language in the claim. Oracle's construction causes confusion, rather than clarity.

### 2. Oracle's construction is barred by prosecution history disclaimer.

During prosecution of the '221 Patent, Oracle unequivocally disclaimed from the scope of its invention any thesaurus of clinical terms *except* a thesaurus of clinical terms specifically identified ("defined") for use in conjunction with a clinical study. This disclaimer included a surrender of any thesaurus that merely contains a collection of general purpose clinical terms, such as the clinical terms already collected in existing medical dictionaries. Tellingly, Oracle entirely disregarded the prosecution history in its Opening Brief. *See generally*, ECF No. 109. Oracle's argument that the term "clinical terms" does not need construction is without merit[10] because the scope of this claim term was clearly altered during prosecution. "The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citation omitted); *see also Phillips*, 415 F.3d at 1317. "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG, Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995); *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340,

---

[10] DrugLogic would agree that the term "clinical terms" *alone* does not require construction. DrugLogic makes the argument that construction is necessary to ensure that the exemplary phrase is not included in the definition of "defining a plurality of clinical terms for use in conjunction with a clinical study."

1349 (Fed. Cir. 2004). "[W]here the patentee has unequivocally disavowed a certain meaning to

obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary

meaning of the claim congruent with the scope of the surrender." *Omega*, 334 F.3d at 1324.

There is a plethora of cases applying prosecution history disclaimer and narrowing the

scope of the claims. In *Omega*, the Federal Circuit listed several examples, including:

> *Bell Atl. Network[, Inc. v. Covad Communs. Grp., Inc.*, 262 F.3d [1258,] 1273-75
> [(Fed. Cir. 2001)] (relying on prosecution history to limit claimed 'transceiver' to
> the three stated modes, because of clearly limiting statements made by the
> patentee to the examiner to overcome a prior art rejection); *Day Int'l, Inc. v.
> Reeves Bros., Inc.*, 260 F.3d 1343, 1349 (Fed. Cir. 2001) (holding that the
> patentee had disavowed curing done at the higher conventional curing
> temperatures, because of representations to the patent examiner that the prior art
> curing temperatures were too high and because of the numerous references to a
> 'low temperature cure' or 'low temperature vulcanization' throughout the file
> wrapper); *Southwall*, 54 F.3d at 1576-77 (holding that the limitation 'sputter-
> deposited dielectric' excluded a two-step process, because the patentee argued
> during prosecution that the metal oxide in the process was 'directly deposited' and
> that the invention thus only covered a one-step process).

*Id.* at 1325 (parallel citations omitted).

Here, the applicant relinquished the right to have the claims construed to include clinical

terms from a medical dictionary when he amended the claims to include the clinical study

limitation and when he argued the importance of the clinical study limitation to distinguish the

purported invention from the prior art. Specifically, in order to overcome a final rejection, the

applicant amended all of the claims "to specify, with more particularity, that the invention relates

to a thesaurus of clinical terms *for use in conjunction with a clinical study*." Ex. 9, p. 6

(emphasis added). "The invention relates to storing, maintaining and accessing a thesaurus of

clinical terms for use with clinical studies." Ex. 9, p. 6. "None of the references cited by the

Examiner relate to the claimed thesaurus of clinical terms for use in conjunction with a clinical

study. By having clinical terms in a thesaurus database (electronic thesaurus) that are organized

**DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION
BRIEF ON UNITED STATES PATENT NO. 6,684,221**
CASE NO. 11-CV-00910 JCS

13

according to a hierarchical relational structure, the claimed invention can streamline the clinical trial process . . ." Ex. 9, p. 7.

In particular, the applicant distinguished the Gusack reference, U.S. Patent No. 6,112,209, arguing:

> … Gusack was cited by the Office to show the hierarchy of relations, but Gusack does not relate to the claimed hierarchy of relations ***used in conjunction with a clinical study***. . . . There is nothing in Gusack or in any other cited reference that suggests that clinical terms should be stored in a <u>thesaurus of terms</u> according to a <u>hierarchy of relations</u> for use in conjunction with a <u>clinical study</u>.

Ex. 9, p. 8 (underlining in original; bold-italics added). The applicant further argued that "none of the cited references relate to clinical studies. Further, the references do not address the issues associated with clinical studies, such as the inconsistencies in terminology in the medical field. With the claimed invention, however, clinical terms for a clinical study are stored according to a hierarchy of relations. . . ." Ex. 9, p. 8.

The applicant unequivocally disclaimed a thesaurus of clinical terms wherein the terms are compiled from sources other than clinical studies, such as existing medical dictionaries. *See Seachange*, 413 F.3d at 1372-73; *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002). The global statements made by the applicant during prosecution, pertaining to all of the pending claims, limit the scope of the term "clinical terms" to clinical terms "for use in conjunction with a clinical study." *See Seachange*, 413 F3.d at 1375 (stating "the applicant made a global statement distinguishing its invention from the prior art and applying specifically the remarks to 'all of the pending claims . . .'"); *see also Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1368-69 (Fed. Cir. 2007). By including the exemplary clause, "such as terms in a medical dictionary," in its proposed construction of "clinical terms," Oracle improperly tries to regain the ground it gave up during prosecution. *Omega*, 334 F.3d at 1323.

Oracle discusses portions of the specification that refer to external terms from a vendor-supplied medical dictionary as "clinical terms" to argue that DrugLogic's construction reads out a preferred embodiment. ECF No. 109, p. 10-11. The case law is clear, however, that amendments and arguments made during prosecution to gain patent allowance will serve to narrow the scope of the claims, even when an embodiment disclosed in the specification will be excluded. *Omega*, 334 F.3d at 1324-25; *Sliptrack Sys., Inc. v. Steeler Metals, Inc.*, 2004 U.S. Dist. LEXIS 21569 at *15-16 (N.D. Cal. Oct. 12, 2004). Even though reading the specification alone may support one construction, contrary assertions in the prosecution history "generated after the written description was drafted" can overcome an interpretation based solely on the specification. *Rheox*, 276 F.3d at 1327; *Elekta*, 214 F.3d at 1308.

In *Rheox*, for example, the Federal Circuit "ruled that the scope of the patent in suit did not cover 'triple superphosphate'--an embodiment expressly disclosed in the written description--because the patentee cancelled a claim covering 'triple superphosphate' and expressly disclaimed that compound in his arguments to the examiner to gain patent allowance." *Omega*, 334 F.3d at 1324-25 (discussing *Rheox*, 276 F.3d at 1325). Similarly, in *N. Amer. Container, Inc. v. Plastipak Pkg., Inc.*, the patentee amended all of the independent claims in response to a rejection "by specifying that the shape of the inner walls in his invention was 'generally convex'" and argued that all of the prior art known to the applicant and referenced by the examiner was concave. 415 F.3d 1335, 1340 (Fed. Cir. 2005). The embodiments and figures disclosed in the specification, however, contained no convex points on the inner wall. *Id.* at 1346. Regardless, the Federal Circuit held that "the fact that claims do not cover certain embodiments disclosed in the patent is compelled when narrowing amendments are made in order to gain allowance over prior art." *Id.*

Here, the prosecution history compels the same result. The applicant unambiguously narrowed the scope of his claims by amending all of the claims to include the clinical study limitation and by strenuously arguing that the prior art did not cover clinical terms for a clinical study. The references in the specification to external dictionary terms as "clinical terms" are overcome by the applicant's arguments and narrowing amendments during prosecution.

### 3. Oracle's proposed construction would render the claims invalid.

Patent terms should be construed in a way that preserves the validity of the claims. *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999); *Omega*, 334 F.3d at 1335 n.6. Oracle cannot dispute that at least WHO-Drug, MedDRA, and WHO-Art, all of which are medical thesauruses that contain a hierarchy of relations, existed in the prior art. ECF No. 44, p. 10-12; ECF No. 50, p. 7; ECF No. 109, p. 5-6, 8. Accordingly, if the definition of "clinical terms" includes "terms in a medical dictionary," as argued by Oracle, then the '221 Patent would clearly read on the prior art, rendering it invalid. Reading the exemplary clause into Representative Claim 1 demonstrates that Oracle's construction conflates the invention with the prior art:

A method of storing a thesaurus of [terms in a medical dictionary] comprising:

> defining a plurality of [terms in a medical dictionary] for use in conjunction with a clinical study;
> storing the plurality of [terms in a medical dictionary] in a memory according to a hierarchy of relations; and
> defining a plurality of relations corresponding to the [terms in a medical dictionary], the relations indicative of an association from a [term in a medical dictionary] to at least one other of the plurality of [terms in a medical dictionary].

If Claim 1 were construed to include terms already in a hierarchical, relational medical thesaurus, there would be no meaningful difference between the invention and the existing prior art medical thesauruses. Accordingly, Oracle's construction is clearly erroneous.

There is no dispute that the prior art medical thesauruses are updated on a periodic basis. ECF No. 109-2 (7:62-65) (stating "the external dictionaries are often distributed in updated versions at periodic intervals, such as quarterly or yearly[, and that] [o]ften clinical terms and relations are changed from version to version."); *see also* Ex. 3, p. 1-2; Ex. 4, p. 1-2. Indeed, Oracle's own extrinsic evidence recognizes that MedDRA is updated regularly, stating "MedDRA is updated twice yearly (April and October) . . . Users may request the addition of new codes [*i.e.*, relationships] to future versions of MedDRA by applying to the MSSO, which then reviews each request. Codes also may be moved, deleted, changed, demoted, and promoted by the MSSO in the updates." ECF No. 109-3, p. 5. Accordingly, merely adding new terms to a prior art medical thesaurus or modifying the relations in a thesaurus is not patentable because the prior art thesauruses have long been regularly updated with new terms and relationships. Thus, if all the alleged invention does is add terms to one of these prior art medical thesauruses, the patent is clearly invalid. To the extent the '221 Patent includes any patentable subject matter,[11] it is limited to the creation of a thesaurus of terms related to a clinical study.

For these reasons, if this Court were inclined to construe the term "clinical terms" independent from the remaining claim language, this Court should not include the exemplary phrase "such as terms in a medical dictionary" in its construction of "clinical terms."

---

[11] Again, DrugLogic contends that even if this Court were to adopt its construction, the '221 Patent is invalid under 35 U.S.C. §§ 101, 102, and/or 103.

## B. "defining a plurality of clinical terms for use in conjunction with a clinical study" [Claim 1][12]

| DrugLogic's Proposed Construction | Oracle's Proposed Construction |
|---|---|
| "developing a list of terms pertaining to the study or observation of medical patients used in connection with a particular clinical study" | "choosing a plurality of terms pertaining to the study or observation of medical patients for use in conjunction with a clinical study" |

The fundamental dispute with respect to this claim term is whether the clinical terms that are being defined in the invention must relate to *a particular* clinical study, or whether the clinical terms may relate to *any* clinical study. It is manifest from the claim terms, the specification and the prosecution history that this claim term must relate to a particular clinical study, not just to any clinical study, performed or to be performed at any time. Otherwise, the clinical study limitation has no meaningful significance.

### 1. The specification and prosecution history support DrugLogic's construction.

It is undisputed that "domain terms" are included in the definition of "clinical terms for use in conjunction with a clinical study." ECF No. 109-2, Fig. 7-8. "Domain terms are specific to a particular study. . . ." ECF No. 109-2 (6:21-22), (7:16-18) ("Domain terms 404 are attributed to a particular study, and contain unpublished terms specific to the study."); *see also* ECF No. 109-2 (5:55-60).[13] The specification explains that "[o]ften, a vendor supplied external dictionary does not contain all the terms required for proposed classification of a particular

---

[12]     The phrases "in conjunction with a clinical study," "in connection with a clinical study," "for the clinical study" and "for a clinical study" appear in Claims 21, 22, 58, and 62. DrugLogic contends that these phrases should be construed in the same manner as the phrase "for use in conjunction with a clinical study" is construed in Claim 1, namely "in connection with a particular clinical study."

[13]     To the extent that company terms arise out of or relate to a particular clinical study, such as a new drug name, such company terms would also fall within the scope of this claim limitation.

study." ECF No. 109-2 (7:1-3). Accordingly, DrugLogic's construction, requiring that clinical terms be used in connection with a particular clinical study, is supported by the specification.

While the specification mentions external dictionary terms as "clinical terms," the amendments made by the applicant during prosecution limited "clinical terms" to terms "for use in conjunction with a clinical study." ECF No. 109-2 (9:16-17); Ex. 9, p. 2-6. Accordingly, as discussed above, the applicant surrendered the inclusion of external dictionary terms in the definition, and Oracle's reliance on the specification's discussion of external dictionary terms as clinical terms is barred by prosecution history disclaimer. *See Phillips*, 415 F.3d at 1317; *Seachange*, 413 F.3d at 1372; *Microsoft*, 357 F.3d at 1349; *Southwall*, 54 F.3d at 1576-77; *Omega*, 334 F.3d at 1324-25. Moreover, for the same reasons discussed above, Oracle's argument that DrugLogic's proposed construction excludes a disclosed embodiment should be rejected. *See Rheox*, 276 F.3d at 1327; *Elekta*, 214 F.3d at 1308; *Omega*, 334 F.3d at 1324-25. DrugLogic's construction does not limit terms from a medical dictionary from being loaded into the thesaurus database, but rather simply makes clear that ***merely*** loading terms from a medical dictionary into the thesaurus database does not fall within the scope of the claims.

### 2. Claim differentiation cannot overcome the prosecution history.

Oracle seemingly makes a claim differentiation argument, asserting that the specification and other claims in the patent only refer to a "particular" clinical study when talking about "domain terms." ECF No. 109, p. 13. Once again, however, Oracle entirely ignores the prosecution history and improperly tries to use claim differentiation to broaden the scope of the claims beyond what was actually allowed by the examiner.

"[The claim differentiation] presumption is not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history."

**DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION**
**BRIEF ON UNITED STATES PATENT NO. 6,684,221**
CASE NO. 11-CV-00910 JCS

19

*Seachange*, 413 F.3d at 1369; *Andersen*, 474 F.3d at 1370. "Claims that are written in different words may ultimately cover substantially the same subject matter." *Seachange*, 413 F.3d at 1369 (citation omitted). Oracle's insistence that "domain terms" are not the same as "clinical terms for use in conjunction with a clinical study" is undermined by the prosecution history. If the clinical study limitation is not construed to mean that the clinical terms must be connected to *a particular* clinical study but rather is construed so that clinical terms can encompass terms from a prior art thesaurus (such as MedDRA),[14] then the creation and updating of MedDRA would fall within the scope of the claims and the '221 Patent would most certainly be invalid. *See Rhine*, 183 F.3d at 1345 (claims should be construed in an attempt to preserve their validity). Oracle simply cannot avoid the import of the narrowing amendments made during prosecution. For the reasons stated herein, this Court should adopt DrugLogic's proposed construction.

### C. **"verbatim clinical data"** [Claim 12]

| DrugLogic's Proposed Construction | Oracle's Proposed Construction |
| --- | --- |
| "exact word-for-word raw clinical data from a clinical study" | "raw information related to the study or observation of medical patients" |

Oracle disputes DrugLogic's definition of "verbatim" as "exact word-for-word raw" as well as the requirement that the clinical data be from a clinical study. Oracle's proposed construction essentially removes the word "verbatim" from the construction of "verbatim clinical data" in Claim 12. It is improper, however, to disregard language appearing in the claims. *Merck & Co., Inc. v. Teva Pharma. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim

---

[14] Oracle failed to provide any support for the proposition that external medical thesauruses contain terms related to *any* clinical study. To the contrary, existing medical thesauruses derive terms from a variety of sources. For example, a prior art medical thesaurus dating back to 1903 explains that the authors consulted "dictionaries, encyclopedias, and other works of reference, monographs, etc." Ex. 1, p. 9. While it is possible that some terms in an external medical thesaurus or dictionary were derived from a clinical study, Oracle cannot argue that all of the terms in a medical thesaurus or dictionary relate to a clinical study.

**DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF ON UNITED STATES PATENT NO. 6,684,221**
CASE NO. 11-CV-00910 JCS

20

construction that gives meaning to all the terms of the claim is preferred over one that does not do so.")  The plain meaning of the word "verbatim" is exact word-for-word.  *See* Ex. 12 [Excerpt from Dictionary.com, www.dictionary.reference    .com (2012)] ("verbatim" means "corresponding word for word to the original source or text"); Ex. 13 [Excerpts from Merriam-Webster's Online Dictionary, www.merriam-webster.com (2012)] ("verbatim" means "in the exact word; word for word").  While both parties include the word "raw" in their definitions, nothing in the specification signifies that the patentee sought to redefine the word "verbatim" to only mean raw.

The specification also supports DrugLogic's proposed construction, "exact word-for-word raw clinical data from a clinical study" wherein it provides:

> The verbatim study terms 26 are provided from clinical data 38 by any suitable method, including the scanner 34 from hardcopy data reports, the PC 36 from a data entry or other suitable application, or a public access network such as the Internet 38 via an HTML browser or other format. ***The raw, unprocessed clinical data*** 38 is then interrogated for verbatim study terms 26 to provide to the input device 14 for classification. In a particular embodiment, the ***raw, unprocessed clinical data*** 38 is received by a clinical study data management application . . .

ECF No. 109-2 (3:51-62) (emphasis added).  Here, the word "unprocessed" is used to describe the clinical data as being its unchanged, original form.  The prosecution history also supports DrugLogic's construction of "verbatim," wherein it states that "deriving clinical terms (e.g. medical and drug terms) ***from free text as originally captured***, to standardized clinical terminology, is complex."  Ex. 9, p. 7.  Free text as originally captured is synonymous with the ordinary definition of "verbatim."   Accordingly, the specification, prosecution history and extrinsic evidence all support DrugLogic's construction of "verbatim."

The specification also supports DrugLogic's definition to the extent that it requires that the "verbatim clinical data" come from a clinical study, stating "the same clinical term may

**DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF ON UNITED STATES PATENT NO. 6,684,221**
CASE NO. 11-CV-00910 JCS

21

appear in a variety of formats throughout ***the clinical data produced by the study***." ECF No. 109-2 (1:42-43) (emphasis added). Moreover, the specification states, "In a typical study, verbatim study terms 26 are extracted from raw clinical data by a variety of methods. . . ." ECF No. 109-2 (3:34-35); (3:58-60). It is clear from the context in the specification that terms are extracted from "verbatim clinical data" from a clinical study.

Moreover, Claim 12 provides:

The method of claim 2 wherein providing a match term further comprises:

> scanning verbatim clinical data; and
> parsing verbatim study terms from the clinical data, wherein the verbatim study terms include the match terms.

ECF No. 109-2 (10:8-14); *see Phillips*, 415 F.3d at 1314 ("the use of a term within the claim provides a firm basis for construing the term.") A plain reading of the claim as a whole leaves no doubt that the verbatim clinical data must come from a clinical study. *See id.*

In addition, the prosecution history also supports DrugLogic's construction, stating:

> By way of background, ***a clinical study is typically a research process by which clinical data is gathered***, such that it assists a user in answering scientific questions and determining whether certain methods of prevention, diagnosis, and treatment are safe or effective. ***Ideally in this process, the clinical data is gathered, captured, classified and organized***. One of the most time-consuming tasks ***within the clinical trial process is classifying and organizing the clinical data***.

Ex. 9, p. 7-8 (emphasis added). This passage makes clear that the clinical data is gathered from a clinical study. For these reasons, this Court should adopt DrugLogic's construction.

## V.    CONCLUSION

Defendant/Counterclaimant DrugLogic, Inc. respectfully requests that this Court construe the disputed terms as set forth above.

Respectfully submitted,

_____/s/ Martin L. Fineman_____
Martin L. Fineman (California State Bar No. 104413)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery St., Suite 800
San Francisco, California 94111-6533
Phone: (415) 276-6500
Fax: (415) 276-6599
E-mail: martinfineman@dwt.com

_____/s/ Erin O. Millar_____
Peter Davis (*admitted pro hac vice*)
Steven E. Tiller (*admitted pro hac vice*)
Erin O. Millar (*admitted pro hac vice*)
Gregory M. Stone (*admitted pro hac vice*)
WHITEFORD TAYLOR & PRESTON, LLP
7 St. Paul Street
Baltimore, Maryland 21202-1636
Phone: (410) 347-8700
Fax: (410) 223-4304
Email:  pdavis@wtplaw.com
Email:  stiller@wtplaw.com
Email:  emillar@wtplaw.com
Email:  gstone@wtplaw.com

***Attorneys for Defendant and Counter-Claimant***
***DRUGLOGIC, INC.***

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 10, 2012 the foregoing

## DRUGLOGIC, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
## ON U.S. PATENT NO. 6,684,221

Was filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record:

Karen Johnson-McKewan
kjohnson-mckewan@orick.com
Christina Von Der Ahe
cvonderahe@orick.com
ORRICK, HERRINGTON & SUTCLIFFE, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

I. Neel Chatterjee
nchatterjee@orick.com
Michael C. Spillner
mspillner@orick.com
ORRICK, HERRINGTON & SUTCLIFFE, LLP
1000 Marsh Road
Menlo Park, CA 94025

Deborah K. Miller (California State Bar. No. 95527)
deborah.miller@oracle.com
Peggy E. Bruggman (California State Bar No. 184176)
peggy.bruggman@oracle.com
Lesley E. Kothe (California State Bar No. 209512)
lesley.kothe@oracle.com
ORACLE CORPORATION
500 Oracle Parkway
Redwood City, California 94065

*Attorneys for Oracle Corporation, Oracle*
*International Corporation, and Oracle America, Inc.*

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

/s/ Erin O. Millar
*Attorneys for Defendant and Counterclaimant,*
*DRUGLOGIC, INC.*