UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE CORP., ET AL.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>DRUGLOGIC, INC.,<br><br>　　　　Defendant. | Case No. C-11-00910 JCS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISQUALIFY DRUGLOGIC'S EXPERT DR. ROBERT NELSON AND MOTION FOR PROTECTIVE ORDER [Docket No. 108]** |

## I.   INTRODUCTION

On March 22, 2012, Plaintiffs Oracle Corporation and Oracle International Corporation ("hereinafter, "Oracle") filed a Motion to Disqualify Druglogic's Expert Dr. Robert Nelson and Motion for Protective Order ("Motion"). A hearing on the Motion was held on June 15, 2012. For the reasons stated below, the Motion is GRANTED in part and DENIED in part.

## II.   BACKGROUND

Oracle asks the Court to disqualify DrugLogic's expert witness Dr. Robert Nelson on the basis that Dr. Nelson owes Oracle ongoing duties, including a duty of confidentiality, which will be violated if he serves as DrugLogic's expert witness. According to Oracle, Dr. Nelson's duties arise from the fact that between 2002 and 2008, he worked as a consultant for Relsys International Inc. ("Relsys"), a company that Oracle acquired in 2009. During that period, Oracle contends, Dr. Nelson was involved in developing Argus PV, later called Argus Perceptive, which DrugLogic now accuses of infringing its U.S. Patent No. 6,789,091 ("the '091 patent"). Further, Oracle asserts, Dr. Nelson was subject to a duty of confidentiality under a 2002 Technology Assignment and Royalties Agreement and a 2003 Strategic Alliance Agreement. *See* Declaration of Bryce W. Baker in Support of Oracle's Motion to Disqualify Druglogic's Expert Dr. Robert Nelson and Motion for Protective Order ("Baker Decl."), Exs. B & E.

Even more significant, Oracle contends, is a 2008 settlement agreement between Dr. Nelson and Relsys ("Settlement Agreement"). *See* Baker Decl., Ex. J. The Settlement Agreement followed Dr. Nelson's threat, in the spring of 2008, to bring a federal lawsuit against Relsys seeking his "fair share" of potential revenues for intellectual property that Dr. Nelson asserted belonged to him that had been used in, *inter alia*, Argus PV, Argus Insight, and Argus Perceptive. Baker Decl., Ex. I; Declaration of Bryce W. Baker in Support of Oracle's Reply in Support of Oracle's Motion to Disqualify Druglogic's Expert Dr. Robert Nelson and Motion for Protective Order ("Baker Reply Decl."), Ex. B.

Under the Settlement Agreement, Relsys paid Dr. Nelson $1.2 million in return for:

1) a permanent, irrevocable and unlimited assignment, sale and transfer of all of Dr. Nelson's intellectual property ("Intellectual Property"), defined to include, *inter alia*, "ideas, inventions, improvements, designs, concepts" "that in any way relate to [Relsys's] Products, whether or not they have been incorporated into [Relsys's] Products, and whether or not they have been disclosed" by Dr. Nelson to Relsys. Ex. J at 1.

2) representations and warranties that he was delivering "good and marketable title to the Intellectual Property," that the Intellectual Property constituted his "original creations," and "does not infringe patent, copyright, trade secret, trademark or other intellectual property rights of any third party." *Id*., Sections 2(c) & (d).

3) an agreement, for ten years, to "defend, indemnify and hold harmless [Relsys] and its officers, directors, employees, agents, attorneys and customers from and against any claim that the Intellectual Property infringes the patent, copyright, trade secret, trademark or other intellectual property rights of any third party." *Id*., Section 2(d).

4) a promise to keep confidential information private for an indefinite period of time, where "confidential information" is defined to include all non-public information about the Intellectual Property, "all information relating to [Relsys], including without limitation its management, business operations, customers, strategies, products, services, plans, designs, employees, independent contractors, and financial information." Dr. Nelson also promised that he would not "use, utilize or exploit all or any part of the Confidential Information" for his "own benefit or for the benefit of any other person, firm or corporation or other entity, for any reason or purpose whatsoever." *Id*., Section 4.

5) a covenant "not to make any negative, disparaging, derogatory, untrue or misleading comments about the Intellectual Property, [Relsys], or [Relsys's] products, services, owners, directors, officers, or employees." *Id*., Section 5(b).

Oracle contends that because of Dr. Nelson's obligations under the Settlement Agreement, and the fact that Dr. Nelson had access to substantial confidential information about the products that are accused of infringement, Dr. Nelson should be disqualified.

2

In its Opposition brief, DrugLogic rejects Oracle's characterization of Dr. Nelson's access to confidential information while he was a consultant at Relsys, contending that Dr. Nelson had *no* involvement in the development of the functionality in Argus Perceptive that is alleged to infringe the '091 patent. According to DrugLogic, Dr. Nelson was hired to develop Argus PV, not Argus Perceptive. Argus Perceptive was not simply a name change for Argus PV, DrugLogic asserts. According to DrugLogic, Argus PV was intended to be complementary to a product being developed by DrugLogic, Qscan. Hence, DrugLogic and Relsys had entered into a Co-Marketing and Development Agreement ("the Co-Marketing Agreement") in 2004 under which each company would use best efforts to market the other's products. Opposition, Ex. 3. According to DrugLogic, in connection with the Co-Marketing Agreement, Dr. Nelson had been asked by Relsys to assist in the development of an interface between Argus PV and DrugLogic's Qscan. However, "unbeknownst to Dr. Nelson . . . . Relsys secretly used its access to Qscan to develop a competing product without Dr. Nelson's involvement;" that product, DrugLogic asserts, came to be known as Argus Perceptive and included functionality that is "entirely distinct from what Dr. Nelson developed for Relsys."

DrugLogic also points to a declaration by Dr. Nelson, filed in support of its Opposition brief, in which Dr. Nelson states as follows:

> During my consulting agreement with Relsys, I was not provided with any financial information regarding Relsys, nor was I provided with any source code by Relsys. I also did not assist in the development of any legal strategy or speak with legal counsel for Relsys regarding development of Argus-PV or the facts and circumstances related to that case.

Nelson Decl., ¶ 29.

Because Oracle has not established that Dr. Nelson had access to any confidential information that is at issue in this case, DrugLogic contends, he should not be disqualified as an expert witness. At a minimum, DrugLogic contends, Dr. Nelson should be permitted to serve as an expert as to issues that are unrelated to the Argus Perceptive product, including infringement by the Empirica Signal product, validity of the '091 patent, non-infringement of U.S. Patent No 6,684,221 ("the '221 Patent") and invalidity of the '221 Patent.

3

In its Reply brief, Oracle argues that DrugLogic's position fails because it has not addressed the significance of the Settlement Agreement, in particular, the broad scope of the intellectual property Dr. Nelson claimed to have developed and which he conveyed to Relsys, and the promises he made not to make any "negative, disparaging, derogatory, untrue or misleading comments about the Intellectual Property," Relsys, or Relsys's products, services, owners, directors, officers or employees." Oracle emphasizes that the Intellectual Property Dr. Nelson claimed to own, and which he then conveyed to Relsys under the Settlement Agreement, was extensive. It included a long list of intellectual property Dr. Nelson asserted, in a letter dated March 17, 2008, he had provided to Relsys. *See* Baker Decl, Ex. J at 1; Baker Reply Decl., Ex. B. Two of the items on the list specifically referenced Argus Perceptive. Baker Reply Decl., Ex. B (including in list of intellectual property purportedly owned by Dr. Nelson: 1) "Detailed A-PV requirements subsequently used, all or in part, in Perceptive, Insight, Safety, and Dossier products; and 2) Concept and detailed implementation of workflow alerts which now run through Argus Safety, Argus Insight, and Argus Perceptive").

Oracle also provides three specific examples, drawn from DrugLogic's infringement contentions, to show that intellectual property conveyed under the Settlement Agreement falls within the scope of DrugLogic's claim that Oracle (as Relsys's successor) has infringed the '091 Patent. According to Oracle, these examples are "just the tip of the iceberg."

First, Oracle points to DrugLogic's infringement contention that Argus Perceptive's "intelligent triage" feature (referred to as "front-end importance triage") infringes. *See* Baker Reply Decl., Ex. C (DrugLogic's Amended Disclosure of Asserted Claims and Infringement Contentions ("Amended Infringement Contentions")) at 7, 12, 13, 20, 31. According to Oracle, the concept of intelligent triage was developed by Dr. Nelson, who introduced the concept in a January 2000 White Paper, and was subsequently include in a confidential Argus PV Business Requirement Specification in July 2001, which Dr. Nelson signed off on in July 2003. *See* Docket No. 108-2, Ex. A (White Paper); Baker Reply Decl., Ex. G. The March 17 Letter also specifically identifies the "[c]oncept and detailed implementation of front-end importance triage." Baker Reply Decl., Ex. B.

Second, Oracle points to DrugLogic's infringement contention that Argus Perceptive

infringes the '091 Patent based on its risk management capabilities. Baker Reply Decl., Ex. C (Amended Infringement Contentions) at 6. According to Oracle, Dr. Nelson has broadly and repeatedly claimed responsibility for Argus' risk management capabilities, including "Good Pharmacovigilance Process (GPVP) – The cornerstone of Risk Management," and this intellectual property was conveyed to Relsys under the Settlement Agreement. Baker Reply Decl., Ex. B (March 17 Letter).

Third, Oracle points to DrugLogic's infringement contention that Argus infringes the '091 Patent because it allows users to "drill down" through case data. Baker Reply Decl., Ex. C (Amended Infringement Contentions) at 14, 15, 17. The concept of "drill down" appears in the Argus PV and Argus Perceptive documentation in connection with a feature called the "Context Matrix." *See* Baker Reply Decl., Exs. H, I. Dr. Nelson claimed in the March 17 Letter that he invented the "[c]oncept and detailed implementation of the Context Matrix," and that intellectual property was therefore conveyed to Oracle under the Settlement Agreement.

Oracle also rejects Dr. Nelson's statement that he was exposed to no confidential information at Relsys because he had no access to source code, did not see any financial information and did not talk to Relsys's attorneys. In addition to the fact that the Settlement Agreement expressly included source code in the intellectual property Dr. Nelson conveyed to Relsys, Oracle points out that the definition of "Confidential Information" in the Settlement Agreement goes far beyond the three categories of information addressed by Dr. Nelson in his declaration. It also provides a declaration from Bruce Palsulich, who was Vice President of Product Development at Relsys between 1991 and 2004, and against from May 2008 until its acquisition by Oracle. Palsulich states that in that role, he developed the Argus product line and worked directly with Dr. Nelson. Palsulich Decl., ¶ 2. Palsulich stated that:

> During his collaboration with Relsys, Dr. Robert Nelson was provided with and had access to documents and information that Relsys considered confidential or highly confidential, including information such as product specifications, business plans, and information regarding customers and prospects. Although limited Relsys confidential information necessary to develop an interface with Qscan, such as data export and import table specifications, may have been shared with DrugLogic under the Co-Marketing and Development Agreement (and protected according to its confidentiality clause), Dr. Nelson enjoyed access to product design documents, for example highly-confidential product requirement specifications, that Relsys International did not share with DrugLogic.

5

*Id.*, ¶ 3.

Similarly, Oracle rejects DrugLogic's contention that Relsys breached the Co-Marketing Agreement by copying DrugLogic's Qscan product without Dr. Nelson's involvement or awareness. According to Oracle, "the analytical functionality that was present in Argus Perceptive when Oracle acquired Relsys was fundamentally the same as that which was present from the earliest days of Argus PV, as a comparison of DrugLogic's Amended Infringement Contentions and the 2001 Argus PV Business Requirement Specification make clear." Oracle asserts, "Dr. Nelson not only had access to these documents, he was personally involved in their creation and the development of the products they described, having reviewed and signed off on the specifications."

Because Dr. Nelson's agreement to serve as an expert witness for DrugLogic violates multiple obligations under the Settlement Agreement, Oracle asserts, he must be disqualified as an expert witness to protect the integrity of the legal process. Oracle rejects DrugLogic's contention that Dr. Nelson should at least be permitted to serve as an expert witness as to the products he did not help to develop, arguing that to the extent that Dr. Nelson has been offered as an expert for claim construction – where DrugLogic will seek constructions that read on *all* of the accused products – his opinions cannot be limited to only certain products but will, instead, have implications for the Argus products as well.

DrugLogic has filed an objection to the Palsulich Declaration and the Argus PV Business Requirement Specification, offered by Oracle in support of its Reply brief. DrugLogic contends that this is evidence should have been offered when Oracle filed the original motion and therefore should not be considered. DrugLogic further contends that Oracle's Reply contains new factual contentions regarding Dr. Nelson's involvement in the development of the accused technology and that these also should not be considered.

At oral argument, DrugLogic stipulated that Dr. Nelson would not be used as an expert as to claim construction. Oracle, in turn, stipulated that Dr. Nelson could serve as an expert as to the '221 patent and as to infringement by the Empirica Signal product. Thus, the only remaining issue to be decided by the Court is whether Dr. Nelson can serve as an expert as to Relsys products or the '091 patent.

### III. ANALYSIS

#### A. DrugLogic's Objection to Oracle's Reply Evidence

The Court overrules DrugLogic's objection to the evidence and purportedly new facts offered by Oracle in support of its Reply brief. The evidence and factual assertions in the Reply brief were in direct response to evidence and factual assertions made by DrugLogic in its Opposition papers relating to Dr. Nelson's access to confidential information and involvement in development of the accused technology while a consultant for Relsys. These issues were raised in the Motion. In any event, DrugLogic was not prejudiced because it was given an opportunity to address this new evidence at the hearing. The objection is OVERRULED.

#### B. Legal Standard

"Federal courts have the inherent power to disqualify expert witnesses to protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004)(citing *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980)). There is no bright-line rule for expert disqualification. *Veazey v. Hubbard*, 2008 WL 5188847, at *5 (D. Haw. Dec. 11, 2008) (citing *Hewlett-Packard*, 330 F. Supp. 2d at 1092). Rather, courts balance the policy objectives that favor disqualification – ensuring fairness and preventing conflicts of interest – against policies militating against disqualification, including guaranteeing that parties have access to witnesses who possess specialized knowledge and allowing witnesses to pursue their professional callings. *Space Systems/Loral v. Martin Marietta Corp.*, 1995 WL 686369, at * 2 (N.D. Cal. Nov. 15, 1995).

"One situation where disqualification may be appropriate is when a party retains expert witnesses who previously worked for an adversary and who acquired confidential information during the course of their employment." *Id*. Thus, courts generally disqualify an expert based on a prior relationship with an adversary if "(1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation." *Hewlett-Packard*, 330 F. Supp. 2d at 1092; *see also Veazey*, 2008 WL 5188847, at *5; *In re JDS Uniphase Corp. Sec. Litigation*, 2006 WL 2845212 (N.D. Cal. Sept. 29, 2006). "In

addition to these two factors, the Court also should consider whether disqualification would be fair to the affected party and would promote the integrity of the legal process." *Hewlett-Packard*, 330 F. Supp. 2d at 1093.

### C. Whether Dr. Nelson had a Confidential Relationship With Relsys

"The party seeking disqualification of an expert witness bears the burden of demonstrating that it was reasonable for it to believe that a confidential relationship existed," and that such a relationship became sufficiently substantial to make disqualification appropriate. *Id.* (citing *Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C.1991); *Pinal Creek Group v. Newmont Mining Corp.*, 312 F.Supp.2d 1212, 1223 (D. Ariz. 2004)). In evaluating the reasonableness of the party's belief, the Court may consider many factors, including

> whether the relationship was one of long standing and involved frequent contacts instead of a single interaction with the expert, whether the expert is to be called as a witness in the underlying case, whether alleged confidential communications were from expert to party or vice-versa, and whether the moving party funded or directed the formation of the opinion to be offered at trial.

*Id.* (quoting *Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1083 (C.D. Cal. 2001)). The Court may also consider

> whether the parties entered into a formal confidentiality agreement, whether the expert was retained to assist in the litigation, the number of meetings between the expert and the attorneys, whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee, whether the expert was asked to agree not to discuss the case with the opposing parties or counsel, and whether the expert derived any of his specific ideas from work done under the direction of the retaining party.

*Id.*; *see also Space Systems/Loral v. Martin Marietta Corp.*, 1995 WL 686369, at * 2 (holding that where expert had been employed by and provided consulting services for the other side, and had signed many confidentiality agreements in connection with those activities, this requirement was met).

Here, Dr. Nelson had a consulting relationship with Relsys that spanned many years and in the course of that relationship signed two confidentiality agreements, as well as the Settlement Agreement containing a confidentiality provision. Therefore, Oracle has satisfied the first part of the test.

### D. Whether Relsys Disclosed Confidential Information to Dr. Nelson Relating to the Accused Products

While the parties have offered dramatically different characterizations of Dr. Nelson's activities while serving as a consultant for Relsys, the record as a whole supports Oracle's contention that Dr. Nelson had access to confidential information about the accused technology – at least as to the accused Relsys products – and even played a role in developing it. Oracle has identified at least three examples of intellectual property that Dr. Nelson helped develop and later conveyed to Relsys that are the subject of DrugLogic's infringement contentions: front-end importance triage, risk management, and drill-down. It has also provided a declaration by the VP of Product Development that Dr. Nelson had access to confidential information, including confidential information that was not shared with DrugLogic under the Co-Marketing Agreement. In light of Dr. Nelson's possession of confidential information that is directly relevant to the claims in this case, Dr. Nelson's involvement in this action as an expert on behalf of DrugLogic on questions related to the Relsys products and the '091 patent poses a substantial risk that the various confidentiality obligations Dr. Nelson agreed to will be breached. *See Pellerin v. Honeywell Intern. Inc.*, 2012 WL 112539, at *3 (S.D.Cal., Jan. 12, 2012) (holding that where expert witness was former employee who possessed confidential information about the relevant technology, disqualification was required because it was unrealistic to believe that former employee could parse his knowledge of the confidential information he had obtained and only rely the information provided in litigation).

It is also improper for Dr. Nelson to serve as an expert witness as to the Relsys products and the '091 patent in light of promises he made not to disparage Relsys or its intellectual property, or to use the intellectual property that he conveyed to Relsys for his own benefit. *See Wang Laboratories, Inc. v. CFR Associates, Inc.*, 125 F.R.D. 10, 13 (D.Mass.,1989) (holding that where former employee had been involved in development of accused technology and had signed an employment agreement prohibiting him from using his employer's confidential information or disclosing it, that individual could not serve as an expert witness for the other side). Indeed, Dr. Nelson's employment as an expert witness for DrugLogic on these issues is fundamentally unfair and threatens the integrity of the litigation. These concerns significantly outweigh the policies favoring ensuring that

parties have access to witnesses who possess specialized knowledge and allowing witnesses to pursue their professional callings.

## IV. CONCLUSION

For the reasons stated above, the Motion is GRANTED in part and DENIED in part. Dr. Robert Nelson is DISQUALIFIED as an expert in this litigation as to the '091 patent and any accused Relsys products. Further, pursuant to the stipulation of the parties: 1) Dr. Robert Nelson shall not offer any expert opinions on claim construction in this case; and 2) Dr. Nelson shall be permitted to offer expert opinions relating to the '221 patent and the accused Empirica Signal product.

IT IS SO ORDERED.

Dated: June 15, 2012

_____
JOSEPH C. SPERO
United States Magistrate Judge