Martin L. Fineman (California State Bar No. 104413)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery St., Suite 800
San Francisco, California 94111-6533
Phone: (415) 276-6500
Fax: (415) 276-6599
E-mail: martinfineman@dwt.com

Peter Davis (*admitted pro hac vice*)
Steven E. Tiller (*admitted pro hac vice*)
Gregory Stone (*admitted pro hac vice*)
Erin O. Millar (*admitted pro hac vice*)
WHITEFORD TAYLOR & PRESTON, LLP
7 St. Paul Street
Baltimore, Maryland 21202-1636
Phone: (410) 347-8700
Fax: (410) 223-4304
Email: pdavis@wtplaw.com
Email: stiller@wtplaw.com
Email: gstone@wtplaw.com
Email: emillar@wtplaw.com

*Attorneys for Defendant and Counter-Claimant*
*DRUGLOGIC, INC.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE CORPORATION *et al.*,<br>　　　　　Plaintiffs,<br>　v.<br>DRUGLOGIC, INC.,<br>　　　　　Defendant.<br><br>DRUGLOGIC, INC.,<br>　　　　　Counterclaimant,<br>　v.<br>ORACLE CORPORATION *et al.*<br>　　　　　Counterclaim Defendants. | Case No. C 11-00910 JCS<br><br>**DRUGLOGIC, INC.'S MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF BRIAN K. PERRY**<br><br>Date:　June 7, 2013<br>Time:　9:30 a.m.<br><br>The Honorable Joseph C. Spero |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on June 7, 2013 at 9:30 a.m., in Courtroom A located on the 15th floor of the United States District Court, 450 Golden Gate Avenue, San Francisco, California, 94102, Defendant/Counter-Plaintiff DrugLogic, Inc. ("DrugLogic") will move to exclude the expert report and testimony of Brian K. Perry ("Mr. Perry") because (1) Mr. Perry's report and testimony disregard the Court's claim constructions and (2) Mr. Perry's new claim constructions rely solely on computer science and information technology ("IT") education and experience that Mr. Perry admits the person of ordinary skill in the relevant art would not typically possess. The Declaration of Erin O. Millar, Esquire is submitted herewith in support of this Motion.[1]

## I. PROCEDURAL HISTORY

On March 19, 2012, the parties submitted an Amended Joint Claim Construction and Prehearing Statement, asking this Court to construe seven (7) terms included in the claims of U.S. Pat. No. 6,789,091 ("the '091 Patent"). *See* ECF No. 107. On August 21, 2012, this Court issued its Claim Construction Order, construing the following terms of relevance to this Motion:

| Term | Court's Construction |
|---|---|
| "permitting at least one remote user to access such data *through the World Wide Web*" | "permitting a user at one computer to access information reflecting occurrences of adverse events on a different computer or server, *through one or more Internet servers*" |
| "associating respective *hyperlinks* with a plurality of portions of such data and analysis" | "creating a plurality of *links within web pages* for some of the previously stored information and some of the results of the statistical analysis *such that by clicking* on the information or results *causes a user to jump to another place in the same web page or to an entirely different web page*" |

*See* ECF No. 142 at 67:12-15; 67:18-20 (emphasis added).

---

[1] Certain exhibits referenced herein are subject to an administrative motion to file under seal being filed concurrently herewith.

2

During claim construction briefing, the parties agreed that a person of ordinary skill in the art would have a bachelor's degree and at least four (4) years of experience in the drug safety or pharmacovigilance field (hereinafter, "drug safety field"). *See* ECF No. 110 (DrugLogic's Opening Claim Construction Brief on the '091 Patent) at 12:3-5; *see also* ECF No. 124-1 (Declaration of Stephen Jolley in Support of Oracle's Brief Regarding the Construction of Disputed Terms in the '091 Patent) at ¶ 16. On January 28, 2013, both of Oracle's experts, Messrs. Jolley and Perry, reiterated this definition of the person of ordinary skill in the art in their expert reports. *See* Millar Decl., Ex. 1 (Excerpts from Expert Report of Stephen Jolley Regarding Non-Infringement of Argus Perceptive and Empirica Signal of the '091 Patent ("Jolley Report")) at ¶ 25 and Ex. 2 (Expert Report of Brian K. Perry Regarding Non-Infringement of Argus Perceptive and Empirica Signal of the '091 Patent ("Perry Report")) at ¶ 35.

## II. SUMMARY OF ARGUMENT

This Court construed the terms "hyperlinks" and "through the World Wide Web" based on the parties' agreement as to the person of ordinary skill in the art. Instead of using the Court's construction of these terms, Mr. Perry is advancing different constructions of these terms in support of his non-infringement arguments. Mr. Perry's non-infringement opinions and testimony, applying his own constructions, should be rejected.

Mr. Perry's new constructions should further be rejected as they are based solely on information that would not have been known by the person of ordinary skill in the drug safety field. Rather, Mr. Perry's constructions are based on his education and experience in the computer science and IT fields. The person of ordinary skill in the drug safety field, however, would not likely have this skill set. Moreover, the limited extrinsic evidence relied upon by Mr.

Perry to support his modified constructions is a publication written for software developers and web designers, people not of ordinary skill in the drug safety field.

Because Mr. Perry is relying on IT education, experience and extrinsic evidence that the person of ordinary skill in the art does not possess to vary the meaning of the Court's claim constructions, his proposed claim constructions and related opinions are irrelevant as a matter of law. For these reasons, DrugLogic respectfully requests that Mr. Perry's testimony be excluded.

## III. ARGUMENT

"The proponent of expert testimony has the burden of proving [its] admissibility…by a preponderance of the evidence." *See MySpace, Inc. v. GraphOn Corp.*, 756 F. Supp. 2d 1218, 1234 (N.D. Cal. 2010) (citing Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments)). Oracle cannot meet this burden with respect to Mr. Perry.

### A. Mr. Perry's Opinions and Testimony Should Be Excluded Because He Did Not Apply the Court's Claim Constructions.

Mr. Perry's opinions and testimony should be excluded because he crafted and applied his own, narrower claim constructions instead of those previously adopted by this Court. *Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1062 (Fed. Cir. 2009) (rejecting non-infringement arguments that relied on claim constructions that were narrower than the court's claim constructions); *see also Gen. Protecht Group, Inc. v. ITC*, 619 F.3d 1303, 1308 (Fed. Cir. 2010) (disregarding expert testimony that was inconsistent with the court's claim construction). At deposition, Mr. Perry admitted that he relied on his own definition of the term "hyperlinks" rather than the Court's. *See* Millar Decl., Ex. 3 (Excerpts from 3/22/2013 Perry Transcript ("Perry Trans.") at 102:24-105:17. Accordingly, Mr. Perry's opinions and testimony should be excluded.

#### 1. Mr. Perry's Opinions that the Accused Products Do Not Infringe the '091 Patent Should Be Excluded Because He Did Not Apply the Court's Construction of "Hyperlinks."

4

During claim construction, this Court adopted Oracle's proposed construction of the phrase "associating respective hyperlinks with a plurality of portions of such data and analysis." *See* ECF No. 142 at 31:17-21. As part of this definition, the Court defined "hyperlinks" as "…links within web pages…such that…clicking on the [links] causes a user to jump to another place in the same web page or to an entirely different web page." *See id.*; *see also* Millar Decl., Ex. 1 (Jolley Report) at ¶ 129 (acknowledging this definition), Ex. 4 (Excerpts from 2/28/2013 Russell Transcript ("Russell Trans.")) at 91:3-9 (Oracle's 30(b)(6) witness applying this definition) and Ex. 5 ('091 Patent) 5:57:62; ECF No. 124 at 21:4-5 (Oracle arguing in favor of this construction of hyperlinks during claim construction).

Ignoring this definition, Mr. Perry ascribes a hyper-technical definition to the term "hyperlinks," adding limitations not found in the '091 Patent or the Court's Order.[2] *See* Millar Decl., Ex. 2 (Perry Report) at ¶ 95-96, 98-99, 100-05. Namely, Mr. Perry seeks to narrow the definition of hyperlinks by adding the following three (3) limitations:

(1) A hyperlink must have a source anchor, destination anchor and direction;

(2) A hyperlink cannot cause a calculation or process to be performed or initiated; and

(3) A hyperlink must be coded in a particular manner using HTML code, either with an "A" for anchor tag or the LINK tag (*e.g.* <A href=http://www.google.com>Search Google</A>).

*See* Millar Decl., Ex. 2 (Perry Report) at ¶ 100, 102-03, 105, 107.

---

[2] The first time Mr. Perry's proposed definition of "hyperlinks" was disclosed to DrugLogic was in his expert report dated January 28, 2013. *See* Millar Decl. at ¶ 17. This opinion was submitted weeks after DrugLogic submitted its expert reports, five (5) months after this Court's Claim Construction Order and two (2) years after Oracle answered interrogatories that did not include these "non-infringement defenses." *See* Millar Decl. at ¶ 17 and Ex. 6 (Excerpts from Oracle's 12/11/2011 Answers to Interrogatories).

5

Applying these additional limitations, Mr. Perry opines that certain clickable objects in the accused products, which he calls "buttons," are not "hyperlinks" because they perform processes or calculations, do not have anchors and directions, and do not use a specific type of HTML code. *See* Millar Decl., Ex. 2 (Perry Report) at ¶ 95-96, 98-99, 100-105. As a result, Mr. Perry opines that the accused products do not infringe. *See* Millar Decl., Ex. 2 (Perry Report) at ¶ 108-19. Mr. Perry offers this opinion despite his concession that the "buttons" appearing in the accused products cause the user to jump to another place when clicked, which places these "buttons" squarely within the Court's definition of hyperlinks. *See* Millar Decl., Ex. 3 (Perry Trans.) at 124:4-130:20; 134:1-11; 135:22-140:24. Mr. Perry's opinions deviate significantly from the Court's construction of the term, "hyperlinks," and thus, should be excluded. *See Linear*, 566 F.3d at 1062; *Gen. Protecht*, 619 F.3d at 1308.

**2. Mr. Perry's Opinions that the Accused Products Do Not Infringe the '091 Patent Should Be Excluded Because He Did Not Apply the Court's Construction of "Through the World Wide Web."**

Mr. Perry once again adds limitations to the claims that appear nowhere in the Court's construction or the '091 Patent. In this regard, the Court construed the term "permitting at least one remote user to access such data through the World Wide Web" as "permitting a user at one computer to access information reflecting occurrences of adverse events on a different computer or server, ***through one or more Internet servers***." *See* ECF No. 142 at 46:13-16 (emphasis added). While the Court made clear that users need only access data through Internet servers, Mr. Perry adds a requirement that such data ***be capable of being accessed*** while passing through these Internet servers. *See* Millar Decl., Ex. 2 (Perry Report) at ¶ 58-59. Based on this additional limitation, Mr. Perry concludes that Argus Perceptive does not infringe the '091 Patent, even though remote users can access data using the public infrastructure of the Internet.

6

*See* Millar Decl., Ex. 2 (Perry Report) at ¶ 93. There is no support for this proposition in the Court's Claim Construction Order or the '091 Patent. *See generally* ECF No. 142 at 26:1-31:21; Millar Decl., Ex. 5 ('091 Patent).

Nothing in the '091 Patent excludes adding a layer of security (like VPNs use) while information travels across the public Internet. *See generally* Millar Decl., Ex. 5 ('091 Patent). Mr. Perry's opinion that information may be encrypted during use of a VPN simply does not negate the fact that a remote user can access data *through* Internet servers.

The Court's Opinion on this issue is illuminating wherein it repeatedly states that where an intranet is used *in conjunction with Internet servers*, this limitation would be satisfied. In this regard, the Court held that the specification "explains that an intranet can be used *together with* a Web server." *See* ECF No. 142 at 44:3 (emphasis in original); 43:23-25 ("the specification makes clear that the words 'through the World Wide Web' require that access must be through one or more Internet servers and that the invention does not include embodiments that utilize *only* a private intranet") (emphasis added); 44:4-5 ("Nothing in the specification suggests that use of an intranet *alone* satisfies this claim term.*)* (emphasis added). All the Court's construction requires is that a remote user be able to access data *through* Internet servers, whether or not an intranet is also utilized. *See* ECF No. 142 at 46:13-16; *see also* Millar Decl., Ex. 5 ('091 Patent) at 25:13-15.

Mr. Perry ignores this portion of the Court's Opinion when he concludes that use of a VPN does not satisfy the "through the World Wide Web" limitation. In his report, however, Mr. Perry admits the following facts:

(1) "[P]hysically distant locations on an intranet create 'Virtual Private Network tunnels' *through the public Internet infrastructure of routers and switches* to securely transmit data."

7

(2) "A Virtual Private Network ('VPN') tunnel creates a secure private intranet network between physically distant locations *using the infrastructure of public networks such as Internet routers and switches*."

(3) "[C]ompanies may provide 'virtual private network' or 'VPN' software that allows authorized users *to connect an external computer, for example a computer located at the user's home, to the company intranet.*"

*See* Millar Decl., Ex. 2 (Perry Report) at ¶ 57-58, 92 (emphasis added). During his deposition, Mr. Perry further conceded that in order to establish a wireless connection to an intranet, a remote user communicates with a VPN concentrator over the Internet. *See* Millar Decl., Ex. 3 (Perry Trans.) at 72:6-25.

Despite admitting that a VPN allows data to traverse the public Internet utilizing the very same infrastructure over which public web pages travel, Mr. Perry inexplicably concludes that the user is not accessing the data through Internet servers. *See* Millar Decl., Ex. 3 (Perry Trans.) 56:22-57:17; 60:10-20; 62:4-9; 64:3-12; 64:16-19. Mr. Perry's expert report and testimony on this issue should be excluded because he does not apply the Court's construction of the term "through the World Wide Web" and because Mr. Perry's own construction adds limitations not found in the '091 Patent. For these reasons, DrugLogic requests that Mr. Perry's expert report and testimony should be excluded.

**B.    Mr. Perry's Testimony Should Further Be Excluded Because He Relies Solely on Computer Science and Information Technology Education and Experience Not Possessed by a Person of Ordinary Skill in the Drug Safety Field.**

To the extent that Mr. Perry is suggesting that the Court's claim constructions are improper or incomplete, Mr. Perry's opinions and testimony should be excluded because they are based on skills not possessed by the person of ordinary skill in the drug safety field. The person of ordinary skill in the art is a "fictional person" who is "considered to have the *normal* skills and knowledge in a particular technical field…." *See PDL Biopharma, Inc. v. Sun Pharm.*

8

1  *Indus.*, 2008 U.S. Dist. LEXIS 105464 at *128 (D.N.J. Dec. 29, 2008) (emphasis added); *see*

2  *also Environ. Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 697 (Fed. Cir. 1983).

3  As stated above, the parties agreed that the person of ordinary skill in the art is a person with a

4  bachelor's degree and four (4) years of experience in the drug safety field. *See* ECF No. 110 at

5  12:3-5; ECF No. 124-1 at ¶ 16; Millar Decl., Ex. 1 (Jolley Report) at ¶ 25 and Ex. 2 (Perry

6  Report) at ¶ 35.

7  According to the '091 Patent, persons working in the drug safety field include risk

8  assessors such as, "government agents who perform such assessment for regulatory purposes,

9  agents of pharmaceutical manufacturers who are tasked with such assessments, health care

10  personnel, such as physicians, nurses, anesthesiologists," *etc*. *See* Millar Decl., Ex. 5 ('091

11  Patent) at 5:31-42. Oracle's witnesses uniformly agreed that most professionals in the drug

12  safety field have medical knowledge typically possessed by health care professionals. *See* Millar

13  Decl., Ex. 3 (Perry Trans.) at 51:11-52:22, Ex. 4 (Russell Trans.) at 61:7-63:21; 70:18-71:21;

14  80:9-21, Ex. 7 (Excerpts from 3/6/2013 Jolley Transcript ("Jolley Trans.")) at 62:23-63:6; 69:16-

15  25, and Ex. 8 (Excerpts from 3/19/2013 Palsulich Transcript ("Palsulich Trans.")) at 35:1-39:23.

16  Oracle witnesses also agreed that it is unlikely that people working in drug safety field would

17  have computer science or IT knowledge, such as the ability to read or write computer code,

18  develop software or build network architectures. *See* Millar Decl., Ex. 3 (Perry Trans.) at 51:11-

19  52:22, Ex. 4 (Russell Trans.) at 63:18-63:25; 70:18-71:21; 80:9-21; 82:4-87:7, Ex. 7 (Jolley

20  Trans.) at 62:6-22, and Ex. 8 (Palsulich Trans.) at 38:7-39:23.

21  In stark contrast to the person of ordinary skill, Mr. Perry is an IT professional who

22  installs and audits computer systems used in the drug safety field. Mr. Perry makes clear that

23  "[i]n forming [his] opinions [he has] … relied on [his] extensive knowledge of

9

1   pharmacoviligance software, systems, and technology, and [his] extensive knowledge of

2   computer science, software development and implementation, website and graphical user

3   interface design, and information technology." *See* Millar Decl., Ex. 1 (Perry Report) at ¶ 30;

4   *see also* Millar Decl., Ex. 3 (Perry Trans.) at 20:10-17; 62:13-18 ("Q: …Is everything in your

5   report based on your experience as the IT guy and your education as the IT guy?  A:  Essentially,

6   yes.") and Ex. 9 (*Curriculum Vitae* of Brian K. Perry ("Perry CV")).[3]  Because Mr. Perry's

7   opinions are based *solely* on skills that even he concedes fall outside of the skill set of the

8   ordinary person working in the drug safety field, such opinions should be excluded.  *See* Millar

9   Decl., Ex. 3 (Perry Trans.) at 20:10-17; 51:11-52:22; 62:13-18; 123:6-130:20.

10          For example, without any intrinsic or extrinsic support, Mr. Perry attempts to narrow the

11  Court's definition of hyperlinks by requiring that hyperlinks be ***coded*** in a particular way.  *See*

12  Millar Decl., Ex. 2 (Perry Report) at ¶ 103 and Ex. 3 (Perry Trans.) at 102:8-23; 108:7-109:8.  In

13  this regard, Mr. Perry repeatedly testified during his deposition that he was unable to determine

14  whether clickable objects in the accused products were hyperlinks without reviewing their source

15  code, despite admitting that clicking on these objects caused the user to jump to another web

16  page.  *See* Millar Decl., Ex. 3 (Perry Trans.) at 124:4-130:20; 134:1-11; 135:22-140:24.  As Mr.

17  Perry admitted, however, persons working in the drug safety field typically are not capable of

---

[3]     Because Mr. Perry is an IT professional often hired by pharmaceutical companies, Oracle argues that he is a person of ordinary skill in the art of drug safety.  *See* Millar Decl., Ex. 2 (Perry Report) at ¶¶ 19-26, 30, Ex. 3 (Perry Trans.) at 24:19-21; 27:6-19 and Ex. 9 (Perry CV).  Mr. Perry admitted, however, that he does not have any medical knowledge, has never performed a single drug safety analysis, and has never used a computer system for the purpose of performing such an analysis.  *See* Millar Decl., Ex. 3 (Perry Trans.) at 24:22-26:25; 49:13-51:10.  Even assuming that Mr. Perry's tangential experience is sufficient to qualify him as a person of ordinary skill in the art, his opinions, based solely on his IT education and experience – not possessed by the person of ordinary skill in the art of drug safety – is irrelevant and unhelpful, and therefore, should be excluded.

reading or writing source code. *See* Millar Decl., Ex. 3 (Perry Trans.) at 51:11-52:22. Thus, it is clear that Mr. Perry is relying on skills that are not typically possessed by the person of ordinary skill in the relevant art.

In *Tivo, Inc. v. Echostar Communs. Corp.*, the Federal Circuit rejected an infringer's attempt to narrow the meaning of the term "object" to "an item written in an object-oriented computer programming language (for example, C++)...." 516 F.3d 1290, 1306-07 (Fed. Cir. 2008). The Federal Circuit held that there was no support for the narrowed construction in the patent and expert testimony alone was insufficient to support the infringer's position. *Tivo*, 516 F.3d at 1307-08. In the same vein, Mr. Perry's opinion alone is insufficient to support his narrowed construction of "hyperlinks." His reliance on information generally known only to persons in the computer science or IT fields should be rejected.[4]

Further, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Gen. Protecht*, 619 F.3d at 1310 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc)); *see also Network Commerce, Inc. v. Microsoft*

---

[4] In addition, Mr. Perry opines that the Argus suite of products was not "designed to be installed on an Internet server and made available through the World Wide Web" because it was not designed with "appropriate architecture to support security measures." *See* Millar Decl., Ex. 2 (Perry Report) at ¶ 62, 67-68. Mr. Perry then reviews various security features and settings he would expect to see if the Argus products were to be deployed over the World Wide Web, including "user activity logging capability," "built-in user session timeouts," "Windows Active Directory domain," "web browser 'cookie' security," *etc. See* Millar Decl., Ex. 2 (Perry Report) at ¶ 69-72, 78. Mr. Perry admitted, however, that his knowledge of these security features is based *solely* on his IT experience and education. *See* Millar Decl., Ex. 3 (Perry Trans.) at 53:15-18; 54:4-7; 54:21-24; 55:24-56:2. Mr. Perry appears to further opine that Argus Perceptive does not store data on servers linked to the Internet as required by the limitation, "storing data regarding the risks of adverse effects from the use of at least one drug of interest in one or more servers linked to the Internet." *See* Millar Decl., Ex. 2 (Perry Report) at ¶ 13, 68. Once again, Mr. Perry does not offer any support for this opinion, instead relying solely on his computer science and IT background. *See* Millar Decl., Ex. 2 (Perry Report) at ¶ 13, 68. These unsupported opinions, based on information and knowledge not possessed by the person of ordinary skill in the drug safety field, should be excluded.

11

1  *Corp.*, 422 F.3d 1353, 1361 (Fed. Cir. 2005) (holding "expert testimony at odds with the intrinsic
2  evidence must be disregarded"). Without any support whatsoever, Mr. Perry asserts that
3  "buttons" are not hyperlinks because they perform some function or process, even though he
4  admits that many so-called "buttons" in the accused products cause the user to jump to another
5  web page, when clicked consistent with the Court's construction of "hyperlinks." *See* Millar
6  Decl., Ex. 2 (Perry Report) at ¶ 104 and Ex. 3 (Perry Trans.) at 109:5-110:3; 124:4-130:20;
7  134:1-11; 135:22-140:24. There is no support for this position anywhere in the specification, nor
8  does Mr. Perry point to any. *See generally* Millar Decl., Ex. 5 ('091 Patent).

9  In fact, contrary to the distinction that Mr. Perry attempts to make, the '091 Patent uses
10 the terms "hyperlinks" and "buttons" interchangeably throughout the specification. In this
11 regard, the specification describes that a user can click on a hyperlink or a button to view details.
12 *See* Millar Decl., Ex. 5 ('091 Patent) at 18:24-26 (stating that a "**hyperlink** . . . brings up a
13 separate page with all details of this dimension") compared with 14:40-51 (stating "[p]ushing the
14 'View' **button** allows a review of specific details) (emphasis added). Similarly, the specification
15 describes that a user can click a hyperlink or a button to perform an operation. *See* Millar Decl.,
16 Ex. 5 ('091 Patent) at 21:12-22 (stating a user can click **hyperlinks** such as 'Apply Filter' and
17 'Compute Correlations'" to initiate the correlator engine and process information) compared
18 with 14:58-63 (stating that a user can "click on the 'Apply' **button**" to apply a filter) (emphasis
19 added). Thus, the intrinsic evidence shows that the terms "hyperlink" and "button" are
20 synonymous.

21 In *Solvay S.A. v. Honeywell Intl., Inc.*, the infringer argued that the court misapplied the
22 term "isolating" by not limiting the gas stream to only residual amounts of mixture components.
23 622 F.3d 1367, 1379-80 (Fed. Cir. 2010). The Federal Circuit found that the patent specification

used the terms "isolating," "separate," and "to draw off" interchangeably and could not be altered by a dictionary definition suggesting that "isolate" meant separation of a pure chemical substance. *Id.* at 1380-82. Here, the specification uses the terms "hyperlinks" and "buttons" interchangeably and thus, Mr. Perry's opinion, supported only by his IT background, cannot alter the '091 Patent's usage of the terms as synonyms. Because Mr. Perry's conclusory opinions are supported solely by a background beyond that of the person of ordinary skill in the art, his opinions must be excluded.

**C.    Mr. Perry's Testimony Should Be Excluded Because He Relies on Extrinsic Evidence from Outside the Drug Safety Field, Which Is Inconsistent with Other Relevant Extrinsic Evidence.**

In addition to relying on his IT background for his newly crafted constructions, Mr. Perry relies on extrinsic evidence not previously presented during claim construction. *See* Millar Decl., Ex. 2 (Perry Report) at ¶ 100. In this regard, Mr. Perry relies on a W3C HTML 4.01 specification from December 1999 ("W3C")[5] to support his new definition of "hyperlinks." *See* Millar Decl., Ex. 2 (Perry Report) at ¶ 100. Extrinsic evidence, however, may not be used "to vary claim terms from how they are defined…." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584-85 (Fed. Cir. 1996). In *Biagro Western Sales, Inc. v. Grow More, Inc.*, the Federal Circuit rejected expert testimony based on labeling standards because the plaintiff was unable to "tie its extrinsic evidence to the patent or the claim language." 423 F.3d 1296, 1303-04 (Fed. Cir. 2005) ("Nothing in the patent or prosecution history indicates that labeling standards are relevant to the claimed fertilizer, and nothing in [the plaintiff's] extrinsic evidence suggests that

---

[5]    During his deposition, Mr. Perry also referred to this publication as the World Wide Web Consortium. *See e.g.* Millar Decl., Ex. 3 (Perry Trans.) at 12:11-13.

13

CASE NO. 11-CV-00910 JCS                    **DRUGLOGIC, INC.'S MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF BRIAN K. PERRY**

a person skilled in the art of *fertilizer formulation* would necessarily use a chemical equivalent to express the amount of phosphorous acid in a fertilizer...") (emphasis in original).

Similarly, Mr. Perry cannot tie his extrinsic evidence from W3C to any language in the '091 Patent. Moreover, at deposition, Mr. Perry conceded that the W3C publication upon which he relies is used primarily, if not exclusively, by web designers and software developers. *See* Millar Decl., Ex. 3 (Perry Trans.) at 13:2-13; 101:18-24. Web designers and software developers, however, do not fall within the scope of the definition of the person of ordinary skill in the drug safety field. Accordingly, this extrinsic evidence should be disregarded.

To the extent that the Court was to consider extrinsic evidence, it might consider extrinsic evidence **submitted by Oracle** during claim construction, which unambiguously encompasses buttons within the definition of hyperlinks. *See* ECF No. 107 at 9:4-6 (citing the definition of "hyperlink" from Newton's Telecom Dictionary, 2001).

> A link from one part of a page on the Internet to another page, either on the same site or a distant site. For example, a restaurant's home page may have a hyperlink or link to its menu. A retailer of laptops might have a link to the site of the laptop's manufacturer. A hyperlink is a way to connect two Internet resources via a simple word or phrase on which a user can click to start the connection. A user can access a Web site and exercise the option to hyperlink to another, related Web site by clicking on that option.…***Sometimes, you'll see a button saying 'For more,' 'Full specs,' or 'Our biography,' etc***…

*See* Millar Decl., Ex. 10 (Newton's Telecom Dictionary, 2001) (emphasis added). At deposition, Messrs. Perry and Jolley generally agreed with this definition. *See* Millar Decl., Ex. 3 (Perry Trans.) at 105:18-108:6 and Ex. 7 (Jolley Trans.) at 172:15-174:7. Mr. Perry's opinion is contrary to this more relevant extrinsic evidence.

Further, Oracle's other expert, Stephen Jolley, who also contends to be a person of ordinary skill in the drug safety field, deferred to Mr. Perry on all of the technical issues regarding hyperlinks and testified that he did not know what anchors or tags were or how to code

14

a hyperlink prior to reviewing Mr. Perry's report.  *See* Millar Decl., Ex. 2 (Jolley Report) at ¶ 130, 317 and Ex. 7 (Jolley Trans.) at 110:3-22; 252:1-253:13.  These admissions further support the position that a definition including these terms would not generally be known by the person of ordinary skill in the drug safety field.  Accordingly, Mr. Perry's opinions and testimony should be excluded.

Similarly, Mr. Perry's opinion that a VPN does not satisfy the "through the World Wide Web" limitation contradicts Relsys International, Inc.'s ("Relsys"), Oracle's predecessor, own statements to its customers about VPNs.  In this regard, Relsys responded to customers' requests for proposal ("RFPs") that specifically asked whether the Argus system was accessible over the Internet, and Relsys stated that this requirement was satisfied using a VPN.[6]  *See* Millar Decl., Ex. 3 (Perry Trans.) at 84:22-89:15; 89:18-90:17; 95:2-23, Ex. 8 (Palsulich Trans.) at 115:1-117:8; 119:6-120:24; 126:1-127:20; 137:3-142:20, Ex. 11 (Excerpts from Relsys responses to RFPs),[7] Ex. 12 (Excerpt from Relsys response to RFP from 3M Pharmaceuticals), Ex. 13 (Excerpt from Relsys response to RFP from Avexa Pharmaceuticals).  These statements make clear that people in the drug safety field understood a VPN to allow data to travel over the Internet.

---

[6] Messrs. Perry and Palsulich try to avoid these admissions by testifying that Relsys was simply telling customers what they wanted to hear in order to obtain more business, even if not technically correct.  *See* Millar Decl., Ex. 3 (Perry Trans.) at 95:2-23 and Ex. 8 (Palsulich Trans.) at 117:25-118:16, 140:7-142:19.  This testimony, however, cuts against Oracle.  By telling customers what they wanted to hear, Relsys recognized that people in the drug safety field understood a VPN to allow data to travel over the Internet.

[7] Certain Relsys responses to RFPs were produced as native Excel spreadsheets, which were identified by Bates-label at Mr. Palsulich's deposition.  *See* Millar Decl., Ex. 8 (Palsulich Trans.) at 113:1-10 (identifying document Bates-labeled OR-DL0000295434); 119:6-22 (identifying document Bates-labeled OR-DL0000341594); 125:25-126:11 (identifying document Bates-labeled OR-DL0000418275).

15

CASE NO. 11-CV-00910 JCS  **DRUGLOGIC, INC.'S MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF BRIAN K. PERRY**

In fact, in reviewing one of these responses, Mr. Perry acknowledged that when Argus is implemented with a VPN that uses the infrastructure of the Internet, the VPN connection is over the Internet. *See* Millar Decl., Ex. 3 (Perry Trans.) at 86:21-89:15. Similarly, Michael Prindle, Oracle's current Senior Director of Cloud Engineering, testified that VPN technology allows data to be sent over the Internet. *See* Millar Decl., Ex. 14 (Excerpts from 4/4/2013 Prindle Transcript) at 5:18-21; 47:16-48:2; 55:3-59:3 ("…the VPN connection was … over the Internet"); 105:6-11. Mr. Perry's opinion and testimony contradicts Relsys' and Oracle's employee's admissions regarding the functionality of a VPN as allowing a remote user to access the Argus product over the Internet.

Again, Mr. Jolley, Oracle's other expert, who also contends that he falls within the scope of the person of ordinary skill in the art, deferred to Mr. Perry's more technical understandings about VPNs. *See* Millar Decl., Ex. 7 (Jolley Trans.) at 253:19-260:7 (testifying that before reading Mr. Perry's report he had a vague understanding that a VPN involved nodes on the Internet and that he is "not really an expert in this field"); *see also* Ex. 1 (Jolley Report) at ¶ 289, 296. Mr. Jolley's testimony indicates that the person of ordinary skill in the art would not use the hyper-technical definitions being proposed by Mr. Perry. Accordingly, Mr. Perry's reliance on W3C, which is a publication outside the drug safety field and which is significantly narrower than the understanding of persons in the drug safety field regarding the meaning of "hyperlinks" and "through the World Wide Web," should be disregarded.

**D.  To the Extent that Mr. Jolley Relies on Mr. Perry's Opinions, Such Opinions Should Be Excluded.**

In Mr. Jolley's expert report, he simply adopts and incorporates Mr. Perry's opinions. *See* Millar Decl., Ex. 1 (Jolley Report) at ¶ 130, 289, 296, 317. At deposition, Mr. Jolley deferred to Mr. Perry on these topics as well. *See* Millar Decl., Ex. 3 (Jolley Trans.) at 110:3-22;

16

252:1-253:13.  To the extent that Mr. Jolley adopts the opinions contained in Mr. Perry's report, such opinions should also be excluded.

WHEREFORE, DrugLogic respectfully requests that the expert report and testimony of Brian K. Perry be excluded and that Paragraphs 130, 289, 296, and 317 of Mr. Jolley's expert report and testimony that adopts the opinions contained in Mr. Perry's expert report be excluded.

Dated:  April 29, 2013            Respectfully submitted,

/s/ Martin L. Fineman
Martin L. Fineman (California State Bar No. 104413)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery St., Suite 800
San Francisco, California 94111-6533
Phone: (415) 276-6500
Fax: (415) 276-6599
E-mail: martinfineman@dwt.com

/s/ Erin O. Millar
Peter Davis (*admitted pro hac vice*)
Steven E. Tiller (*admitted pro hac vice*)
Gregory Stone (*admitted pro hac vice*)
Erin O. Millar (*admitted pro hac vice*)
WHITEFORD TAYLOR & PRESTON, LLP
7 St. Paul Street
Baltimore, Maryland 21202-1636
Phone: (410) 347-8700
Fax: (410) 223-4304
Email:  pdavis@wtplaw.com
Email:  stiller@wtplaw.com
Email:  gstone@wtplaw.com
Email:  emillar@wtplaw.com

*Attorneys for Defendant and Counter-Claimant*
*DRUGLOGIC, INC.*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 29, 2013 the foregoing

**DRUGLOGIC, INC.'S MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF BRIAN K. PERRY**

was filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record.

> Karen Johnson-McKewan (California State Bar No. 121570)
> kjohnson-mckewan@orrick.com
> Christina Von der Ahe (California State Bar No. 255467)
> cvonderahe@orrick.com
> ORRICK, HERRINGTON & SUTCLIFFE, LLP
> The Orrick Building
> 405 Howard Street
> San Francisco, California 94105-2669
> Telephone: (415) 773-5700
> Fax: (415) 773-5759
>
> I. Neel Chatterjee (California State Bar No. 173985)
> nchatterjee@orrick.com
> Michael C. Spillner (California State Bar No. 205785)
> mspillner@orrick.com
> ORRICK, HERRINGTON & SUTCLIFFE, LLP
> 1000 Marsh Road
> Menlo Park, California 94025
> Telephone: (650) 614-7400
> Fax: (650) 614-7401
>
> Deborah K. Miller (California State Bar. No. 95527)
> deborah.miller@oracle.com
> Peggy E. Bruggman (California State Bar No. 184176)
> peggy.bruggman@oracle.com
> Lesley E. Kothe (California State Bar No. 209512)
> lesley.kothe@oracle.com
> ORACLE CORPORATION
> 500 Oracle Parkway
> Redwood City, California 94065
> Telephone: (650) 506-5200
> Fax: (650) 506-7114
>
> ***Attorneys for Oracle Corp., Oracle International Corp. and Oracle America, Inc.***

1  I certify that all parties in this case are represented by counsel who are CM/ECF participants.

2

3                                                             /s/
                                            *Martin L. Fineman*
                                            *Attorneys for Defendant and Counterclaimant,*
4                                           *DRUGLOGIC, INC.*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
                                                   19
25

    CASE NO. 11-CV-00910 JCS              **DRUGLOGIC, INC.'S MOTION TO EXCLUDE THE EXPERT REPORT AND**
26                                                              **TESTIMONY OF BRIAN K. PERRY**