FILED

OCT 1 6 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE CORPORATION, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>DRUGLOGIC, INC.,<br><br>    Defendant. | Case No.  C-11-00910 JCS<br><br>REDACTED<br>**ORDER RE DRUGLOGIC'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF BRIAN K. PERRY AND ORACLE'S MOTION FOR SUMMARY JUDGMENT OF COMPLAINT (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '091 PATENT)** |
| DRUGLOGIC, INC.,<br><br>    Counterclaimant,<br><br>    v.<br><br>ORACLE, CORP, INC., et al.,<br><br>    Counterclaim Defendants. | Re: Docket Nos. 235, 278<br><br> |

<div style="writing-mode: vertical-rl">United States District Court<br>Northern District of California</div>

## I.    INTRODUCTION

In this action, DrugLogic, Inc. ("DrugLogic") and Oracle Corporation ("Oracle") assert claims of patent infringement against one another.  The subject of the instant motions is DrugLogic's claims that Oracle's Empirica Signal and Argus Perceptive products infringe claims 1-16 of U.S. Patent No. 6,789,091 ("the '091 patent").  In its Motion for Summary Judgment of Complaint (Declaratory Judgment of Non-Infringement) ("Summary Judgment Motion"), Oracle seeks summary judgment of non-infringement of the '091 patent as to both products.   In the Motion to Exclude the Expert Testimony of Brian K. Perry ("Motion to Exclude"), DrugLogic asks the Court to exclude the opinions of Oracle's expert, Brian Perry, which Oracle offers in support of its Summary Judgment Motion.   For the reasons stated below, the Motion to Exclude is

DENIED. The Summary Judgment Motion is GRANTED.[1]

## II. BACKGROUND

### A. The Accused Products

#### 1. Empirica Signal

Empirica Signal is a drug safety analysis software tool. Declaration of Karen Johnson-McKewan ("KJM Decl."), Ex. 2 (Expert Report of Stephen Jolley Regarding Non-Infringement of Argus Perceptive and Empirica Signal of the '091 Patent ("Jolley Report")) ¶ 68. It was developed by a company called Phase Forward, which was acquired by Oracle in 2010. *Id.* Oracle's September 2011 Empirica Signal online help manual describes Empirica Signal Version 7.3 as "a web-based analysis environment for generating statistical scores for combinations of drugs and events in a drug safety database, and for detecting signals (unexpected associations of drugs and events)." KJM Decl., Ex. 16 (Online Help Manual for Empirica Signal Version 7.3 ("Online Help Manual")) at 13. It further states that Empirica Signal allows a user to perform "data mining runs," which "extract[] data from the source and appl[y] a statistical algorithm to generate signal scores;" these scores identify "potential signals" and the Empirica Signal user "determines whether those scores represent true signals." *Id.*

#### 2. Argus Perceptive

Argus Perceptive was a "computer-implemented drug safety analysis tool." KJM Decl., Ex. 2 (Jolley Report) ¶ 72. It was developed by a company called Relsys International, Inc. ("Relsys"), which was acquired by Oracle in 2009. *Id.* Oracle no longer sells Argus Perceptive. *Id.* Argus Perceptive, like Empirica Signal, allows users to "perform data mining runs to learn about the possible associations between certain drugs and certain adverse events." *Id.*

### B. Asserted Claims of the '091 Patent

The '091 patent has two independent claims, claims 1 and 8; all of the remaining claims depend from either claim 1 or claim 8. Claim 1 reads as follows:

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1. A computer-implemented method for assessing and analyzing the risks of adverse effects resulting from the use of at least one drug of interest, comprising:

storing data regarding the risks of adverse effects from the use of at least one drug of interest in one or more servers linked to the Internet;

updating such data regarding the risks with additional information pertinent to the risks of adverse effects from the use of the at least one drug of interest;

permitting at least one remote user to access such data through the World Wide Web upon proper authentication;

permitting the at least one user to identify the at least one drug of interest;

permitting the at least one remote user to select data stored in the one or more servers relevant to the safety of using the at least one drug of interest;

permitting the at least one remote user to analyze safety issues resulting from the use of the at least one drug of interest; and permitting the at least one remote user to display such data and analysis,

wherein the step of permitting the at least one remote user to analyze comprises associating respective hyperlinks with a plurality of portions of such data and analysis, the plurality of hyperlinks respectively corresponding to places in an up and down hierarchy and allowing analytical drill down by selectively selecting successive hyperlinks, a last one of the hyperlinks in the up and down hierarchy linking to a previously-stored case describing adverse effects resulting from the use of the at least one drug of interest.[2]

Claim 8 is identical to claim 1 except that it refers to "substances" rather than "drugs." DrugLogic has accused Oracle of infringing claims 1-16 of the '091 patent. To establish infringement, DrugLogic must establish that Oracle's accused products meet the requirements of claims 1 or 8.

**C.    Oracle's Contentions Regarding Non-Infringement of the '091 Patent**

In its Summary Judgment Motion, Oracle asserts it is entitled to summary judgment of non-infringement of the '091 patent by Argus Perceptive because DrugLogic cannot show that Argus Perceptive: 1) permits a user to access data "through the World Wide Web;" 2) stores data in servers "linked to the Internet;" 3) "associate[es] respective hyperlinks with a plurality of portions

---

[2] Hereinafter, the last section of the claim, starting with the word "wherein" is referred to as the "Wherein Clause."

3

of such data and analysis;" 4) includes "a plurality of hyperlinks respectively corresponding to places in an up and down hierarchy;" 5) "allows[s] analytical drill down by selectively selecting successive hyperlinks;" 6) comprises "a last one of the hyperlinks in the up and down hierarchy linking to a previously stored case;" and 7) satisfies the Wherein Clause.

Oracle argues that summary judgment of non-infringement of the '091 patent by Empirica Signal is warranted because DrugLogic cannot show that Empirica Signal: 1) "associat[es] respective hyperlinks with a plurality of portions of such data and analysis;" 2) includes "a plurality of hyperlinks respectively corresponding to places in an up and down hierarchy;" 3) "allow[s] analytical drill down by selectively selecting successive hyperlinks;" 4) comprises "a last one of the hyperlinks in the up and down hierarchy linking to a previously-stored case;" and 5) satisfies the Wherein Clause.

Oracle asserts the Court should grant summary judgment of non-infringement not only as to direct infringement but also as to any claim of indirect infringement or infringement under the doctrine of equivalents.

### D. DrugLogic's Contentions Regarding Exclusion of the Perry Report

In its Motion to Exclude, DrugLogic asks the Court to exclude the expert report of Oracle's expert, Brian Perry, as well as portions of the Jolley Report that rely on Mr. Perry's opinions, on the basis that: 1) Mr. Perry's opinions are inconsistent with the Court's constructions of the claim terms "permitting at least one remote user to access such data through the World Wide Web" and "associating respective hyperlinks with a plurality of portions of such data and analysis;" and 2) Mr. Perry possesses expertise in computer science and information technology that the person of ordinary skill in the art would not have possessed.

## III. THE MOTION TO EXCLUDE

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles

United States District Court
Northern District of California

and methods, and (3) the witness has applied the principles and
methods reliably to the facts of the case.

F.R.Evid. 702. In determining whether expert testimony meets the requirements of Rule 702,

courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc.*, in which the

Supreme Court described the relevant inquiry as follows:

> Faced with a proffer of expert scientific testimony, then, the trial
> judge must determine . . . whether the expert is proposing to testify
> to (1) scientific knowledge that (2) will assist the trier of fact to
> understand or determine a fact in issue. This entails a preliminary
> assessment of whether the reasoning or methodology underlying the
> testimony is scientifically valid and of whether that reasoning or
> methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

Although DrugLogic invokes Rule 702, *see* Motion to Exclude at 4, it does not assert that

Mr. Perry's opinions are unreliable under *Daubert*. Instead, it cites patent infringement cases in

which courts have declined to credit the opinions of an expert when that expert's opinion

conflicted with the court's claim construction. *See* Motion to Exclude at 4 (citing *Linear*

*Technology Corp. v. ITC*, 566 F.3d 1049, 1062 (Fed. Cir. 2009); *General. Protecht Group, Inc. v.*

*ITC*, 619 F.3d 1303, 1308 (Fed. Cir. 2010)). In *Linear Technology*, the Federal Circuit affirmed a

final determination of infringement by the United States International Trade Commission, finding

that the Commission's conclusion was supported by substantial evidence and rejecting arguments

by the alleged infringer that the Federal Circuit found were inconsistent with the applicable claim

construction. 566 F.3d at 1062. The holding in *Linear Technology* makes no mention of any

expert opinion and nothing in that decision suggests that an expert's opinion is subject to

exclusion under Rule 702 on the basis that it is inconsistent with the court's claim construction.

Similarly, the *General Protecht* decision involves the Federal Circuit's review of a decision by the

International Trade Commission finding infringement. Although the Federal Circuit did reverse

the finding of infringement on the basis that the Commission relied on the opinion of an expert

that conflicted with the properly construed claim language, the Federal Circuit *did not* hold that

the expert's opinion was inadmissible under Rule 702; nor did it address that question.  619 F.3d

at 1308.

United States District Court
Northern District of California

5

1       Nor has DrugLogic cited any cases suggesting that the opinions of an expert whose

2   qualifications *exceed* the qualifications of a hypothetical person of ordinary skill in the art should

3   be excluded under Rule 702. *See* Motion to Exclude at 8-9 (citing *PDL Biopharma, Inc. v. Sun*

4   *Pharm. Indus.*, 2008 U.S. Dist. LEXIS 105464, at *128 (D.N.J. Dec. 29, 2008); *Environ. Designs,*

5   *Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 697 (Fed. Cir. 1983)).  Nor do the cases cited

6   by DrugLogic to support its position that Mr. Perry's opinions should be excluded on this basis

7   address this question.

8       Accordingly, the Court DENIES DrugLogic's Motion to Exclude on the ground that the

9   issues raised therein go to the weight of Mr. Perry's opinions, not their admissibility, and are not

10  the proper subject of a *Daubert* motion.[3]

11  **IV.    THE SUMMARY JUDGMENT MOTION**

12      **A.    Legal Standards**

13          **1.    Legal Standard Governing Summary Judgment**

14      Summary judgment on a claim or defense is appropriate "if the movant shows that there is

15  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

16  law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

17  the absence of a genuine issue of material fact with respect to an essential element of the non-

18  moving party's claim, or to a defense on which the non-moving party will bear the burden of

19  persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

20  made this showing, the burden then shifts to the party opposing summary judgment to designate

21  "specific facts showing there is a genuine issue for trial." *Id.*  "[T]he inquiry involved in a ruling

22  on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof

23  that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252

24  (1986).  On summary judgment, the court draws all reasonable factual inferences in favor of the

25  non-movant. *Id.* at 255.

26

27  ───────────────

[3] To the extent the arguments raised in DrugLogic's Motion to Exclude are incorporated by
28  reference in its brief opposing Oracle's summary judgment motion, the Court considers them in
    that context.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2. Legal Standard Governing Patent Infringement

A determination of infringement is a two-step process. *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997). The first step is claim construction, which is a question of law to be determined by the court. *Id.* The second step is an analysis of infringement, in which it must be determined whether a particular device infringes a properly construed claim. *Id.*

A device literally infringes if each of the limitations of the asserted claim is found in the accused device. *Id.* In the alternative, a device may infringe under the doctrine of equivalents "if every limitation of the asserted claim, or its 'equivalent,' is found in the accused subject matter, where an 'equivalent' differs from the claimed limitation only insubstantially." *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998). However, application of the doctrine of equivalents may be limited as a result of the prosecution history of the patent. In particular, "a narrowing amendment made [during patent prosecution] to satisfy any requirement of the Patent Act may give rise to an estoppel." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002).

The patentee always bears the burden of proof on infringement. *Under Sea Industries, Inc. v. Dacor Corp.*, 833 F.2d 1551, 1557 (Fed. Cir. 1987). Thus, a patentee is entitled to summary judgment if it can show that it is "more likely than not" that the accused product possesses all of the elements of the asserted claim. *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 (Fed. Cir. 2005) (*citing Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986)). Once the patentee has made a prima facie showing that it is more likely than not that all the claim limitations are met, the accused infringer must come forward with more than a scintilla of evidence to create a genuine issue of material fact as to non-infringement to survive a patentee's summary judgment motion. *Id.* Conversely, an accused infringer is entitled to summary judgment of non-infringement where it shows "that the patentee failed to put forth evidence to support a finding that a limitation of the asserted claim was met by the structure in the accused devices." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1578 (Fed. Cir. 1989).

### 3. Legal Standards Governing Claim Construction

In construing patent claims, the court must begin with the words of the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.1996). "In the absence of an express intent to impart a novel meaning to the claim terms, the words take on the full breadth of the ordinary and customary meanings attributed to them by those of ordinary skill in the art." *Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc. v. Mega systems, LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003) (citation omitted).

The most "significant source of the legally operative meaning of disputed claim language" is the intrinsic evidence of record, that is, the claims, the specification and the prosecution history. *Vitronics Corp.*, 90 F.3d at 1582. This is because "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).

Courts may also use extrinsic evidence in construing claim terms if it is necessary, so long as such evidence is not used to "vary or contradict the terms of the claims." *Markman v Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995). As the court explained in *Markman*, "[extrinsic] evidence may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Id.* at 980. The Federal Circuit has warned, however, that such evidence is generally "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1318. Thus, courts are free to consult dictionaries and technical treatises so long as they are careful not to elevate them "to such prominence . . . that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321-22.

United States District Court
Northern District of California

**B.    Infringement by Argus Perceptive**

    **1.    Whether Argus Perceptive Permits a User To Access Data "Through The World Wide Web"**

        **a.    Background**

Claims 1 and 8 of the '091 patent require "permitting at least one remote user to access . . . data through the World Wide Web."  The Court construed the term "permitting at least one remote user to access such data through the World Wide Web" as meaning "permitting a user at one computer to access information reflecting occurrences of adverse events on a different computer or server, through one or more Internet servers." Claim Construction Order at 46.  In adopting this construction, the Court rejected Oracle's proposed limitation "using a standard Web browser, without using special software."  *Id.* at 44-46.  However, it held that "the invention does not include embodiments that utilize only a private intranet." *Id.* at 43.  On summary judgment, the primary dispute turns on whether DrugLogic can establish infringement based on evidence that Argus Perceptive can be linked to the World Wide Web using a Virtual Private Network ("VPN") connection.

In its Summary Judgment Motion, Oracle argues that Argus Perceptive does not meet this claim limitation, citing the opinions of its experts, Stephen Jolley and Brian Perry, as well as that of its Rule 30(b)(6) witness, Bruce Palsulich.   Summary Judgment Motion at 6 (citing KJM Decl., Ex. 2 (Jolley Report) ¶¶ 285-290;[4] *id.*, Ex. 4 (Expert Report of Brian K. Perry Regarding Non-Infringement by Argus Perceptive and Empirica Signal of the '091 Patent ("Perry Report")) ¶¶ 60-93; *id.*, Ex. 9 (Declaration of Bruce Palsulich Regarding Argus Perceptive ("Palsulich Decl.")).

In his report, Mr. Jolley opines that nothing in the opinions of DrugLogic's expert, Dr. Sydney Kahn, indicates that Argus Perceptive "permit[s] at least one remote user to access such data through the World Wide Web upon proper authentication."  KJM Decl., Ex. 2 (Jolley Report) ¶ 292.   To the contrary, Dr. Jolley asserts, "Dr. Kahn admits that 'based on [his] current

---

[4] Although Oracle cites to paragraphs 285-290 of the Jolley Report, those paragraphs address the claim term "storing data regarding the risks of adverse effects from the use of at least one drug of interest in one or more servers linked to the Internet."  Mr. Jolley addresses the claim term "permitting at least one remote user to access such data through the World Wide Web upon proper authentication" in paragraphs 291-297 of his report.

United States District Court
Northern District of California

1   understanding of Argus Perceptive, [he] cannot state with complete certainty that it does meet [the

2   World Wide Web] limitation.'"   *Id.* (quoting Kahn Report, Ex. I at 1).   Mr. Jolley notes that Dr.

3   Kahn relies on references to Argus Perceptive as being "Web-based" but opines that this reliance

4   is misplaced because "[a] 'Web-based' piece of software is not necessarily a piece of software that

5   is linked to the Internet." *Id.* ¶¶ 293-294.   According to Mr. Jolley, "'Web-based' can refer to

6   software that makes use of Hypertext Markup Language ('HTML') and Universal Resource

7   Locators ('URLs') to operate [and] 'Web based' software can operate on an internal private

8   network, without being linked to the Internet." *Id.* ¶ 294.   Mr. Jolley states, ███████████████

9   ████████████████████████████████████████████████████████████████████████████

10  ████████████████████████████████   Finally, Mr. Jolley states that he has reviewed

11  Mr. Perry's expert report and agrees with his conclusion that Argus Perceptive does not "permit[]

12  a user to access data 'through the World Wide Web.'" *Id.* ¶ 296.

13         In his report, Mr. Perry opines that Argus Perceptive was not designed to be accessible

14  through the World Wide Web and ███████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████   He also

16  rejects the opinion of Dr. Kahn that Argus Perceptive meets this limitation.   *Id.* ¶¶ 86-93.

17         With respect to the design of Argus Perceptive, Mr. Perry's opinion is based on ████████

18  ████████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



¶¶ 73-85.  First, he cites Dr. Kahn's failure to include in his report any opinion that any Argus manual he had reviewed "instructed customers to install or deploy any Argus product on the Internet or World Wide Web."  *Id.*  ¶ 74.  Mr. Perry further states that █████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

*Id.* ¶ 77.  Mr. Perry further opines that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

Finally, Mr. Perry rejects the opinion of DrugLogic's expert, Dr. Kahn, that Argus Perceptive meets this limitation.  *Id.* ¶¶ 86-93.  In particular, Mr. Perry addresses Dr. Kahn's reliance on: 1) Oracle materials describing the Argus suite of products as "web-enabled" or "web-based"; and 2) his understanding that "authenticated users can . . . access Argus Perceptive remotely, via the public internet, from computers outside a company firewall and intranet."  *Id.* ¶ 87 (quoting KJM Decl., Ex. 7 (Expert Report of Sidney N. Kahn ("Kahn Expert Report"), Ex. I at 1)).

With respect to the description of Argus products as "web-based" or "web-enabled," Mr. Perry states as follows:



*Id.* ¶ 88.

      Mr. Perry goes on to reject Dr. Kahn's suggestion that the claim limitation is met because users can access Argus Perceptive remotely, through the public internet, from computers outside a company firewall. *Id.* ¶ 89. He opines that ████████████████████████████████████████

████████████████████████████████████████████████████ He further opines that the possible use of VPN software to access Argus Perceptive on a company intranet by a remote user does not show that Argus Perceptive meets this limitation, stating as follows:

> Most commonly, companies may provide "virtual private network" or "VPN" software that allows authorized users to connect an external computer, for example a computer located at the user's home, to the company intranet. While connected, the VPN software assigns the user an IP address within the company intranet and connects the user to the company intranet as if he or she were another client computer on the company intranet network. Once connected via VPN, a user is indistinguishable from any other computer on the company's private intranet. In effect, the employee's computer becomes another "company campus" and data passes to and from the user through a secure tunnel just as it would between any other two company locations.

> Accessing a system such as Perceptive via a VPN is not equivalent to making Perceptive accessible through the World Wide Web or on an Internet server. VPN technology specifically makes an external user appear as "internal" (or as if they were directly on the intranet) as far as the applications/servers on the intranet are concerned. From the standpoint of Perceptive, all connections, including those of VPN users, would appear to be coming from the intranet (i.e., if one turned on HTTP web server logs on the Perceptive server, connections would be recorded as originating from internal IP addresses – even in the case of remote users accessing via VPN). Therefore, a user accessing Perceptive via VPN is not accessing Perceptive through the World Wide Web.

United States District Court
Northern District of California

1    *Id.* ¶¶ 92-93.

2         Oracle also points to Dr. Kahn's own statements, both in his report and in his deposition,

3    that he could "not state with complete certainty" that Argus Perceptive met this limitation.

4    Summary Judgment Motion at 6 (citing KJM Decl., Ex. 7 (Kahn Report, Ex. I at 1); *id.*, Ex. 8

5    (Kahn Dep.) at 119 (testifying that he did not know "with certainty" whether this limitation is

6    met), 121 (testifying that *assuming* Amgen uses Argus Perceptive, its employees who work

7    remotely throughout the country would be able to access Argus on the Amgen intranet but

8    conceding that he doesn't know if Amgen uses Argus Perceptive)).   According to Oracle, because

9    DrugLogic's own expert cannot say for sure whether Argus Perceptive "permit[s] at least one

10   remote user to access . . . data through the World Wide Web," and in light of the evidence offered

11   by Oracle that it does not, DrugLogic cannot meet its burden on summary judgment as to this

12   claim term. *Id.*

13        In a footnote in its brief, Oracle also addresses the possibility that DrugLogic would

14   respond to the Summary Judgment Motion by arguing that Argus Perceptive infringes the '091

15   patent when a user company employs a "VPN-like product" to allow its employees to access its

16   internal network remotely.  Summary Judgment Motion at 7 n. 4.  Oracle rejects this argument on

17   three grounds.  First, Oracle contends DrugLogic has no evidence that any user has ever accessed

18   Argus Perceptive remotely, through a VPN or any other software. *Id.*  Second, Oracle argues that

19   even if a company installed "separate software, like a VPN, to allow remote access, it would be

20   the company or that other software that 'permitt[ed] at least one remote user to access such data

21   through the World Wide Web,' not Argus Perceptive." *Id.* (citing  KJM Decl., Ex. 4 (Perry

22   Report) ¶¶ 89-93).  Third, Oracle contends accessing an intranet via a VPN is different from

23   making that intranet available "through the World Wide Web." *Id.* (citing KJM Decl., Ex. 4

24   (Perry Report) ¶ 93).  Oracle also points to the Court's holding in its claim construction order that

25   "the invention does not include embodiments that utilize only a private intranet." *Id.* (citing Claim

26   Construction Order at 43).

27        DrugLogic challenges Oracle's position on two grounds.  First, it asserts the Court should

28   not consider Mr. Perry's opinion regarding the use of VPN software to access Argus Perceptive

*United States District Court*
*Northern District of California*

through the World Wide Web because Mr. Perry did not apply the correct claim construction and because his opinions are based on information technology expertise that a person of ordinary skill in the arts would not have had.  DrugLogic, Inc.'s Opposition to Oracle's Motion for Summary Judgment of Complaint (Declaratory Judgment of Non-Infringement of '091 Patent) ("Summary Judgment Opposition") at 26 n. 28;  *see also* Motion to Exclude.  Second, it argues that Argus Perceptive meets this claim limitation because Oracle's expert concedes that a user can remotely access Argus Perceptive using VPN software that connects the remote user to an intranet over the Internet.  Summary Judgment Opposition at 26 (citing Declaration of Erin O. Millar in Support of DrugLogic Inc.'s Opposition to Oracle's Motion for Summary Judgment of Complaint (Declaratory Judgment of Non-Infringement of '091 Patent) ("Millar Opposition Decl."), Ex. 22 (Palsulich Dep.) at 117-118 (testifying that Argus Perceptive could be accessed using a VPN and that when a VPN connection is used, the Internet serves as a "conduit or backbone"); *id.*, Ex, 13 (Perry Dep.) (testifying that Argus Perceptive could be accessed using a secure VPN connection); *id.*, Ex. 23 (Perry Report) ¶¶ 57-58, 92 (stating that when a VPN connection is used, information travels over the infrastructure of the Internet)).

DrugLogic also argues that Oracle's position is contradicted by Relsys's "repeated statement[s] to customers that Argus could be accessed over the Internet using VPN technology." *Id.* at 27 (citing Millar Opposition Decl., Ex. 24 (Relsys responses to customers' requests for proposal ("RFPs") representing that Argus could be accessed over the Internet using VPN technology); *id.*, Ex. 13 (Perry Dep.) at 84-90, 95 (testifying that Argus Perceptive could be accessed over the Internet using VPN technology);  *id.*, Ex. 22 (Palsulich Dep.) at 115:1-117:8, 119:6-120:24; 126:1 -127:20; 137:3 -142:20 (same)).

Oracle rejects DrugLogic's assertion that Mr. Perry's opinions should not be considered, arguing that his opinions are consistent with the Court's claim construction and that his expertise is consistent with the definition of a person of ordinary skill in the art to which the parties agreed. Oracle's Opposition to DrugLogic's Motion to Exclude the Expert Testimony of Brian K. Perry ("Motion to Exclude Opposition").

Oracle contends Mr. Perry's position is consistent with the Court's claim construction for

United States District Court
Northern District of California

several reasons. First, according to Oracle, DrugLogic's position is based on the proposition that "remote access using a VPN satisfies the 'through one or more Internet servers' element of the Court's claim construction because a VPN uses the infrastructure of the Internet." *Id.* at 14. According to Oracle, the Perry Report explains why this proposition is incorrect. *Id.* Oracle states:

> [DrugLogic's] reasoning is flawed because it relies on a misunderstanding of what constitutes an "Internet server." The Perry Report correctly explains why. Remote VPN access to an internal company intranet does not travel "through one or more Internet servers." This is because an "Internet server" is a computer that is "designed to receive requests over the Internet and return a response." Perry Report ¶ 49. An "Internet server" is distinct from the "routers and switches" that generally make up the public infrastructure of the "Internet." *Id.* ¶ 47. VPNs create "tunnels" that are "secure private network[s] between physically distant locations using the infrastructure of public networks such as Internet routers and switches." *Id.* ¶¶ 57-58. Data travelling along VPN tunnels travels across routers and switches, not "through one or more Internet servers." *Id.* ¶¶ 57-59, 92-93. DrugLogic's argument thus assumes that "Internet servers" and "routers and switches" are the same thing, *see* D.I. 235 at 8: 9-12, an assumption for which DrugLogic offers no support, and which Mr. Perry debunks.

*Id.*

Second, Oracle rejects DrugLogic's assertion that Mr. Perry has added a requirement to the Court's claim construction that data passing "through one or more Internet servers" must be "capable of being accessed while passing through these Internet servers." *Id.* at 14 (citing Motion to Exclude at 6). According to Oracle, this argument is "simplistic and wrong" because Mr. Perry is "simply describ[ing] the fact that intranet network data that traverses the public infrastructure of routers and switches is not accessible to those routers and switches." *Id.* at 15. Oracle argues that Mr. Perry does not add any new requirement and moreover, his conclusions regarding non-infringement do not depend on any "capable of being accessed" requirement. *Id.*

Third, Oracle contends DrugLogic's position "ignores the fact that VPN programs operate to make remote computers *part of* a private intranet." *Id.* (citing Perry Report ¶ 92) (emphasis in brief). In other words, the user's computer is assigned the IP address of the company intranet when a VPN program is used. *Id.* Therefore, Oracle asserts, if a company that uses Argus Perceptive permits its employees to access Argus using a VPN, Argus is still being accessed via

United States District Court
Northern District of California

16

the *intranet*. *Id.*

Fourth, Oracle asserts DrugLogic's position is factually incorrect because it assumes that a "private intranet" must be located at a single physical location. *Id.* at 15-16. This position, according to Oracle, is unsupported by any expert opinion and consists entirely of attorney argument. *Id.* at 16. Oracle contends Mr. Perry's expert opinion explains why DrugLogic's assumption is wrong, making "the fundamental point that VPN access is an 'embodiment that utilize[s] only a private intranet,' and thus excluded from the Court's claim construction." *Id.* at 15; *see also* KJM Decl., Ex. 4 (Perry Report) ¶¶ 56-57, 92-93.

Oracle also rejects DrugLogic's contention that Mr. Perry's opinions should not be considered because he has IT expertise that is beyond that which would be possessed by a person of ordinary skill in the art of the '091 patent. Motion to Exclude Opposition at 17-19. First, Oracle notes that although the parties agreed that a person of ordinary skill in the art would have a bachelor's degree and at least four years of experience in the drug safety or pharmacovigilance field, Oracle has "consistently taken the position that a person of ordinary skill in the art should have experience *in the technical and computing side* of the pharmacovigilance field." *Id.* at 18 n. 10. To the extent DrugLogic contends one of ordinary skill in the art is a medical professional with no computer experience, Oracle argues, its position must be wrong because 35 U.S.C. § 112 requires that a patent contain adequate written description to enable one of skill in the art to make the claimed invention. *Id.* at 19. Clearly, Oracle asserts, a person with no computer science background could not make the software claimed in the '091 patent; conversely, § 112 indicates that a person of ordinary skill in the art must be a person who has skills in software development. *Id.* Therefore, Oracle contends, Mr. Perry's opinions should be considered. *Id.* Oracle further points out that DrugLogic's experts, Drs. Kahn and Nelson (in contrast to Mr. Jolley and Mr. Perry) admit they could not make the software claimed in the '091 patent.

In Oracle's Reply ISO Motion for Summary Judgment of Non-Infringement of '091 Patent ("Summary Judgment Reply"), Oracle rejects DrugLogic's assertion that summary judgment should be denied because Argus Perceptive *could* be made accessible using a VPN connection. Summary Judgment Reply at 16. Oracle argues that there is no evidence that any customer

authorized to use the Argus ███████████████ has made Argus Perceptive accessible via VPN. *Id.* Even if there were, however, this evidence would not establish that Argus Perceptive software permits access to the World Wide Web but rather, only that an implementation using VPN software permits such access. *Id.* Nor does it establish that secure access via a VPN connection qualifies as "access through the World Wide Web." *Id.* Similarly, Oracle argues, the Relsys RFPs stating Argus Perceptive can be accessed using a VPN do not establish that this claim limitation is met. *Id.*

> ### b.   Analysis
>
> #### i.   Whether Mr. Perry is a Person of Ordinary Skill in the Art

DrugLogic contends Mr. Perry's opinions are not relevant to whether it can establish infringement of the claim term requiring that Argus Perceptive permit access to the World Wide Web because he possesses qualifications that a person of ordinary skill in the art would not have possessed. DrugLogic is incorrect.

The parties agreed that a person of ordinary skill in the art is a person with a bachelor's degree and at least four years of experience in the drug safety or pharmacovigilance field. They did not agree that a person of ordinary skill in the art could have no familiarity with computer software developed for use in the area of pharmacovigilance. Nor would such an exclusion have made sense. The '091 invention is directed at computer software in the field of pharmacovigilance. [5] To be enabled, a patent must provide disclosure sufficient to allow a person of ordinary skill in the art to make the invention without undue experimentation. *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 941 (Fed. Cir. 1990) (citing 35 U.S.C. § 112). It therefore follows that where the claimed invention is computer software, a person of ordinary skill in the art in the field of the invention must have *some* computer programming skills. *See id.* Further, to the extent that Mr. Perry may have more expertise in information technology than would have been possessed by a hypothetical person of ordinary skill in the art, that is not a

---

[5] Pharmacovigilance is the science of detecting, assessing, understanding and preventing adverse effects resulting from the administration of drugs. *See* DrugLogic's Second Amended Answer, ¶ 80.

ground for excluding his testimony.   To the contrary, the Federal Circuit has expressly held that "[b]ecause the person having ordinary skill in the art is a theoretical construct and is not descriptive of some particular individual, a person of exceptional skill in the art should not be disqualified because he or she is not ordinary enough." *Norgren Inc. v. International Trade Comm'n*, 699 F.3d 1317, 1325 (Fed. Cir.  2012) (quotations and citation omitted).   Accordingly, the Court declines to exclude the opinions of Mr. Perry on this ground.

<div style="text-align:center">

ii.   **Whether DrugLogic Has Offered Evidence Sufficient to Establish that Argus Perceptive Permits Users to Access Data "through the World Wide Web"**

</div>

DrugLogic relies on evidence that a company intranet with Argus Perceptive installed on it can be accessed using VPN or similar software to show that Argus Perceptive meets the '091 claim limitation requiring that it "permit[ ] at least one remote user to access . . . data through the World Wide Web."  Based on this evidence, DrugLogic contends summary judgment of non-infringement on this question should be denied.  The Court disagrees.

As a preliminary matter, the Court notes that even DrugLogic's own expert, Dr. Kahn, was unable to opine with confidence that this claim limitation is met by Argus Perceptive.  *See* KJM Decl., Ex. 7 (Kahn Report, Ex. I at 1) ("based on my current understanding of Argus Perceptive, I cannot state with complete certainty that it does meet this limitation").  More importantly, the evidence cited by DrugLogic is not sufficient to establish that Argus Perceptive meets this claim limitation in light of the unrebutted expert testimony of Mr. Perry identifying the flaws, from a technological standpoint, in DrugLogic's position.

As stated above, in its Claim Construction Order, the Court construed the term "permitting at least one remote user to access . . . data through the World Wide Web" to mean "permitting a user at one computer to access information reflecting occurrences of adverse events on a different computer or server, through one or more Internet servers."  Claim Construction Order at 46.  The Court also held that "the invention [claimed in the '091 patent] does not include embodiments that utilize only a private internet."  *Id.* at 43.  While it is undisputed that VPN (or similar) software may be used to connect a user remotely to a company intranet on which the Argus products have

<div style="text-align:center">19</div>

United States District Court
Northern District of California

United States District Court
Northern District of California

1   been installed, and also that the connection uses the infrastructure of the Internet to allow the

2   remote user to access Argus Perceptive, DrugLogic offers no evidence to rebut Mr. Perry's

3   testimony that: 1) the tunnel through which remote users communicate when they use a VPN

4   consists only of routers and switches and does not involve the use of Internet *servers*; and 2)

5   when a remote user connects to a company intranet using a VPN, the remote computer is assigned

6   the IP address of the company's intranet and thus becomes *part of* the  private intranet.  As the

7   Court has held that this claim term requires access "through one or more Internet servers" and that

8   an embodiment that uses only a private intranet cannot satisfy this claim term, DrugLogic's

9   evidence is not sufficient to create a fact question that defeats summary judgment of non-

10  infringement as to this claim element.  Moreover, it is not Argus Perceptive that permits a user to

11  access data through the Internet when VPN software is used – it is the VPN.  Accordingly, Oracle

12  is entitled to summary judgment noninfringement on this additional ground.

13          **2.   Whether Argus Perceptive Stores Data In Servers "Linked To The Internet"**

14              **a.   Background**

15          Claim 1 of the '091 patent requires "storing data regarding the risks of adverse effects from

16  the use of at least one drug of interest in one or more servers linked to the Internet."  The parties

17  did not ask the Court to construe this claim term.  Oracle argues that it is entitled to summary

18  judgment that Argus Perceptive does not meet this requirement because it has presented

19  substantial evidence that Argus Perceptive does not store data "in servers linked to the Internet."

20  Summary Judgment Motion at 7 (citing KJM Decl., Ex. 2 (Jolley Report) ¶¶ 285-290; *id.*, Ex. 4

21  (Perry Report) ¶¶ 60-993; *id.*, Ex. 9 (Palsulich Decl.) ¶ 3).  According to Oracle, the only evidence

22  offered by DrugLogic to show that this limitation is met by Argus Perceptive is the statement of

23  Dr. Kahn ███████████████████████████████████████████████████████

24  ███████████████████████████████████████████  Oracle further cites Dr. Kahn's

25  deposition testimony stating that he could not state "for certain" whether this limitation was met

26  by Argus Perceptive but that this was "an inference" that could be drawn from the language in the

27  manual.  *Id.* (citing KJM Decl., Ex. 8 (Kahn Dep.) at 131).  This inference, Oracle asserts, is

28  unsupported by the evidence and is not sufficient to create a fact question on summary judgment.

United States District Court
Northern District of California

1    *Id.*

2          In its opposition brief, DrugLogic contends that to the extent a computer can use VPN

3    software to access Argus Perceptive remotely using the Internet's infrastructure, "it is self-evident

4    that the data . . . must be stored in a server that is 'linked to the Internet.'"   Summary Judgment

5    Opposition at 28.  DrugLogic further relies on testimony by Oracle's expert, Mr. Perry, that

6    "Argus Safety, the database component where the data regarding adverse events is stored, uses

7    electronic data interchange ('EDI') gateways to transfer data over the Internet to the FDA and

8    other companies." *Id.* (citing Millar Opposition Decl., Ex. 13 (Perry Dep.) at 79-84); *id.*, Ex. 22

9    (Palsulich Dep.) at 155-159; *id.*, Ex. 24 ███████████████████████████████

10   ████████████████   According to DrugLogic, "[i]t is axiomatic that in order to accomplish

11   electronic transfers to and from the Argus Safety database using EDI gateways over the Internet,

12   the data must be stored in servers linked somehow (directly or indirectly) to the Internet." *Id.* at

13   28-29.

14         Oracle responds that the evidence concerning EDI gateways relates to Argus Safety, not

15   Argus Perceptive.  Summary Judgment Reply at 16.  In any event, Oracle asserts, to the extent

16   companies have used an EDI gateway to send information to the FDA, this is something that was

17   done by the companies, not by Oracle or Relsys. *Id.* at 16-17.  Finally, Oracle's experts, Mr.

18   Jolley and Mr. Perry, have opined that in the context of the '091 patent, "linked to the Internet"

19   means more than the ability to send information via secure channels. *Id.* at 17.  Instead, "it means

20   'having a public IP address' and 'being accessible from the public Internet.'" *Id.* (citing KJM

21   Decl., Ex. 2 (Jolley Report) ¶¶ 285-290; *id.*, Ex. 4 (Perry Report) ¶¶ 60-93).  Given that

22   DrugLogic has offered *no* expert witness testimony contradicting the opinions of Mr. Perry and

23   Mr. Jolley on this point, Oracle asserts, DrugLogic has failed to establish the existence of a

24   genuine dispute of material fact as to this claim element.

25              **b.    Analysis**

26         DrugLogic contends it can show that this claim limitation is met based on evidence that

27   data from Argus Safety can be conveyed to the FDA using an EDI gateway, as well as the opinion

28   of Dr. Kahn that Argus Perceptive can be accessed remotely using VPN software.  The Court

                                                   21

United States District Court
Northern District of California

1    rejects these arguments.

2         With respect to DrugLogic's argument based on use of an EDI gateway to convey

3    information to the FDA from Argus Safety, DrugLogic has not offered any expert testimony

4    supporting its argument that such evidence would be sufficient to show, within the meaning of the

5    '091 claims, that Argus Perceptive meets this claim limitation.  More generally, DrugLogic has

6    not offered expert testimony addressing the meaning of this claim term, which the Court was not

7    asked to construe.  Nor has DrugLogic offered any expert testimony to rebut the opinions of

8    Oracle's experts that "linked to the Internet" in the context of the '091 patent means having a

9    *public* IP address and being accessible from the public Internet.  The Court further finds that

10   Oracle's proposed interpretation of this claim term is consistent with the Court's construction of

11   "permitting at least one remote user to access such data through the World Wide Web."  In

12   particular, the Court found that that claim term required that users must be able to access "such

13   data" – that is, the data referred to in the Storing Data limitation at issue here – through "one or

14   more Internet servers."  As neither a connection to a company intranet using VPN software nor

15   use of an EDI gateway to convey information from a company intranet to the FDA involves the

16   use of a public IP address that allows access from the public Internet, the Court concludes

17   DrugLogic has failed to meet its burden as to this claim term. Therefore, Oracle is entitled to

18   summary judgment that Argus Perceptive does not satisfy this claim term.

19

20        3.    **Whether Argus Perceptive "Associat[es] Respective Hyperlinks With a Plurality of Portions of Such Data and Analysis"**

21             a.    **Background**

22        Claims 1 and 8 of the '091 patent require "associating respective hyperlinks with a

23   plurality of portions of such data and analysis."  The Court construed this claim term as "creating a

24   plurality of links within web pages for some of the previously stored information and some of the

25   results of the statistical analysis such that clicking on the information or results causes a user to

26   jump to another place in the same web page or to an entirely different web page."  Claim

27   Construction Order at 31.

28        In its Summary Judgment Motion, Oracle asserts DrugLogic cannot show that Argus

Perceptive meets this limitation because it has offered no evidence that Argus Perceptive creates

hyperlinks on any "results of the statistical analysis."  Summary Judgment Motion at 8.  Oracle

argues that the numbers in the "A" column of Argus Perceptive upon which Dr. Kahn relies do not

show that this requirement is met because they represent "simple counts of the number of reported

cases" and are not "the results of the statistical analysis" required under the Court's claim

construction.  *Id.* (citing KJM Decl., Ex. 7 (Kahn Report, Ex. I at 5); *id.*, Ex. 8 (Kahn Dep.) at

165-166, 175).  According to Oracle, even Dr. Kahn uses "hedging language" with respect to this

claim limitation and does not state outright that the case counts in Column "A" are "the results of

the statistical analysis."  *Id.* at 9 (citing Ex. 7 (Kahn Report, Ex. I at 4 ("The hyperlink associated

with each drug-event count in Column 'A' represent a system-generated plurality of web page

hyperlinks for accessing the statistical analysis results. Count computation by the system is

intrinsic to all of the subsequent statistical analysis."))).

Oracle cites the Court's claim construction in support of its position that the numbers in

Column "A" cannot be the "results of the statistical analysis" required to meet this claim

limitation, arguing as follows:

> As this Court has interpreted them, the independent claims recite
> "permitting the at least one remote user to run a statistical analysis
> that finds 'signals.'" [Joint Statement of Facts re Oracle's Motion
> for Summary Judgment ("UF")] 1. It is that same "statistical
> analysis" that is referred to in the following clause, which requires
> "creating a plurality of links within web pages for . . . some of the
> results of the statistical analysis." The "statistical analysis" to which
> the '091 patent refers, however, is one that "finds 'signals' such as
> anomalies in a random population, changes against a known
> background, or coherent targets in a noise background," and the
> results of the statistical analysis are the "signals" themselves. UF 1;
> [KJM Decl.,] Ex. 1 ('091 Patent) at 20:54-57. Case counts do not
> provide that information and so cannot be "signals;" if they cannot
> be "signals," they likewise cannot be "the results of the statistical
> analysis."

*Id.* Oracle also cites the '091 specification in support of its position that the "results of the

statistical analysis" are the signals that the '091 invention was designed to find.  *Id.* at 9-10 (citing

'091 patent at 4:29-34, 6:20-23,  9:66-10:5, 20:54-57, 20:57-60,  21:1-11, 20:52-56, 22:59-64,

23:21-27, 23:3- 24:23-31).

United States District Court
Northern District of California

According to Oracle, "signals" in the '091 patent are "the results of statistical algorithms that give *meaning* to simple case counts by comparing those counts with other information" and thus, the "signals" in the Argus Perceptive screen shot from Dr. Kahn's report are not the numbers in the "A" column but instead, the numbers in the columns to the right of the "A" column, labeled "PRR" and "Chi^2." *Id.* at 10 (citing KJM Decl., Ex. 2 (Jolley Report) ¶¶ 100, 302-304).

Finally, Oracle points to Dr. Kahn's deposition testimony in which Oracle contends he concedes that case counts in Argus Perceptive are not signals. *Id.* at 10-11 (citing KJM Decl., Ex. 8 (Kahn Dep.) at 167-170). In particular, Oracle cites the following testimony by Dr. Kahn:

> Q: Is a case count an anomaly in a random population?
>
> A: It may be.
>
> Q: How would you know?
>
> A: By doing a statistical analysis on the case count.
>
> Q: And what would the statistical analysis have to be?
>
> A: The statistical analysis could be one of a variety of tools, such as the ones I will show in here, the PRR, the EBGM and whatever other tools, statistical tools are implemented in the system.
>
> . . .
>
> Q: Is there any way to evaluate the statistical significance of just the case count standing alone?
>
> A: Certainly.
>
> Q: How would you do that?
>
> A: Using the PRR or EBGM.
>
> Q: You would have to use those two?
>
> A: Well, statistical analysis cannot be done on one value. It has to be a value in relation to other things or in comparison with something else.

*Id.* at 10-11 (citing KJM Decl., Ex. 8 (Kahn Dep.) at 167-170).

In its Opposition brief, DrugLogic rejects Oracle's argument that number counts are not the result of statistical analysis, citing the '091 specification, the testimony of Drs. Nelson and Kahn to the contrary, and past statements by Oracle. Summary Judgment Opposition at 17-19. As to the '091 patent, DrugLogic points to column 18, ll. 8-20, describing tables that list the "reaction count" and then stating that "[t]he ability to browse statistics, up and down a hierarchy,

24

and within real time, is important . . . ." *Id.* at 17. DrugLogic contends this passage "expressly describes a case count as a statistic." *Id.* DrugLogic also cites column 19, ll. 6-15, which refers to "statistics" in the context of describing a demographics table. *Id.* In addition, DrugLogic points to Figures 17-19, which depict the case count on the results screen of the proportional analysis engine. *Id.* According to DrugLogic, "the only result that is specified as being hyperlinked is the reaction count, not any other statistic." *Id.* (citing '091 patent at 23: 52-62 ("FIG. 19 is the tabular presentation of the proportional analysis results . . . The remaining three columns in the table preferably indicate the reaction count (field 1902) (with a hyperlink to the cases themselves), the expected reaction count (field 1903), and the Relative Ratio (field 1904)").

DrugLogic also cites the testimony of Drs. Nelson and Kahn that "the reaction count is both a statistical analysis unto itself and a portion of the calculation of other statistics, such as EBGM and PRR." *Id.* at 17 (citing Millar Opposition Decl., Ex. 7 (Expert Report of Robert C. Nelson ("Nelson Report"), Ex. 3 at 4) ("[t]he count . . . is a descriptive statistic [and] is a portion of the statistical analysis because it is an essential part of the PRR and EBGM statistical analyses"); *id.*, Ex. 8 (Kahn Report, Ex. I at 4)("[A case count] is intrinsic to all of the subsequent statistical analyses."); *id.*, Ex. 16 (Nelson Dep.) at 99:12-20; 103:10-20; 105:7-107:11 (testifying that case count is a statistic); and *id.*, Ex. 11 (Kahn Dep.) at 51:1-21; 165:24-166:17 (same)). Further, DrugLogic points to testimony by Dr. Kahn that a case count "can identify an anomaly against a known background." *Id.* (citing Millar Opposition Decl., Ex. 11 (Kahn Dep.) at 167-168).

According to DrugLogic, Oracle's position should also be rejected because it is inconsistent with its own past statements in various manuals and training guides. *Id.* at 18. For example, DrugLogic points to a statement in the Empirica Signal Manual stating as follows: "[t]he following statistics are provided for the combination of the drug and event: N – observed number of cases. EBGM – Empirical Bayesian Geometric Mean . . ." *Id.* (citing Millar Opposition Decl., Ex. 6 (Empirica Signal Manual) at 319-20). DrugLogic also cites a reference in the same manual to "N" as a statistical score, *id.* at 179-181, as well as other training materials describing case counts as statistics. *Id.* (citing Millar Opposition Decl., Ex. 17 (Excerpt from WebVDME15

United States District Court
Northern District of California

United States District Court
Northern District of California

4.0 Training Guide ("WebVDME Training")) at 14 (describing the case count, EBGM and EBO5 as statistics); *id.*, Ex. 18 (Excerpt from WebVDME Response to Request for Information) at OR-DL001215941 at R10-1-9, Comment Section (referring to "signal detection statistics such as counts and measures of disproportionality")).

Oracle responds that to the extent the '091 patent, the Empirica training materials and DrugLogic's experts have described case counts as statistics, this evidence is irrelevant; the relevant question, according to Oracle, is whether case counts are "the results" of the statistical analysis claimed in the patent, that is, a statistical analysis "that finds 'signals' such as anomalies in a random population, changes against a known background, or coherent targets in a noise background.'" Summary Judgment Reply at 9. Oracle contends DrugLogic fails to address or rebut its argument that the number counts cited by Dr. Kahn are not signals. *Id.* Oracle also rejects DrugLogic's reliance on Dr. Kahn's testimony that a number count could constitute a signal to the extent it demonstrated an "anomaly against a known background." *Id.* According to Oracle, Dr. Kahn was merely opining that "in a particular situation, where the user of a drug safety analysis system knows certain information about the population that has been exposed to the drug of interest, the user could apply that knowledge to a case count in order to understand that the case count represents an anomaly in a population." *Id.* This testimony, Oracle contends, is an admission that the case count, standing alone, does not represent an anomaly in a random population. *Id.*

### b. Analysis

DrugLogic contends it can show Argus Perceptive meets this claim limitation based on the number counts in Column "A" that are cited by Dr. Kahn. Because the Court concludes that these number counts are not "the results of the statistical analysis" described in the '091 patent, Oracle is entitled to summary judgment that Argus Perceptive does not meet this requirement.

When the Court construed the independent claims of the '091 patent, it found that the claim term "permitting the at least one remote user to analyze safety issues" meant "permitting the at least one remote user to run a statistical analysis that finds 'signals' such as anomalies in a random population, changes against a known background, or coherent targets in a noise

background." It is this analysis that is subsequently referenced in the Wherein Clause, which states, in part, "wherein the step of permitting the at least one remote user to analyze comprises associating respective hyperlinks with a plurality of portions of *such data and analysis*." Thus, in construing the phrase "associating respective hyperlinks with a plurality of portions of such data and analysis" with reference to "the results of the statistical analysis," the Court implicitly recognized that that claim term described a particular *type* of analysis, namely, the analysis that "finds 'signals' such as anomalies in a random population, changes against a known background, or coherent targets in a noise background." None of the evidence offered by DrugLogic is sufficient to show that this requirement is met by Argus Perceptive.

DrugLogic has offered evidence that a number count may be described as a statistic – testimony by Drs. Nelson and Kahn, statements in the '091 specification, and statements made by Oracle and Relsys with reference to the Empirica product. None of this evidence, however, establishes that the number counts in Column "A" of Argus Perceptive upon which DrugLogic relies are the "results of the statistical analysis" that is claimed in the '091 patent, which identifies signals. Indeed, Dr. Kahn all but admits that the number counts are merely *plugged in* to the PRR and EBGM statistical analysis to find the signals that are the "results of the analysis." Further, Dr. Kahn's testimony that a number count can be used to identify an anomaly in a random population falls short because it depends upon the knowledge of the user regarding trends in a number count, which would allow the user to compare the number of adverse events over time. Dr. Kahn's testimony does not establish that a number count, by itself, is a signal, as is required by the independent claims of the '091 patent. Oracle therefore is entitled to summary judgment as to this claim element.

### 4. Whether Argus Perceptive Includes "A Plurality of Hyperlinks Respectively Corresponding To Places in an Up and Down Hierarchy"

#### a. Background

The asserted claims of the '091 patent require "associating respective hyperlinks with a plurality of portions of such data and analysis, the plurality of hyperlinks respectively corresponding to places in an up and down hierarchy." In its Claim Construction Order, the Court

1  found that the phrase "hyperlinks . . . corresponding to places in an up and down hierarchy" means

2  "such links respectively corresponding to different levels of a structured medical dictionary, such

3  as MedDRA." Claim Construction Order at 25.

4        In its Summary Judgment Motion, Oracle contends DrugLogic has failed to offer evidence

5  sufficient to establish that Argus Perceptive meets this limitation. Summary Judgment Motion at

6  11-12. In particular, it argues that Dr. Kahn's position – that this limitation is satisfied by the

7  hyperlinked case counts in Column "A" discussed above – fails because Dr. Kahn does not

8  identify a "*plurality* of hyperlinks" and ignores the word "respectively" in the claim language. *Id.*

9  at 11 (citing KJM Decl., Ex. 7 (Kahn Report, Ex. I at 5) ("The Hierarchy limitation requires that

10  the hyperlinks correspond to different levels of a structured medical dictionary, such as MedDRA.

11  Here, the analysis was run at the MedDRA SOC level. The hyperlinks in Column "A" reflect the

12  number of cases for the drug of interest within a given SOC, corresponding to levels of

13  MedDRA.")).

14        Oracle's expert, Mr. Jolley, rejects Dr. Kahn's opinion, explaining his conclusion as

15  follows:

16        The "wherein" clause recites "associating respective hyperlinks with
        a plurality of portions of such data and analysis, the plurality of
17        hyperlinks respectively corresponding to places in an up and down
        hierarchy, and allowing analytical drilldown by selectively selecting
18        successive hyperlinks." It is clear from this language that the
        hyperlinks "corresponding to places in an up and down hierarchy"
19        must enable the user to move through the hierarchy in some way. In
        other words, if the numbers in Column "N" above are hyperlinks
20        corresponding to the HLGT level of the MedDRA hierarchy,
        clicking on those hyperlinks should take the user to another level of
21        the MedDRA hierarchy, such as the HLT level. For hyperlinks to be
        part of a "plurality of hyperlinks respectively corresponding to"
22        different levels of the MedDRA hierarchy, there must be a process
        by which the hyperlinks take the user through at least two levels of
23        the MedDRA hierarchy.
24

25  *Id.* (quoting KJM Decl., Ex. 2 (Jolley Report) ¶ 88). According to Mr. Jolley, "the links in

26  Column 'A' do not move the user to a different level of the MedDRA hierarchy. Instead, they

27  simply move the user to a list of the cases underlying the 'N' number." KJM Decl., Ex. 2 (Jolley

28  Report) ¶ 314. Oracle further points to Dr. Kahn's deposition testimony, in which Dr. Kahn stated

United States District Court
Northern District of California

28

1    that the word "respectively" in the claim term had no specific meaning to him and that if he had

2    drafted the claim he would have left the word out. *Id.* at 12 (citing KJM Decl., Ex. 8 (Kahn Dep.)

3    at 277-279). According to Oracle, Dr. Kahn's opinion should be rejected because he has ignored

4    the words of the claim, which is contrary to the basic rules of claim construction. *Id.* at 12 (citing

5    *IXYS Corp. v. Advanced Power Tech., Inc.*, 301 F. Supp. 2d 1065, 1074 (N.D. Cal. 2004)).

6            In its Opposition brief, DrugLogic contends Oracle has taken inconsistent positions as to

7    the meaning of the word "respectively." Summary Judgment Opposition at 21. According to

8    DrugLogic, the word "respectively" means "that one hyperlink is on analysis while a separate

9    hyperlink is on data because 'hyperlinks' is plural as is 'data *and* analysis.'" *Id.* (emphasis in

10   original). This position is consistent with statements made by Oracle at the claim construction

11   hearing, DrugLogic asserts. *Id.* (citing Millar Opposition Decl., Ex. 14 (Claim Construction

12   hearing transcript) at 45). According to DrugLogic, Oracle has now changed its position,

13   however, arguing "that there must be only one hyperlink that corresponds to at least two levels of

14   the MedDRA, even though the terms 'hyperlinks' and 'levels' are both plural." *Id.* DrugLogic

15   argues that Oracle's "inconsistent use of the term 'respective'" should be rejected. *Id.*

16          In its Reply brief, Oracle notes that DrugLogic did not provide a citation showing where

17   Oracle expressed its "purportedly inconsistent position" and argues that DrugLogic has, in fact,

18   mischaracterized its position. Summary Judgment Reply at 8. Oracle contends it has consistently

19   taken the position that this claim term requires "(1) hyperlinks that correspond to one level of a

20   structured medical dictionary; and (2) other hyperlinks that correspond to a second level of a

21   structured medical dictionary." *Id.* at 9 (citing Summary Judgment Motion at 11-12).

22          **b.    Analysis**

23          DrugLogic contends it can establish that Argus Perceptive meets this claim limitation

24   based on Dr. Kahn's opinion that the number counts in Column "A", which are linked to

25   information about the underlying cases, are the "links [that] respectively correspond[ ] to different

26   levels of a structured medical dictionary, such as MedDRA." The Court disagrees.

27          The language of the claim refers to a "plurality" of hyperlinks. The Court has construed

28   this language to mean that these hyperlinks correspond to "different" levels of the MedDRA

hierarchy. DrugLogic has made no attempt to reconcile its position with this language. It has not offered any testimony by Dr. Kahn explaining how the hyperlinks in Column "A", which at best represent only one level of the MedDRA hierarchy, can establish the existence of hyperlinks at *different* levels of that hierarchy. Indeed, Dr. Kahn has testified that he ignored the word "respectively" in the claim language altogether. Because his opinion is inconsistent with the claim language, the Court finds that it does not establish the existence of a genuine issue of material fact. Therefore, Oracle is entitled to summary judgment that Argus Perceptive does not meet this claim requirement.

### 5. Whether Argus Perceptive "Allows[s] Analytical Drill Down By Selectively Selecting Successive Hyperlinks"

#### a. Background

The independent claims of the '091 patent require "allowing analytical drill down by selectively selecting successive hyperlinks." The Court has construed the phrase "allowing analytical drill down" to mean "allowing a user to redo the analysis in real time at different levels of the hierarchy by selectively selecting successive hyperlinks." Claim Construction Order at 67. According to DrugLogic's expert, Dr. Kahn, Argus Perceptive satisfies this claim element because a user is able to change the MedDRA level at which an analysis is performed by "selecting a different level from the 'Analysis Level' drop down menu on the 'Analysis Report' screen (here, the PT level) and clicking the 'Generate' hyperlink to redo the analysis at that level." KJM Decl., Ex. 7 (Kahn Report, Ex. I at 5).

Oracle seeks summary judgment that Argus Perceptive does not meet this claim limitation on two grounds: 1) "Dr. Kahn only identifies one 'hyperlink' for selection, not multiple 'successive' hyperlinks that are 'selectively selected'"; and 2) the "Generate" feature that Dr. Kahn identifies is not a "hyperlink" but a button and therefore is not consistent with the '091 patent or specification and claims. Summary Judgment Motion at 13. With respect to the question of whether the "Generate" feature is a hyperlink or a button, Oracle argues that Dr. Kahn's opinion should be given no weight because he has no expertise on this question. *Id.* (citing KJM Decl., Ex. 8 (Kahn Dep.) at 110) (testifying that his understanding that a button is a

hyperlink is "not based on any expertise in pharmacovigilance"); *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1431 (9th Cir. 1991)). Oracle further contends Dr. Kahn's opinion should not be credited because, notwithstanding his opinion that buttons are "hyperlinks," he tends to refer to them as "buttons." *Id.* (citing KJM Decl., Ex. 8 (Kahn Dep.) at 285 ("So the Next button, the Back button are, in my estimation, hyperlinks . . . "); *id.* at 104 ("[C]ertainly the Save button would be a hyperlink button")).

On the other hand, Oracle asserts, it has offered the testimony of two experts, Mr. Perry and Mr. Jolley, that "people of ordinary skill in the art of the '091 patent in 2001 knew the difference between these two user-interface tools, and referred to them by different names." *Id.* (citing KJM Decl., Ex. 2 (Jolley Report) ¶¶ 124-125; *id.,* Ex. 4 (Perry Report) ¶¶ 99-126). Mr. Jolley states in his report, "[i]n my experience as a professional in the fields of drug safety and pharmacovigilance, I have never referred to buttons in a software-driven user interface as hyperlinks, or vice versa." KJM Decl., Ex. 2 (Jolley Report) ¶ 124. He goes on to state that he would not have understood the hyperlinks claimed in the '091 patent to include "buttons" and opines that the '091 specification appears to distinguish between hyperlinks and buttons. *Id.* ¶¶ 125-126 (citing '091 patent at 14:44-45 ("Pushing the 'View' button allows a review of the specific details of the filter"); 14:60-65 ("If a user wishes to apply this saved filter as his/her current query, he/she would click on the 'Apply' button")). According to Mr. Jolley, "when the '091 patent discusses 'buttons,' those buttons appear, visually, as buttons in the Figures of the '091 patent." *Id.* ¶ 126 (including graphic showing Fig. 3 of '091 with "View" and "Apply" buttons in boxes).

Mr. Jolley points out that elsewhere, the '091 patent discusses "hyperlinks" or "links." *Id.* ¶ 127 (citing '091 patent, 16:2-4 ("The search results also allow access to the drug's 'pedigree,' or lexical mapping information, indicated by a question mark link"); 15:2-16 ("Each listing ends with a hyperlink that a user can employ to view the results of the search"); 17:61-64; 18:24-26; 21:66-22:2; 23:58-62; 24:46-48). According to Mr. Jolley, the graphic depictions of these "hyperlinks" or "links" do not show them as buttons in the '091 patent. *Id.* (including graphic showing Fig. 5 of the '091 patent in which results in "Pedigree" column are not in boxes).

31

Mr. Jolley opines that the Court's claim construction preserves the distinction between a button and a hyperlink by referring to a "link" in its construction. *Id.* ¶ 129. Because a "button" is not a "link," it does not satisfy this claim limitation even if it "may allow a user to move from one web page to another." *Id.* Finally, Mr. Jolley opines that he agrees with Mr. Perry's "technical explanation of why buttons are not hyperlinks." *Id.* ¶ 130.

Mr. Perry's technical explanation in support of the distinction Oracle draws between a "button" and a "hyperlink" is as follows:

> In May 2001, as it is today, a "hyperlink" was understood as a specific piece of HTML code. Consistent with the Court's construction, a hyperlink's function is to link one web page, or a location on a web page, with another. A developer does so by making particular portions of the text of a web page "clickable" for the person reading the page. The official definition of "hyperlink," synonymous with "link," that was then current, and is still current, is from the W3C HTML 4.01 specification of 24 December 1999 (available at http://www.w3.org/TR/1999/REC-html401-19991224/); wherein a hyperlink is defined as "a connection from one Web resource to another" having "two ends – called anchors – and a direction. The link starts at the 'source' anchor and points to the 'destination' anchor (see http://www.w3.org/TR/1999/REC-html401-19991224/struct/links.html). The W3C HTML specification further describes hyperlinks as being implemented in HTML either with the A (for "anchor") tag or the LINK tag.

KJM Decl., Ex. 4 (Perry Report) ¶ 100; *see also id.*, ¶ 103 ("An anchor tag is simply a small piece of HTML code that contains the destination the hyperlink will link to and the "clickable" text that will be displayed. For example, <A href="http://www.google.com">Search Google</A> would display the (typically) blue, underlined text "Search Google" that, when clicked on, would direct the user's web browser to go to www.google.com."). Mr. Perry goes on to opine that buttons, dropdown menus and checkboxes are distinct user interfaces that use different HTML code than is used to create hyperlinks. *Id.* ¶¶ 104-106. Further, Mr. Perry states, "in HTML coding, buttons, dropdown menus, and checkboxes fulfill a separate role from hyperlinks." *Id.* ¶ 107. In particular, "[w]hereas a hyperlink is a direct link from one location to another, buttons, dropdown menus, and checkboxes populate onscreen forms and submit such form information to an application that is running in the web browser itself or a web server, which then computes an outcome based on other information." *Id.*

United States District Court
Northern District of California

Based on the differences in the HTML coding associated with buttons as compared to hyperlinks, Mr. Perry goes on to address Dr. Kahn's opinion that in Argus Perceptive, to redo the analysis by selectively selecting successive hyperlinks a user can (1) select an entry from the "Analysis Level" dropdown menu; and (2) click "Generate." *Id.* ¶ 121.  Mr. Perry states that he has reviewed the code that corresponds with the dropdown menu and the "Generate" feature and that neither has the HTML code associated with hyperlinks. *Id.* ¶¶ 124-125.  In particular, according to Mr. Perry, the code

*Id.* ¶ 125.  According to Mr. Perry:

*Id.* (emphasis added).

DrugLogic rejects Oracle's assertion that "buttons" are not "hyperlinks" within the meaning of the '091 patent.  Summary Judgment Opposition at 21-22.  First, DrugLogic contends Mr. Perry's opinions should be excluded because he has added limitations to the Court's claim construction requiring that hyperlinks "(i) must have a source anchor, destination anchor and direction, (ii) cannot cause a calculation or process to be performed or initiated, (iii) must be coded in a particular manner; and (iv) must have the appearance of a link as opposed to appearing as a box, menu or other selectable point." *Id.*  In support of this assertion, DrugLogic points to the Court's construction of "associating respective hyperlinks with a plurality of portions of such data and analysis" as meaning "creating a plurality of *links within web pages* for some of the previously stored information and some of the results of the statistical analysis *such that clicking*

United States District Court
Northern District of California

1    on the information or results *causes a user to jump to another place in the same web page or to an*

2    *entirely different web page*." Motion to Exclude at 5 (emphasis added).  According to DrugLogic,

3    in adopting this construction the Court implicitly held that "hyperlinks" in the '091 patent are

4    "links with web pages such that clicking causes a user to jump to another place in the same web

5    page or to an entirely different web page." *Id.*  Therefore, DrugLogic asserts, Mr. Perry's opinion

6    constitutes an improper attempt to impose additional limitations. *Id.*

7    　　　DrugLogic also argues that Mr. Perry's opinion that a hyperlink cannot perform a function

8    or a process is inconsistent with the express terms of the claim, requiring analytical drill down.

9    Summary Judgment Opposition at 22.  In particular, DrugLogic argues that "[i]f a hyperlink could

10   not perform a function or process, then 'analytical drill down'– a concept that unquestionably

11   involves a function or process – could not be performed by selecting hyperlinks." *Id.*

12   　　　In its Motion to Exclude, DrugLogic argues that "buttons" fit "squarely within the Court's

13   definition of hyperlinks" because, as Mr. Perry concedes, clicking them causes the user to jump to

14   another place.  Motion to Exclude at 6 (citing Declaration of Erin O. Millar ISO DrugLogic, Inc.'s

15   Motion to Exclude the Expert Report and Testimony of Brian K. Perry ("Millar Motion Decl."),

16   Ex. 3 (Perry Dep.) at 124-130, 134, 135-40).  DrugLogic further contends Mr. Perry's opinions

17   should be rejected because Oracle is attempting to add claim limitations based on knowledge that

18   would not have been available to a person of ordinary skill in the relevant art, who typically would

19   not have been able to read or write source code. *Id.* at 10-11.  In addition, DrugLogic asserts, the

20   terms "hyperlink" and "button" are used interchangeably in the '091 patent, contradicting Mr.

21   Perry's opinion that a button is not a hyperlink. *Id.* at 12 (citing '091 Patent at 18:24-26 (stating

22   that a "hyperlink . . . brings up a separate page with all details of this dimension"), 14:40-51

23   (stating "[p]ushing the 'View' button allows a review of specific details"), 21:12-22 (stating a user

24   can click "hyperlinks" such as "Apply Filter" and "Compute Correlations" to initiate the correlator

25   engine and process information),  14:58-63 (stating that a user can "click on the 'Apply' button" to

26   apply a filter).

27   　　　DrugLogic also objects to Mr. Perry's reliance on the W3C HTML 4.01 specification from

28   December 1999 ("W3C"), arguing that it amounts to an improper attempt to vary the meaning of

the claim based on extrinsic evidence. *Id.* at 13 (citing *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1584-1585 (Fed. Cir. 1996)).   According to DrugLogic, Oracle cannot directly tie this extrinsic evidence to the '091 patent and therefore the Court should not consider it. *Id.* (citing *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1303-04 (Fed. Cir. 2005)).   In addition, DrugLogic asserts, this evidence should not be considered because it is used primarily by web designers and software developers. *Id.* at 14 (citing Millar Motion Decl., Ex. 3 (Perry Dep.) at 13, 101).   If the Court is inclined to consider extrinsic evidence, DrugLogic asserts, it should consider the definition of "hyperlink" that was offered by Oracle during claim construction, from Newton's Telecom Dictionary, 2001, which states, in part, as follows:

> A link from one part of a page on the Internet to another page, either on the same site or a distant site. For example, a restaurant's home page may have a hyperlink or link to its menu. A retailer of laptops might have a link to the site of the laptop's manufacturer. A hyperlink is a way to connect two Internet resources via a simple word or phrase on which a user can click to start the connection. A user can access a Web site and exercise the option to hyperlink to another, related Web site by clicking on that option . . . . Sometimes, you'll see a button saying 'For more,' 'Full specs,' or 'Our biography,' etc. . . .

*Id.* (quoting Millar Motion Decl., Ex. 10 (Newton's Telecom Dictionary, 2001)).

In its Summary Judgment Reply, Oracle contends DrugLogic has failed to respond to its arguments to the extent it relies on the Court's claim construction, the '091 specification and the expert testimony of Mr. Jolley.  Summary Judgment Reply at 12.  Oracle further asserts that DrugLogic's Motion to Exclude should be denied as to Mr. Perry's opinions relating to the distinction between buttons and hyperlinks for the reasons stated in its opposition to DrugLogic's Motion to Exclude.  Summary Judgment Reply at 13.  In addition, Oracle rejects DrugLogic's assertion that Mr. Perry's opinion is inconsistent with the claim language requiring "analytical drill down" be performed by "selectively selecting successive hyperlinks." *Id.*  According to Oracle, there is no inconsistency because: "[a]ccording to the 'wherein' clause, a user on a page representing drug safety analysis at one level of the MedDRA hierarchy can select a hyperlink in order to travel to a page representing drug safety analysis at another level of a MedDRA hierarchy. Such a hyperlink would have 'two ends or a direction,' and would not necessarily cause any

1    calculation or process to be performed." *Id.*

2        In its opposition to DrugLogic's Motion to Exclude, Oracle argues that Mr. Perry's

3    position is consistent with the Court's claim construction and with the intrinsic and extrinsic

4    evidence. Motion to Exclude Opposition at 5-13. First, Oracle asserts the Court did not construe

5    the term "hyperlink" on its own; nor did it hold that a hyperlink is "anything that a user can click

6    on to cause the user to jump to another place in the same web page or to an entirely different web

7    page." *Id.* at 5. In support of this position, Oracle points to the fact that the Court used the word

8    "link" in its construction, thereby preserving the concept of a hyperlink. *Id.* at 5-6. Oracle also

9    notes that the question of whether a button is a hyperlink was never presented to the Court during

10   claim construction and was only subsequently raised by DrugLogic. *Id.* Because Mr. Perry's

11   opinions do not conflict with the Court's claim construction, Oracle contends, it should be

12   permitted to offer that expert testimony to rebut DrugLogic's position. *Id.* at 7.

13       Oracle also rejects DrugLogic's argument that "button" and "hyperlink" were used

14   interchangeably in the '091 patent. *Id.* at 8. Oracle asserts the examples offered by DrugLogic in

15   support of this contention do not support its position. *Id.* First, it addresses DrugLogic's

16   assertion that "the specification describes that a user can click on a hyperlink or a button to view

17   details." *Id.* (quoting Motion to Exclude at 12). DrugLogic cites two passages in the '091

18   specification in support of this assertion, at col. 18, ll. 24-26 and col. 14, ll. 40-51. However,

19   according to Oracle, these passages refer to two different functions, "one performed by a hyperlink

20   and one performed by a button." *Id.* Oracle explains its position as follows:

21           Specifically, at 18:24-26, the '091 patent provides: "A hyperlink
             offering more details concurrently follows the Reactions table, and
22           brings up a separate page with all details of this dimension." This
             sentence refers to Figure 7 of the '091 patent, which . . . depicts a
23           hyperlink titled "More Details." '091 Pat. Fig. 7 (hyperlink indicated
             by blue arrow). At 14:40-51, on the other hand, the patent explains:
24           "Pushing the 'View' button allows a review of the specific details of
             the filter." This sentence refers to Figure 4 of the '091 patent, which
25           . . . depicts a button entitled "View."

26

27   *Id.* Further, according to Oracle, a comparison of the "More Details" feature depicted in Figures 7

28   with the "View" feature in Figure 4 shows that they are depicted differently, with only the latter

United States District Court
Northern District of California

1   depicted in a box, showing that "the 'More Details' hyperlink and the 'View' button are different

2   user interface elements." *Id*. at 9-10.

3       Oracle also challenges DrugLogic's second example, in which DrugLogic contends "the

4   specification describes that a user can click a hyperlink or a button to perform an operation." *Id*. at

5   10 (citing Motion to Exclude at 12).   DrugLogic cites the '091 patent at 21:12-22 and 14:58-63 in

6   support of this contention.   Oracle contends these passages also refer to two different functions,

7   one performed by a hyperlink and one performed by a button.   *Id*.   Oracle states as follows:

8

9       At 14:58-63, the '091patent provides: "If a user wishes to apply this
        saved filter as his/her current query, he/she would click on the
10      'Apply' button." The "Apply" button is depicted in Figure 4 . . .,
        next to the "View" button. At 21:12-22, on the other hand, the '091
11      patent provides: "As a preferred example, the profiler screen can
        provide a number of hyperlinks choices, including 'Apply Filter'
12      and 'Compute Correlations.'" This preferred example does not
        appear to be depicted in any of the figures of the '091 patent.
13      However, by their very names, it appears that the "Apply Filter"
        hyperlink is a different tool in the '091 patent from the "Apply"
14      button. And, given the fact that the '091 patent does not describe the
        functionality of the "Apply Filter" hyperlink at all, there is no basis
15      for DrugLogic to argue that the "Apply Filter" hyperlink performs
        the same function as the "Apply" button.

16  *Id*.   In addition, Oracle contends "buttons" and "hyperlinks" are distinguished in other parts of the

17  '091 specification. *Id*. (citing '091 patent at 15:2-16; 16:2-4; 17:61- 64; 18:24-26; 21:66-22:2;

18  23:58-62; 24:46-48).   Oracle contends this is consistent with Mr. Perry's opinions explaining that

19  hyperlinks and buttons are functionally different user interface elements. *Id*. at 10-11 (citing Perry

20  Report ¶¶ 102-104).

21      Turning to the extrinsic evidence, Oracle rejects DrugLogic's reliance on the definition of

22  "hyperlink" in the Newton Telecom Dictionary in support of its contention that a button is a

23  hyperlink. *Id*. at 11-12.   As a preliminary matter, Oracle points out that DrugLogic omitted in its

24  Motion to Exclude the passage in the definition stating that "[a] hyperlink is also called an

25  anchor." *Id*. at 11.   Further, Oracle asserts, the reference to "a button saying 'For more,' 'Full

26  specs,' or 'Our biography,' etc." does not support DrugLogic's position because it "merely

27  indicates that hyperlinks can *sometimes* be made to *look like* buttons, not that the two are

28  synonymous." *Id*. (emphasis in original).

United States District Court
Northern District of California

1    Oracle also rejects DrugLogic's assertion that Mr. Perry's opinions based on the W3C

2    specification should be excluded because he "cannot tie his extrinsic evidence from W3C to any

3    language in the '091 Patent." *Id.* at 12 (quoting Motion to Exclude at 14). Oracle argues this

4    assertion "makes no sense," given that the term "hyperlink" appears in the '091 claims and the

5    '091 patent specification contains the following description of hyperlinks:

6

7    The World Wide Web (Web) is a system of Internet servers that
     support specially formatted documents. The documents are
     formatted in a language called HTML (HyperText Markup
8    Language) that supports links to other documents, as well as
     graphics, audio, and video files. This means a user can jump from
9    one document to another simply by clicking on hot spots.

10   *Id.* (quoting '091 patent at 5:56-62). In other words, Oracle contends, the '091 patent expressly

11   describes hyperlinks as being coded in HTML. *Id.* As W3C provides the World Wide Web

12   Consortium's official definition of the term "hyperlink," Oracle asserts, it is directly tied the '091

13   patent and may properly be considered in determining the meaning of "hyperlink" in the '091

14   patent. *Id.* (citing Perry Report ¶ 100) (stating that W3C contains the official definition of

15   "hyperlink" which has applied since December 1999).[6] Oracle also points out that DrugLogic has

16   itself referred to hyperlinks as having an "anchor" and a "target." *Id.* at 13.

17   In its reply on the Motion to Exclude, DrugLogic argues that the Court did, indeed,

18   construe the term "hyperlinks" and reiterates its assertion that Oracle is now trying to add

19   limitations to the Court's claim construction. Motion to Exclude Reply at 1-2. DrugLogic rejects

20   Oracle's attempt to distinguish buttons and hyperlinks in the '091 patent based on the depiction of

21   buttons using a box, arguing that this argument conflicts with Oracle's presentations at claim

22   construction, when Oracle modified the GO button in Figure 3 to look like a hyperlink and the

23   SEE CASES button in Figure 17 to appear as a hyperlink. *Id.* at 3 (citing Declaration of Steven E.

24   Tiller in Support of DrugLogic, Inc.'s Reply to Exclude the Expert Report and Testimony of Brian

25   K. Perry ("Tiller Decl."), Ex. A (excerpt from tutorial presentation) at 100, 106). Further,

26

27   [6] According to Oracle, "[t]he World Wide Web Consortium is an international community that
     develops open standards to ensure the long-term grow[th] of the Web. . . . It was founded by Tim
28   Berners Lee, the recognized inventor of HTML." Motion to Exclude Opposition at 12 n. 5 (citing
     http://www.w3.org/People/Berners-Lee/).

United States District Court
Northern District of California

according to DrugLogic, at the claim construction hearing Oracle "affirmatively stated that what [it] now calls the 'SEE CASES' button is the 'hyperlink' identified in the last element of claim 1." *Id.* at 3-4 (citing Tiller Decl., Ex. B (7/12/2012 Claim Construction Hearing Trans.) at 96. DrugLogic contends Oracle "had to make this concession or its claim construction theories would fail because it would not be able to show 'a last one of the *hyperlinks* in the up and down hierarchy linking to a previously stored case.'" *Id.* at 4 n. 7. DrugLogic again asserts that Mr. Perry's opinion contradicts the language of the claim requiring "drill down" to the extent he testifies that a "hyperlink" cannot perform a function or operation. *Id.* Finally, DrugLogic argues that the reference to HTML code in the specification is not sufficient to tie the W3C to the '091 patent and that the *Biagro* case is on point. *Id.* at 5.   To the extent W3C conflicts with the specification, which describes hyperlinks as hotspots that cause a user to jump somewhere, DrugLogic asserts, it would be improper to add limitations to the "hyperlink" claim term on the basis of that evidence. *Id.*

### b.   Analysis

To show that Argus Perceptive "allow[s] analytical drill-down by selectively selecting successive hyperlinks," DrugLogic points to its expert's opinion that the "Generate" button in Argus Perceptive is a "hyperlink." Thus, the question of whether DrugLogic has presented evidence sufficient to survive summary judgment as to this claim requirement primarily turns on whether a "button" is a "hyperlink" within the meaning of the '091 patent.  The Court concludes that it is not.

As a preliminary matter, the Court rejects DrugLogic's contention that the Court has already construed the term "hyperlink" to mean *anything* that takes a user from one web page to another or to a different place on a web page.  The Court's use of the word "link" in its construction reflects the fact that the Court did not attempt to construe the word "hyperlink" on its own;  nor was it asked to do so.  "Link" is a synonym of "hyperlink" and carries no separate technical meaning.  *See* Perry Report ¶ 100.  The Court did not address in its claim construction order whether a button is a hyperlink.  Neither did the Court hold that simply because a feature performs the function of taking a user to a different place it must be a hyperlink.  Further, even if

United States District Court
Northern District of California

the Court's claim construction could be interpreted as addressing that question, the Court is not

barred from revisiting its previous construction. Rather, it is well-established that a trial court may

engage in additional claim construction or modify a previous construction after the *Markman*

hearing where necessary or appropriate. *See Utah Med. Prods., Inc. v. Graphic Controls Corp.*,

350 F.3d 1376, 1382 (Fed. Cir. 2003) (recognizing that Court may amend its claim construction

order prior to entry of judgment); *Continental Lab. Prods., Inc. v. Medax Intern., Inc.*, 1999 WL

33116499, at *4 (S.D. Cal., Aug. 12, 1999) (holding that it was appropriate to revisit claim

construction at the summary judgment stage of the case where "both sides have extensively

briefed claim construction in their memoranda and have presented arguments they did not present

at the time the court issued its previous order"). Such additional claim construction is appropriate

here because the Court did not consider the issue that is at the heart of Oracle's request for

summary judgment as to this claim term. Therefore, the Court addresses the meaning of the word

"hyperlink" in the '091 patent.

As the words of the '091 claims do not offer any significant guidance as to the meaning of

the word "hyperlink," the Court looks to the '091 written description. In the written description,

the patentees refer to both "buttons" and "hyperlinks", and in the accompanying figures, buttons

are depicted differently from hyperlinks. *See* KJM Decl., Ex. 2 (Jolley Report) ¶¶ 126, 127 (citing

'091 patent at 14: 44-45 (referring to "View" button), 14: 60-65 (referring to "Apply" button), Fig.

3 (depicting "View" and "Apply" buttons in a box), 16:2-4 ("the search results also allow access

to the drug's 'pedigree,' or lexical mapping information, indicated by a question mark link"),

Figure 5 (showing question marks in Pedigree column without using boxes)). Oracle's experts

have opined that the fact that the patentees used different words and depicted these user interface

tools differently supports the conclusion that buttons are not hyperlinks. The Court agrees.

The examples offered by DrugLogic to show that the words "button" and "hyperlink" were

used interchangeably in the '091 patent are not persuasive. First, DrugLogic cites the passages at

18:24-26 (stating that a "hyperlink . . . brings up a separate page with all details of this

dimension"), and 14:40-51 (stating "[p]ushing the 'View' button allows a review of specific

details of the filter") to show that a user can click on either a hyperlink or a button to view details.

United States District Court
Northern District of California

United States District Court
Northern District of California

*Id.* The fact that in the '091 patent both "buttons" and "hyperlinks" can be used to obtain details does not establish that "buttons" and "hyperlinks" are the same, however. Similarly, DrugLogic's reliance on col. 21, ll. 12-22 (stating a user can click hyperlinks such as "Apply Filter" and "Compute Correlations" to initiate the correlator engine and process information) and col. 14, ll. 58-63 (stating that a user can "click on the 'Apply' button" to apply a filter") are inconclusive as nothing in the patent indicates one way or the other whether the "Apply Filter" hyperlink in the first passage is the same as the "Apply" button described in the second passage. The Court further notes that while Oracle has offered the opinions of two experts, Mr. Perry and Mr. Jolley, who have opined that the written description of the '091 patent shows that the patentees treated "buttons" and "hyperlinks" as different user interface tools, DrugLogic has not offered any expert testimony in support of its own reading of the '091 specification. Rather, its opinion that the words "button" and "hyperlink" were used interchangeably in the '091 patent is supported only by lawyer's argument.

The extrinsic evidence also supports the conclusion that a "button" is not a "hyperlink" for the purposes of the '091 patent claims. Oracle has offered the opinion of Mr. Perry on this question, who has opined that a person of ordinary skill in the art at the time of the invention would have understood that the HTML code for a hyperlink uses an anchor, or "A" tab, which "is simply a small piece of HTML code that contains the destination the hyperlink will link to and the 'clickable' text that will be displayed." KJM Decl., Ex. 4 (Perry Report) ¶ 103. A button, on the other hand, does not include this code and does not have an anchor and a direction. *See id.* ¶ 104. Mr. Perry further opines that hyperlinks perform a different function from buttons in that "buttons generally submit an on-screen form for processing by a server application or cause some other calculation or process to be performed" whereas a hyperlink is simply "a direct link from one location to another." *Id.* ¶¶ 104, 107.

DrugLogic does not offer any expert testimony suggesting that Mr. Perry's opinion as to the code that characterizes hyperlinks and buttons is incorrect. Rather, it simply seeks to exclude Mr. Perry's opinion on the basis that it is inconsistent with the Court's claim construction and the '091 patent. For the reasons discussed above, the Court finds that Mr. Perry's opinion is not

41

inconsistent with either its own claim construction or the '091 specification and therefore considers Mr. Perry's opinions. Further, Mr. Perry's opinion supports the conclusion that a hyperlink is characterized, at minimum, by HTML code that includes an anchor and a direction. This position is also supported by both the Newton Telecom Dictionary definition of hyperlink cited by both parties and the W3C HTML 4.01 specification from December 1999.

The Newton Telecom Dictionary definition expressly states that "[a] hyperlink is also called an anchor." The most sensible reading of this statement, in light of Mr. Perry's expert report, is that it is a reference to the HTML code associated with a hyperlink. The statement cited by DrugLogic, referring to buttons, does not stand for a contrary result when read in context. The full definition of "hyperlink" reads as follows:

> **Hyperlink**: A link from one part of a page on the Internet to another page, either on the same site or a distant site. For example, a restaurant's home page may have a hyperlink or link to its menu. A retailer of laptops might have a link to the site of the laptop's manufacturer. A hyperlink is a way to connect two Internet resources via a simple work or phrase on which a user can click to start the connection. A user can access a Web site and exercise the option to hyperlink to another, related Web site by clicking on that option. *You'll recognize hyperlinks on Web pages because the links look different. Typically they're in blue and underlined. Sometimes, you'll see a button saying "For more," "Full specs," or "Our biography," etc.* During the linking process, the user remains connected in a Web session through a process known as spoofing. A hyperlink is also called an anchor.

Millar Motion Decl., Ex. 10 (emphasis added). The highlighted text states that a hyperlink might *look* like a button; it does not, however, suggest that the underlying HTML code for such a button would be different from the code associated with hyperlinks that are underlined and in blue.

The W3C also supports the conclusion that a hyperlink is characterized by HTML code that includes an anchor tag and has a direction. *See* KJM Decl., Ex. 4 (Perry Report) ¶ 100 (stating that W3C defines "hyperlink" as "a connection from one Web resource to another" having "two ends – called anchors – and a direction. The link starts at the 'source' anchor and points to the 'destination' anchor'"). The Court rejects DrugLogic's contention that this extrinsic evidence should not be considered because it is not tied to the '091 patent. To the contrary, the '091 patent makes clear that the hyperlinks in the invention use HTML code. *See* '091 patent at 5: 56-62. To

United States District Court
Northern District of California

the extent the W3C specification offers a definitive set of standards for HTML code (which DrugLogic does not dispute), it is directly tied to the '091 patent and can properly be considered in determining the meaning of the word "hyperlink" in the claims.

DrugLogic's reliance on *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1303-04 (Fed. Cir. 2005) is misplaced. In that case, the court held that extrinsic evidence about standards used to label fertilizers – including a labeling guideline that treated a chemical equivalent as the same as the underlying chemical – could not be offered to show that the claim at issue encompassed a chemical equivalent.   423 F.3d at 1303-04. The court explained:

> even if we agree that the labeling convention and guidelines demonstrate that those skilled in the art are familiar with the use of "chemical equivalents," the problem is that Biagro cannot tie its extrinsic evidence to the patent or the claim language. Nothing in the patent or prosecution history indicates that labeling standards are relevant to the claimed fertilizer, and nothing in Biagro's extrinsic evidence suggests that a person skilled in the art of fertilizer formulation would necessarily use a chemical equivalent to express the amount of phosphorous acid in a fertilizer that does not actually contain phosphorous acid.

*Id.* Here, in contrast to *Biagro*, the extrinsic evidence at issue is not offered to establish that a claim term encompasses an equivalent. Rather, it is offered to provide the definition of a term that has an accepted meaning when used in reference to the HTML computer language. Given that the patentees state in the '091 patent that their invention uses HTML code, this extrinsic evidence, unlike the extrinsic evidence in *Biagro*, is directly relevant to the construction of the term "hyperlink" and may be considered by the Court so long as it does not vary the meaning of the term as set forth in the claims and specification. The Court finds that it does not.

DrugLogic also challenges Mr. Perry's position that hyperlinks and buttons perform different functions, arguing that this position is inconsistent with the claim terms because if a hyperlink cannot process data, a user could not perform "analytical drill down (or "redo the analysis" under the Court's claim construction) by "selectively selecting successive hyperlinks." The Court disagrees. Under the Wherein Clause, a user on a page representing drug safety analysis at one level of the MedDRA hierarchy can "redo the analysis" by selecting a hyperlink  to travel to a page representing drug safety analysis at another level of a MedDRA hierarchy. Such a

United States District Court
Northern District of California

hyperlink would have "two ends or a direction," and would not necessarily cause any calculation or process to be performed.  Therefore, there is no inconsistency.

For the reasons discussed above, the Court construes "hyperlink" as "a link within web pages such that clicking on the link causes a user to jump to another place in the same web page or to an entirely different web page and where the link is characterized by HTML code having a source anchor, destination anchor and direction."  Based on that construction, the Court finds that DrugLogic cannot establish that Argus Perceptive meets the claim requirement "allow[s] analytical drill down by selectively selecting successive hyperlinks" and therefore, that Oracle is entitled to summary judgment on this question.

### 6.  Whether Argus Perceptive Comprises "A Last One of the Hyperlinks in the Up and Down Hierarchy Linking to a Previously Stored Case"

#### a.  Background

The independent claims of the '091 patent require "a last one of the hyperlinks in the up and down hierarchy linking to a previously-stored case describing the adverse effects resulting from the use of the at least one drug of interest."  In his expert report, Dr. Kahn opines that Argus Perceptive meets this claim requirement because "[t]he association of each hyperlink in Column 'A' with the source data stored and/or accessed by the system meets the Linking To a Case limitation."  KJM Decl., Ex. 7 (Kahn Expert Report, Ex. I at 5).  At his deposition, Dr. Kahn clarified that the feature of Argus Perceptive that he contends is the "last hyperlink" is not the hyperlinks in Column "A", which link to case lists, which in turn link to individual case data.  *See* KJM Decl., Ex. 8 (Kahn Dep.) at 194; *see also* KJM Decl., Ex. 2 (Jolley Report) ¶ 328.  Rather, Dr. Kahn takes the position that the case list constitutes the "last . . . hyperlink[ ]."  *Id.*

In its Summary Judgment Motion, Oracle argues Dr. Kahn's opinion fails because the hyperlinks in Column "A" do not link to the case details but rather, link to an intermediate page that contains a list of cases.  Summary Judgment Motion at 16 (citing KJM Decl., Ex. 2 (Jolley Report) ¶¶ 319-334).  Further, to the extent Dr. Kahn asserts that this requirement is met by the link between the case list and the case details, this position also fails, Oracle contends, because the case list is at the same level of the MedDRA hierarchy as the previous screen, showing the case

United States District Court
Northern District of California

results pages.  Therefore, Oracle asserts, the hyperlinks in the case list "cannot be the last hyperlinks 'in an up and down hierarchy.'"  *Id.*; *see also* KJM Decl., Ex. 2 (Jolley Report) ¶ 327 ("The case list screen, which displays the case ID numbers that link to source data, is not 'in the up and down hierarchy.'  No MedDRA-related analysis was run to render that screen.").

In its Opposition brief, DrugLogic rejects Oracle's position, citing passages in the '091 specification in which it contends "this precise process is described."  Summary Judgment Opposition at 25 (citing '091 patent at FIG. 1 (described at 9:10-29); 9:65-10:5, FIGS. 13-15 (described at 21:23-24; 21:65-22:42), FIG. 19 (described at 23:52-62), FIG. 21 (described at 24:32-59)).  According to DrugLogic, these figures show that the '091 patent "expressly contemplates accessing individual case details by clicking a hyperlink associated with a case count or other result which first takes a user to a case series followed by clicking on a hyperlink associated with a Case ID or other data point to then view individual case details."  *Id.*  DrugLogic further asserts that the '091 patent does not describe any embodiment "where clicking one link associated with results takes a user directly to individual case lists."  *Id.* at 25-26.  Therefore, DrugLogic contends, Oracle's "attempt to require a 'direct link' should be rejected."  *Id.* at 26.

In a footnote, DrugLogic also asserts that "[e]ven if a 'direct link' is required, the links associated with the Case IDs in the case lists, each of which correspond to the level of the MedDRA hierarchy at which the analysis is performed, directly link to the individual case details."  *Id.* n. 27.

In its Reply brief, Oracle rejects DrugLogic's reliance on the '091 specification, arguing that even if it describes embodiments in which a user can link from an analysis page to an intermediate page to a case details page, these examples are irrelevant because the specification does not state that any of these examples link the analysis page to the case details page.  Summary Judgment Reply at 15.  Further, Oracle asserts, DrugLogic's position is inconsistent with the plain language of the patent claims.  *Id.*  Finally, to the extent DrugLogic is asking the Court to modify the meaning of the claim language based on the specification, this is an argument that should have been raised at claim construction and therefore should be rejected as untimely, Oracle contends.  *Id.*

### b.   Analysis

The dispute between the parties as to whether Argus Perceptive satisfies this claim term turns on the question of whether the claimed link to the case details requires a direct link, as Oracle contends, or rather, whether the link can be indirect, that is, linking from an analysis page to the case details page via an intermediate case list page. This is a question of claim construction. Although DrugLogic might have raised this issue earlier in the case, its failure to do so does not prevent the Court from addressing the question now for the reasons discussed above.

The Court looks first to the words of the claim, which are clear:  the claim requires that the last hyperlink in the up and down hierarchy must "link[] to a previously stored case." The claim language does not suggest that a hyperlink may "link" to a previously stored case through some intermediate page. Further, although some of the embodiments described in the specification show such an intermediate page, the inventors do not refer to these "indirect" links involving an intermediate step as linking the initial hyperlink to the page that appears once the user has made a selection from the intermediate page. Nor has DrugLogic offered any expert testimony suggesting that a person of skill in the art would have understood the claim language referring to "linking to a previously stored case" to include a process that involved clicking to bring up an intermediate page and then clicking on a selection from that page to bring up the case details. Therefore, the Court concludes that DrugLogic has not demonstrated that the plain meaning of the claim language encompasses an "indirect" link from a last hyperlink in the up and down hierarchy to case details.

Further, the Court finds unpersuasive DrugLogic's alternative theory that the link between the case list and the case details satisfies this requirement because the "Case IDs in the case lists, each of which correspond to the level of the MedDRA hierarchy at which the analysis is performed, directly link to the case details." Summary Judgment Opposition at 26 n. 27. This theory requires that the Court find that the Case IDs in the case last constitute the "last hyperlink in the up and down hierarchy." DrugLogic has not offered any expert testimony supporting this conclusion, however, and Oracle's expert has expressly opined that the case list is *not* in the up and down hierarchy because "[n]o MedDRA-related analysis was run to render that screen." KJM

United States District Court
Northern District of California

United States District Court
Northern District of California

Decl., Ex. 2 (Jolley Report) ¶ 327.

Accordingly, the Court finds that DrugLogic has failed to offer evidence sufficient to survive summary judgment on the question of whether Argus Perceptive meets this requirement.

### 7. Whether Argus Perceptive Satisfies the "Wherein" Clause

#### a. Background

The Wherein Clause of claims 1 and 8 of the '091 patent states, in full, as follows:

> wherein the step of permitting the at least one remote user to analyze comprises associating respective hyperlinks with a plurality of portions of such data and analysis, the plurality of hyperlinks respectively corresponding to places in an up and down hierarchy and allowing analytical drill down by selectively selecting successive hyperlinks, a last one of the hyperlinks in the up and down hierarchy linking to a previously-stored case describing adverse effects resulting from the use of the at least one drug of interest.

In its Claim Construction Order, the Court construed the following phrases in the wherein clause: "allowing analytical drill down," "hyperlinks . . . corresponding to places in an up and down hierarchy," and "associating respective hyperlinks with a plurality of portions of such data and analysis."

In its Summary Judgment Motion, Oracle contends DrugLogic cannot establish that Argus Perceptive satisfies the requirements of the Wherein Clause, arguing that Dr. Kahn's infringement theory is incorrect and fragmented. Summary Judgment Motion at 17. According to Oracle, based on the Court's constructions, the Wherein Clause means the following:

> creating a plurality of links within web pages for some of the previously stored information and some of the results of the statistical analysis such that clicking on the information or results causes a user to jump to another place in the same web page or to an entirely different web page, such links respectively corresponding to different levels of a structured medical dictionary, such as MedDRA, and allowing a user to redo the analysis in real time at different levels of the hierarchy by selectively selecting successive hyperlinks.

*Id.* In other words, Oracle contends, the language of the Wherein clause "shows that the system: (1) creates links corresponding to different levels of a hierarchy; (2) allows a user to move up and

down *that* hierarchy *by using those links*, and (3) allows the user to redo the analysis in real time *by using those links*." *Id.* (emphasis in original) (citing KJM Decl., Ex. 2 (Jolley Report) ¶ 134).

Oracle argues that Dr. Kahn improperly reads the Wherein Clause as consisting of separate requirements. *Id.* Thus, according to Oracle, Dr. Kahn identifies the numbers in Column "A" of Argus Perceptive as being the hyperlinks that are associated with analysis and that correspond to places in the up-and-down-hierarchy but does not rely on these numbers when he addresses analytical drill-down, instead pointing to a different alleged hyperlink, namely, the Generate button discussed above, to satisfy that requirement. *Id.* (citing KJM Decl., Ex. 8 (Kahn Dep.) at 67 (testifying that "when there is a reference to the plurality of hyperlinks here in the claim,  that is a . . . different set of hyperlinks than the selectively selecting successive hyperlinks")).  Oracle argues that Dr. Kahn's opinions reflect a "fundamental misreading of the patent and the Court's claim construction," both of which require that "the *same* hyperlinks: (1) are associated with analysis; (2) correspond to places in an up and down hierarchy; and (3) allow a user to redo the analysis in real time." *Id.* at 18.

DrugLogic argues that Oracle is incorrect in its assertion that the Wherein Clause requires that all of the steps described in it must be performed by the same set of hyperlinks.  Summary Judgment Opposition at 11.  DrugLogic contends the Wherein Clause "requires at least two analyses be performed: (i) an initial analysis performed at one MedDRA level; and (ii) a second, 'redone,' analysis performed at a different MedDRA level." *Id.* at 12.  According to DrugLogic, when both the initial analysis and the "redone" analysis are performed, the system creates hyperlinks associated with the underlying analysis and data. *Id.*  DrugLogic further contends that "[n]othing in the claim, the Court's Claim Construction Order, or the specification . . . requires that all of the hyperlinks that correspond to the 'different' levels of the MedDRA hierarchy be generated as a result of the initial analysis." *Id.*  Rather, DrugLogic asserts, "[t]he claim is open to the possibility that additional hyperlinks corresponding to different levels of the MedDRA hierarchy are generated when the 'redone' analysis is performed at the different level of MedDRA during the 'analytical drill down.'" *Id.*

DrugLogic asserts Oracle's position is inconsistent with the patent and "does not make

48

sense because it requires that one hyperlink be capable of taking a user to two places; namely, to case details for the initial analysis and to a redone analysis calculated at another level of MedDRA." *Id.* at 13. Further, DrugLogic contends, "each time the specification describes hyperlinks being associated with the results of an analysis, it further describes those hyperlinks as permitting users to link to a case series followed by clicking on other links associated with data to view additional case details." *Id.* at 13 (citing '091 patent at 9:10-21, 9:66-10:5, 23:52-62). According to DrugLogic, there is no suggestion in the specification that these hyperlinks permit the user to redo an analysis at a different level of MedDRA hierarchy. *Id.*

Oracle's position also contradicts the patent's description of "analytical drill down," DrugLogic asserts. *Id.* at 13-14. DrugLogic contends the Court's construction of that claim term was based on the following three sentences in the specification:

> The invention also allows "analytical drill down." That is, the ability to redo the analysis, in a preferred case, for a drug and reaction system-organ-class. The user then selects the level (e.g., PT) for re-analysis and is given the results in real time.

*Id.* (quoting '091 patent at 23:41-51); *see also* Claim Construction Order at 10. DrugLogic asserts that this passage does not "discuss using the same hyperlinks which are associated with results and which correspond to particular levels of MedDRA to also perform analytical drill down." *Id.* at 14. Instead, DrugLogic contends, it "merely requires that users be able to select a different level of the MedDRA hierarchy at which an analysis is performed and that those results be provided in real time." *Id.*

DrugLogic argues that Figure 17 of the '091 patent also supports its position. *Id.* According to DrugLogic, that figure shows one hyperlink performing analytical drill down ("DRILLDOWN TO MEDDRA LEVEL") and a separate hyperlink for viewing case details ("SEE CASES"). *Id.* Because under Oracle's interpretation of the Wherein Clause this embodiment would not be covered by the claims of the '091 patent, DrugLogic contends, it should be rejected. *Id.* DrugLogic also points to Oracle's presentation during claim construction, in which Oracle's use of Figure 17 showed "choosing a hyperlink corresponding to a MedDRA level from a drop down menu causes the system to redo the analysis while clicking the 'SEE CASES'

49

hyperlink takes the user to the underlying case details." *Id.* at 14-15. According to DrugLogic, Oracle's current position as to the meaning of the Wherein Clause is inconsistent with its earlier position (which is in line with DrugLogic's reading of the Wherein Clause). *Id.* at 15.

In addition to the specification, DrugLogic relies on the claim language itself, arguing that Oracle's position "defies ordinary grammar principles. *Id.* DrugLogic reasons as follows:

> the "wherein clause" begins with "associating respective hyperlinks with a plurality of portions of such data and analysis," followed by a comma and the phrase "the plurality of hyperlinks respectively corresponding to places in an up and down hierarchy." . . . '091 Patent at 25:28-31. This punctuation and explicit reference to "the plurality of hyperlinks" indicates that the patentee is referring to the hyperlinks discussed in the prior limitation (namely, those hyperlinks associated with data and results). Indeed, recognizing this point, the Court construed this phrase beginning with the words "such links." In contrast, the phrase that follows reads "and allowing analytical drill down by selectively selecting successive hyperlinks." *Id.* at 25:31-33. Markedly absent from this phrase is any reference to "the plurality of hyperlinks," "said hyperlinks," "the hyperlinks that were associated," "the hyperlinks in the hierarchy" or any other linguistic signal indicating that the patentee was referring to the hyperlinks referenced earlier in the "wherein clause." Further, the claim requires "a last one of the *hyperlinks in the up and down hierarchy* linking to a previously-stored case..." *Id.* at 25:33-34 (emphasis added). By referencing the "up and down hierarchy," the claim makes clear that these hyperlinks which link to previously stored data are the same hyperlinks that correspond to the MedDRA hierarchy (and thus, which are associated with data and results). Lastly, the position of the Linking to a Case Limitation after the analytical drill down step further supports DrugLogic's position because its position indicates that linking to case details applies to both the initial, and redone, analysis.

*Id.* at 15-16.

In its Reply brief, Oracle rejects DrugLogic's assertion that the Wherein Clause can be satisfied by multiple different groups of hyperlinks. Summary Judgment Reply at 2. It argues that the language and "basic grammatical structure" of the clause makes clear that the Wherein Clause is describing one group of hyperlinks, all of which must have the following characteristics: "(1) the hyperlinks must be on data and analysis; (2) they must each correspond to a different hierarchical level of a structured medical dictionary; (3) they must permit a user to 'selectively

select' them in succession to redo an analysis at a different level of that structured medical dictionary; and (4) at the bottom of the dictionary hierarchy, the last hyperlink must link to a previously-stored case." *Id.* at 3. According to Oracle, DrugLogic does not dispute that the accused hyperlinks in Oracle's products "do not possess all four of these attributes." *Id.*

Oracle contends DrugLogic's assertion that the Wherein Clause can be satisfied by separate sets of hyperlinks is flawed for at least two reasons. *Id.* First, the only place in the Wherein Clause that the creation of hyperlinks is described, according to Oracle, is the phrase "associate[es] respective hyperlinks with a plurality of portions of . . . data and analysis." *Id.* The Wherein Clause does not describe the creation of any other set of hyperlinks. *Id.* Second, the wording of the Wherein Clause makes clear that the hyperlinks that allow analytical drill down are the same hyperlinks on data or analysis that correspond to different levels of a structured medical dictionary, Oracle asserts. *Id.* Oracle argues that there is no comma between the phrase "hyperlinks respectively corresponding to places in an up and down hierarchy," and the phrase "allowing analytical drill down by selectively selecting successive hyperlinks" because they are "both references to the same thing, describing different attributes of that same thing." *Id.*

Oracle rejects DrugLogic's reliance on Figure 17 of the '091 patent, arguing that this figure does not satisfy the requirements of the Wherein Clause. *Id.* at 6 n. 1. In particular, Oracle argues that because Figure17 uses button clicks and pulldown menus rather than hyperlinks, it is not an example of the claimed "analytical drill down by selectively selecting successive hyperlinks." *Id.* According to Oracle, the figures of '091 patent were submitted before the Wherein Clause was added to secure issuance of the patent and the figures were not changed to reflect the additional limitations contained in that clause. *Id.* Therefore, Oracle contends, it is proper to read Figure 17 out of the patent. *Id.* (citing *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005) ("The fact that claims do not cover certain embodiments disclosed in the patent is compelled when narrowing amendments are made in order to gain allowance over prior art").

Oracle also rejects DrugLogic's assertion that Oracle's interpretation of the Wherein

Clause requires that "*one hyperlink* be capable of taking a user to *two places*; namely to case details for the initial analysis *and* to a redone analysis calculated at another level of the MedDRA." *Id.* at 7 (quoting Summary Judgment Opposition at 13) (emphasis in original). Oracle contends DrugLogic has misrepresented its position. *Id.* at 7. Similarly, Oracle asserts that its position at the claim construction hearing is consistent with its current position because Oracle used the figure to illustrate analytical drill down up and down a hierarchy using dropdown menus, *not* analytical drill down *by selectively selecting successive hyperlinks* as is required by the Wherein Clause.

### b.   Analysis

Oracle argues that it is entitled to summary judgment that Argus Perceptive does not infringe because the hyperlinks DrugLogic relies on to show that the product "allows analytical drill down" are not the same as the hyperlinks it contends are associated with the analysis and that permit the user to move up and down the MedDRA hierarchy. The Court agrees.

DrugLogic's reading of the Wherein Clause is illogical and inconsistent with the grammar of the claim language. The Wherein Clause describes the creation of only one set of hyperlinks and the requirements for those hyperlinks are set forth in a single sentence. The phrases "the plurality of hyperlinks respectively corresponding to places in an up and down hierarchy" and "allowing analytical drill down by selectively selecting successive hyperlinks" are connected by the word "and". Dr. Kahn's attempt to establish that Argus Perceptive meets the requirements of the Wherein Clause fails, therefore, because he has not identified a single set of hyperlinks in Argus Perceptive that meets the requirements of the Wherein Clause.

The Court finds DrugLogic's reliance on the specification of the '091 patent unpersuasive. DrugLogic points to the passage at col. 23, ll. 41-51, cited by the Court in support of its construction of "allowing analytical drill down." As DrugLogic itself points out, however, that passage simply does not address the question of whether the Wherein Clause describes a single set of hyperlinks or multiple hyperlinks. Figure 17 also does not support DrugLogic's position because it does not depict an embodiment that includes "selectively selecting successive hyperlinks," as DrugLogic's counsel pointed out at the Claim Construction Hearing. *See*

Declaration of Christina Von Der Ahe ISO Oracle's Reply ISO Motion for Summary Judgment of Non-Infringement of '091 Patent ("Von Der Ahe Reply Decl."), Ex. 2 (Claim Construction Hearing Trans.) at 99.

Finally, the Court rejects DrugLogic's assertion that Oracle's position would require the same hyperlink to link to two different places. Oracle argues the hyperlinks associated with data and analysis are the same hyperlinks that take users to results of an analysis performed at another level of MedDRA and that when a user has reached the last hyperlink "in the up and down hierarchy," *that* hyperlink will take a user to the case details. Under this interpretation of the Wherein Clause, which the Court finds to be correct, no single hyperlink takes a user to two places.

### C.   Infringement by Empirica Signal

#### 1.   Whether Empirica Signal "Associat[es] Respective Hyperlinks With a Plurality of Portions of Such Data and Analysis"

##### a.   Background

As noted above, claims 1 and 8 of the '091 patent require "associating respective hyperlinks with a plurality of portions of such data and analysis." The Court construed this claim term as "creating a plurality of links within web pages for some of the previously stored information and some of the results of the statistical analysis such that by clicking on the information or results causes a user to jump to another place in the same web page or to an entirely different web page." Claim Construction Order at 31. According to DrugLogic's experts, Drs. Nelson and Kahn, Empirica Signal, like Argus Perceptive, meets this claim requirement based on case counts in Column "N" of that product. KJM Decl., Ex. 5 (Nelson Report, Ex. 3 at 4); *id.*, Ex. 7 (Kahn Report), Ex. C at 6.

In its Summary Judgment Motion, Oracle asserts that DrugLogic cannot show that Empirica Signal meets this limitation because it has offered no evidence that it creates hyperlinks on any "results of the statistical analysis." Summary Judgment Motion at 18. In particular, Oracles argues that the case counts in the "N" column of Empirica Signal, like the case counts in Argus Perceptive, are not "the results" of any statistical analysis and therefore do not constitute "signals" as required by the claim. *Id.*

Oracle further asserts that DrugLogic's position fails because the number counts in Column "N" are not hyperlinks such that clicking on them "causes a user to jump to another place in the same web page or to an entirely different web page." *Id.* at 18-19.  Instead, clicking on the numbers causes a pop-up menu to appear.[7]  *Id.* at 19 (citing KJM Decl., Ex. 2 (Jolley Report) ¶ 90).  Therefore, Oracle argues, clicking on the numbers in the "N" Column does not cause a user to "jump" anywhere; "the user is still on the same web page, in the same place." *Id.* (citing KJM Decl., Ex. 2 (Jolley Report) ¶ 90).

Oracle further contends both of DrugLogic's experts ignored the pop-up menu in their expert reports and that at their depositions, they were unable to explain how the pop-up menus squared with the opinions in their reports. *Id.*  In particular, when asked about the pop-up menu at his deposition, Dr. Nelson revoked his prior testimony, saying that a pop-up menu was not the same thing as a hyperlink and therefore, that the opinion in his report was "inaccurate." *Id.* at 19-20 (citing KJM Decl., Ex. 6 (Nelson Dep.) at 120:15 - 123:4).  Similarly, Oracle asserts, Dr. Kahn was unable offer any opinion as to whether clicking on a number that generates a pop-up menu amounts to jumping to a different place on the same page or to a different web page. *Id.* at 20-21 (citing KJM Decl., Ex. 8 (Kahn Dep.) at 308: 24 - 310:23).  Rather, he testified that the pop-up menu might be considered by a "nontechnical user" of HTML to be a different  place or web page but that he was "not the right person" to answer that question from "a technical perspective." *Id.*

Finally, Oracle rejects the opinions of Drs. Nelson and Kahn that the bar graphs in Empirica Signal, shown in the screenshot depicted in Paragraph 15 of the Johnson-McKewan Declaration, constitute "hyperlinks" associated with "the results of the analysis." *Id.* at 21 (citing KJM Decl., Ex. 5 (Nelson Report, Ex. 3 at 10; *id.*, Ex. 7 (Kahn Report, Ex. C at 11)).  According to Oracle, these bars do not constitute "hyperlinks" because, like the "N" numbers, clicking on them only brings up a pop-up menu and does not cause a user to "jump" to a different place.

---

[7] In the briefs and deposition testimony cited by Oracle, the attorneys and experts use various terms to describe this menu, including "pop-up menu," "pop down menu" and "drop down menu." As the parties have used these terms interchangeably the Court assumes that any possible technical distinctions between these terms are not relevant to the issues before the Court. Therefore, the Court treats the terms as having the same meaning and uses the term "pop-up menu" in its own discussion.

Summary Judgment Motion at 21 (citing KJM Decl., Ex. 2 (Jolley Report) ¶¶ 102-107; *id.*, Ex. 6 (Nelson Dep.) 120:15-123:4 (testimony of Dr. Nelson that he had made the same mistake with respect to the bar graphs as he had as to the case counts in Column "N", that is, he had failed to take into account that clicking on them generated a pop-up menu)).

In its Opposition brief, DrugLogic rejects Oracle's position that case counts are not the results of statistical analysis for the reasons discussed above with respect to Argus Perceptive. *See* Summary Judgment Opposition at 17-19. DrugLogic further rejects Oracle's assertion that Empirica Signal does not meet this claim limitation because clicking on the case counts and on the bar graphs generates a pop-up menu. *Id.* at 19-20. DrugLogic points to statements in the Empirica Signal manual that it contends refer to these case counts as "hyperlinks." *Id.* (citing Millar Opposition Decl., Ex. 6 (Online Help Manual for Empirica Signal 7.3) at 62 ("On many Empirica Signal pages, the count (N) of cases is a hyperlink that you can click to display a menu with drilldown options"), 274 ("If the report includes a count (N) of cases that is a hyperlink, you can click the hyperlink to display a menu from which you can drill down."); *id.*, Ex. 17 (WebVDMA 4.0 Training Guide) at 10 (referring to "numeric hyperlink in the 'N' column")). DrugLogic further contends Oracle's position "stands in stark contrast to the Court's Claim Construction Order, which construed the term 'hyperlinks.'" *Id.* at 20 (citing Claim Construction Order at 67: 12-15). DrugLogic also points to the deposition testimony of Oracle's expert, Mr. Perry. *Id.* (citing Millar Opposition Decl., Ex. 13 (Perry Dep.) at 127-129, 134, 135-140). According to DrugLogic, Mr. Perry "conceded that when clicked, the hyperlinks associated with the case counts take the user to a different web page." *Id.* at 20.

In its Reply brief, Oracle contends the case counts in Empirica Signal are not the "results of the statistical analysis" required by the '091 patent, as discussed above. Summary Judgment Reply at 9-10. Oracle further asserts that DrugLogic's assertion that the case counts or bar graphs are hyperlinks should be rejected because its own experts did not offer testimony supporting this position. *Id.* at 11-12. Oracle asserts that references to pop-up boxes in its own materials have no bearing on whether these are "hyperlinks" within the meaning of the '091 patent. *Id.* Further, Oracle asserts, DrugLogic has mischaracterized Mr. Perry's deposition testimony. *Id.* at 12.

According to Oracle, "[i]n the portions of the Perry deposition cited, Mr. Perry does not state that the clicking on the case counts takes the user to a different web page. Instead, he states that clicking the hyperlinks *within the pop-up menu* may take the user to a different page." *Id.* (emphasis in original). According to Oracle, that fact is not at issue and therefore does not create a genuine issue of material fact. *Id.*

### b. Analysis

To the extent DrugLogic's infringement claim as to Empirica Signal is based on the testimony of Drs. Nelson and Kahn that the case counts in the "N" Column are the hyperlinks claimed in the phrase "associating respective hyperlinks with a plurality of portions of such data and analysis," DrugLogic's position fails, as a matter of law, for the reasons discussed above, in connection with Argus Perceptive. In particular, assuming the number counts are hyperlinks, they are not "signals" or the "results of the statistical analysis" described in the '091 patent. Therefore, Oracle is entitled to summary judgment that Empirica Signal does not infringe on that basis.

The Court further concludes that neither the case counts in Column "N" nor the bars of the bar graphs in Empirica Signal are hyperlinks and therefore, for this additional reason, they do not satisfy this claim requirement. When clicked, both generate a pop-up menu. Oracle's expert has opined that this action does not take the user to another web page or even another place in the same web page, as required by the claims of the '091 patent. *See* KJM Decl., Ex. 2 (Jolley Report) ¶¶ 90 (case counts in "N" Column), 103 (bar graphs). DrugLogic's experts have offered no testimony to the contrary. Dr. Kahn has conceded that he does not have the technical understanding of HTML coding to respond knowledgably on this issue. Dr. Nelson, when asked about the pop-up menu that is generated when the case counts and bar graphs are clicked, expressly stated that his prior opinion that these features were "hyperlinks" within the meaning of the '091 patent was inaccurate. DrugLogic's attempt to rely on the deposition testimony of Oracle's expert, Mr. Perry, is also misplaced. At his deposition, Mr. Perry testified that clicking the hyperlinks within the pop-up menu might take the user to a new webpage. He did not testify that clicking the numbers in the "N" Column or clicking on the bar graphs would achieve this result. *See* Millar Opposition Decl., Ex. 13 (Perry Dep.) at 127-128. Accordingly, the Court

finds that DrugLogic has not offered evidence that is sufficient to survive summary judgment as to this claim term.

### 2. Whether Empirica Signal Includes "A Plurality of Hyperlinks Respectively Corresponding To Places in an Up and Down Hierarchy"

#### a. Background

As noted above, the asserted claims of the '091 patent require "associating respective hyperlinks with a plurality of portions of such data and analysis, the plurality of hyperlinks respectively corresponding to places in an up and down hierarchy." In its Claim Construction Order, the Court found that the phrase "hyperlinks . . . corresponding to places in an up and down hierarchy" means "such links respectively corresponding to different levels of a structured medical dictionary, such as MedDRA." Claim Construction Order at 25. DrugLogic's experts, Drs. Kahn and Nelson, take the position that the case counts in Empirica Signal, like those in Argus Perceptive, satisfy this limitation. KJM Decl., Ex. 5 (Nelson Report, Ex. 3 at 5) ("The hyperlinks in Column 'N' correspond to levels of MedDRA in that the hyperlinks relate to the number of cases falling within a particular HLGT for a drug"); *id.*, Ex. 7 (Kahn Report, Ex. C at 6) ("The hyperlinks in Column 'N' reflect the number of cases containing a given HLT, corresponding to a level of MedDRA"). In addition, Drs. Nelson and Kahn contend bars in the bar graphs in Empirica Signal satisfy this requirement. *See* KJM Decl., Ex. 5 (Nelson Report, Ex. 3 at 10); *id.*, Ex. 7 (Kahn Report, Ex. C at 11).

Oracle seeks summary judgment that Empirica Signal does not satisfy this claim requirement for the same reason the case counts in Argus Perceptive fail to establish infringement. Summary Judgment Motion at 21-22. In particular, Oracle contends DrugLogic has failed to "identify a *plurality* of hyperlinks *respectively* corresponding to different places in an up and down hierarchy." *Id.* Further, as discussed above, Oracle contends neither the case counts nor the bar graphs identified by DrugLogic's experts are hyperlinks. *Id.*

#### b. Analysis

The Court finds that the case counts in the "N" Column of Empirica Signal do not satisfy this claim requirement for the same reason the case counts in Argus Perceptive are insufficient to

United States District Court
Northern District of California

1   create a fact question, that is, DrugLogic has failed to identify hyperlinks at different levels of the

2   MedDRA hierarchy.   In addition, neither the numbers in the "N" Column nor the bars in the bar

3   graphs of Empirica Signal are "hyperlinks" for the reasons discussed above.   Therefore, Oracle is

4   entitled to summary judgment that Empirica Signal does not meet this claim requirement.

5
6   **3.   Whether Empirica Signal "Allow[s] Analytical Drill Down By Selectively Selecting Successive Hyperlinks"**

7   **a.   Background**

8   The independent claims of the '091 patent require "allowing analytical drill down," which

9   the Court has construed as "allowing a user to redo the analysis in real time at different levels of

10   the hierarchy."   Claim Construction Order at 67.   DrugLogic's experts, Drs. Nelson and Kahn,

11   have pointed to several different ways they contend Empirica Signal meets this limitation.

12   First, they opine that a user of Empirica Signal can redo an analysis  in real time at

13   different levels of the MedDRA hierarchy by performing the following steps: 1) clicking on the

14   "Data Mining Runs" tab; 2)  clicking the "Re-Run" "hyperlink"; 3)  clicking the "Next"

15   "hyperlink"; 4) clicking the "Back" "hyperlink" three times; 5) highlighting a new level of the

16   MedDRA hierarchy for the data mining run; 6) clicking the "Next" "hyperlink" three times; 7)

17   typing a name for the new data mining run; 8) clicking the "Next" "hyperlink"; and 9) clicking the

18   "Submit" "hyperlink" (the "Modified Data Mining Run").[8]   Summary Judgment Motion at 22-24

19   (citing KJM Decl., Ex. 2 (Jolley Report) ¶¶ 84, 115-138, 177; *id.*, Ex. 5 (Nelson Report, Ex. 3 at

20   6); *id.*, Ex. 7 (Kahn Report, Ex. C at 7-8)).

21   Second, DrugLogic's experts contend Empirica Signal allows a user to redo the analysis in

22   real time by performing the following process: 1) creating a data mining run with certain

23   parameters; 2) naming the data mining run; 3) performing the data mining run; 4) reviewing the

24   results of the data mining run; 5) creating a new data mining run with similar parameters, but

25   _____

26   [8] Oracle has identified four discrete theories of infringement in the opinions of Drs. Nelson and Kahn with respect to the analytical drill down claim limitation, referring to them as follows:  1)

27   "Modified Data Mining Run Allegation"; 2) "New Data Mining Run Allegation"; 3) "Modified Report Allegation"; and 4) "New Report Allegation."   Because DrugLogic has raised no

28   objection to Oracle's categorization of its theories, and to avoid confusion, the Court adopts Oracle's terminology as to this claim term.

58

calculated at a different MedDRA level than the first data mining run; 6) giving the new data

mining run a new name; 7) performing the new data mining run; 8) viewing the results of the new

data mining run; 9) accessing a pull-down menu that lists all the data mining runs that the user has

created; and 10) utilizing that pull-down menu and a "View Results Table" button to review the

results of the different data mining runs in turn (the "New Data Mining Run Allegation"). *Id.* at

24 (citing KJM Decl., Ex. 2 (Jolley Report) ¶¶ 185, 199-203; *id.*, Ex. 5 (Nelson Report, Ex. 4); *id.*,

Ex. 7 (Kahn Report, Ex. D)).

Third, DrugLogic contends Empirica Signal allows a user to redo the analysis because a

user can modify a previously created report to show results at different levels of the MedDRA

hierarchy by clicking the "Edit Definition" "hyperlink" (the "Modified Report Allegation"). *Id.* at

24-26 (citing KJM Decl., Ex. 3 (Jolley Supp. Report) ¶¶ 40, 43-52; *id.*, Ex. 5 (Nelson Report, Ex.

9 at 6).

Fourth, DrugLogic's experts contend a user of Empirica Signal can redo the analysis at a

different level of the ATC hierarchy by running a new report at a second level of the ATC

hierarchy, after running a report at a first level of the MedDRA hierarchy (the "New Report

Allegation"). *Id.* at 26 (citing KJM Decl., Ex. 3 (Jolley Supp. Report) ¶¶ 41, 53-63; *id.*, Ex. 5

(Nelson Report, Ex. 9 at 10-11); *id.*, Ex. 7 (Kahn Report, Ex. C at 7-8). This process involves the

following steps: 1) clicking "Report Definitions" on the "Display Report" screen of a previous

report; 2) clicking the icon next to a report for a different level of the MedDRA hierarchy; 3)

clicking on "Run" from within the pop-up menu that appears; and 4) viewing a screen that says

"Please wait while your report is generated." *Id.*

In its summary judgment motion, Oracle asserts that all of DrugLogic's infringement

theories as to this claim term fail for one or more of the following reasons: 1) they rely on the idea

that button icons that bring up pop-up menus are "hyperlinks;" 2) they do not allow the user to

redo the analysis in real time; and 3) they do not show any analysis that is redone. Summary

Judgment Motion at 22.

With respect to the Modified Data Run Allegation, Oracle contends this process does not

involve "selectively selecting successive hyperlinks" because it uses buttons, which it asserts are

59

United States District Court
Northern District of California

1  not "hyperlinks," as discussed above. *Id.* at 23.  Oracle further contends the Modified Data Run

2  Allegation does not allow the user to redo the analysis *in real time*, as the Court's claim

3  construction requires. *Id.* at 23-24.  In particular, according to Oracle's expert, Mr. Jolley, this

4  requirement is not met because: 1) "The data mining runs that a user creates in Empirica Signal

10  Mr. Jolley's understanding of the queuing process in Empirica Signal is based on a

11  discussion with Chan Russell, Vice President of Product Safety in the Health Sciences Global

12  Business Unit of Oracle. *Id.* ¶ 164.  Based on this conversation, Mr. Jolley describes the process

13  as follows:

21  As to the New Data Mining Run Allegation, Oracle raises the same objections, namely,

22  this process involves the use of buttons, not "hyperlinks" and does not perform the analysis in real

23  time. *See* Summary Judgment Motion at 24 (citing  KJM Decl. Ex. 2 (Jolley Report) ¶ 201

24  ("View Results Table" button is not a hyperlink and even if it were, it does not "correspond[ ] to

25  places in an up and down hierarchy"), ¶ 168 (process in Modified Data Mining Run Allegation

26  does not redo the analysis in real time);  ¶ 187 ("The only difference between the Modified Data

27  Mining Run Allegation and the New Data Mining Run Allegation is that, in the Modified Data

28  Mining Run Allegation, the Empirica Signal user uses a 'Back' button to modify the parameters of

60

the original data mining run and create new runs, while in the New Data Mining Run Allegation, the Empirica Signal user clicks on 'Create Run' to create new runs").

Oracle also asserts that the Modified Report Allegation does not satisfy this claim term. *Id.* at 24-26.  First, it contends DrugLogic's experts have provided so few details about this process that summary judgment is appropriate on that basis alone. *Id.* at 25.   In particular, Mr. Jolley states that he attempted to carry out the process described by DrugLogic's experts by clicking on "Edit Definition" but that "[c]licking 'Edit Definition,' alone, did not allow [him] to modify a previously created report in order to obtain results at a different level of the MedDRA hierarchy." *Id.* at25 (citing KJM Decl., Ex. 3 (Jolley Supp. Report) ¶ 44).  Mr. Jolley states that when he attempted to come up with his own process for modifying previously created reports by making selections in the Empirica Signal user interface after clicking "Edit Definition" he "found that any process that even arguably gives the user results at a different level of the MedDRA hierarchy requires clicking on various buttons and making various selections within menus." *Id.* (citing KJM Decl., Ex. 3 (Jolley Supp. Report) ¶ 45).

Finally, Oracle contends the New Report Allegation fails because it relies on the idea that clicking on an icon that brings up a pop-up menu constitutes a hyperlink, which it contends is incorrect, as discussed above. *Id.* at 26 (citing KJM Decl., Ex. 2 (Jolley Report), ¶ 90; *id.*, Ex. 3 (Jolley Supp. Report) ¶ 53-63).

In its Opposition brief, DrugLogic argues that it has presented evidence that shows that Empirica Signal allows users to redo an analysis at a different MedDRA level by "selectively selecting successive hyperlinks" in "essentially the same way as depicted in the patent figures." Summary Judgment Opposition at 8.  DrugLogic points to Figure 3 of the '091 patent, which depicts a pull-down menu for the levels of the ATC hierarchy followed by the "'GO' hyperlink," and to Figure 7, which is described in the specification as showing a pull-down menu labeled "View" 700 to the right of the Reactions tab, followed by a "filter hyperlink 701." *Id.* (citing '091 patent, Figs. 3, 7 and 17: 61-65).  Thus, DrugLogic contends, the '091 patent figures "show a user changing the standard medical dictionary hierarchy level using a pull-down menu and then clicking a separate hyperlink to initiate the analysis." *Id.*  Similarly, DrugLogic asserts, Empirica

61

Signal allows a user to "click[] the 'Re-Run' hyperlink followed by 'Next' and 'Back' hyperlinks, which take the user to a screen where he/she can select a different MedDRA level at which the analysis will be redone." *Id.* at 8 (citing Millar Opposition Decl., Ex. 7 (Nelson Report, Ex. 3 at 6-7)). DrugLogic concedes that the process used by Empirica Signal uses the selection of more "hyperlinks" than are shown in Figures 3 and 7 but contends this does not take Empirica Signal outside the scope of the claims. *Id.* at 9 (citing *SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1336 (Fed. Cir. 1999)). DrugLogic further contends "each of the hyperlinks selected in the process described above causes the user to jump to another place on a web page or to another web page" and therefore, that Oracle's argument that certain objects are "buttons" and not "hyperlinks" should be rejected. *Id.* at 10, 21-22.

DrugLogic also asserts that the "Report feature of Empirica . . . satisfies the Analytical Drill Down Limitation." *Id.* at 10. With this feature, "a user chooses to display results of an initial analysis using a customized report template created [at] one level of MedDRA. . . . The user can then redo the analysis by clicking the 'Report Definitions' hyperlink, clicking the hyperlink next to another report template created to display results at a different level of MedDRA, and clicking the 'Run' hyperlink." *Id.* According to DrugLogic, this process allows a user to redo the analysis at a different level of the MedDRA hierarchy by selecting hyperlinks. *Id.* DrugLogic asserts that the hyperlinks described in this process need not correspond to the MedDRA hierarchy, but even if there were such a requirement, it would be met "because each hyperlink corresponds to either the level at which the original analysis was calculated or the level at which the redone analysis is calculated." *Id.* n. 12.

DrugLogic rejects Oracle's assertion that Empirica Signal does not perform analytical drill down in real time. *Id.* at 22-24. First, it points to evidence it contends establishes that as to each of Empirica Signal's methods of infringement, redone analyses are initiated upon request. *Id.* at 23 (citing Millar Opposition Decl., Ex. 19 (Russell Dep.) 127:20-128:4; *id.*, Ex. 6 (Empirica Manual) at 95; *id.*, Ex. 20 (Prindle Dep.) at 116:5-120:14). Second, DrugLogic argues that to the extent Mr. Jolley testified that *some* of the analyses he performed were completed in a "reasonable period of time," this is sufficient to create a fact question as to whether the real time requirement is

met. *Id.* at 24 (citing Millar Opposition Decl., Ex. 21 (Jolley Dep.) at 180:3-187:21). DrugLogic also rejects Oracle's argument that the New Data Mining Run Allegation does not meet the "in real time" requirement because "the user merely iterates between analyses previously performed." *Id.* at 23 n. 24 (citing Summary Judgment Motion at 24:6-25). According to DrugLogic, this argument is incorrect because Dr. Kahn's theory is that this requirement is met when, after the initial run is complete, a user selects the original run parameters but at a different level of the hierarchy;  while Dr. Kahn explains that a user can then iterate between the two analyses simply by clicking hyperlinks, he does not rely on that feature to show that the claim requirement is met. *Id.*

DrugLogic also rejects Oracle's argument that it has failed to provide sufficient details explaining the New Report Allegation, asserting that the details are set forth in the Empirica Signal Manual, which "shows how custom reports can be created, including creating reports to be calculated at different MedDRA levels." *Id.* at 24 n. 25 (citing Millar Opposition Decl., Ex. 6 (Empirica Signal Manual) at 243-46, 249-75, 278-83).

In its Reply brief, Oracle reiterates its position that "buttons" are not "hyperlinks." Summary Judgment Reply at 13. With respect to the requirement that the analysis be redone "in real time," Oracle contends DrugLogic has conceded "that the concept of 'real time' requires that an analysis be initiated and performed immediately upon request." *Id.* at 13-14. Under this standard, there is no issue of fact because all of the evidence, including the evidence cited by DrugLogic in its Opposition brief, consistently shows that the redone analyses in Empirica Signal are not initiated immediately, but are instead submitted to a queue to await processing. *Id.*

### b.   Analysis

DrugLogic has pointed to four processes in Empirica Signal that it contends meet the '091 patent requirement "allowing a user to redo the analysis in real time at different levels of the hierarchy by selectively selecting successive hyperlinks." The Court finds that all of DrugLogic's theories fail because they rely on user interface elements such as buttons and pop-up menus that are not "hyperlinks" within the meaning of the '091 patent. The Court does not reach the question of whether the processes identified by DrugLogic's experts in Empirica Signal allow users to redo any analysis or, if they do, whether the analysis is redone in "real time."

United States District Court
Northern District of California

First, the Modified Data Mining Run Allegation fails because it requires the user to click on a series of buttons, including the "Back" button, to modify the parameters of the original data mining run and create new runs. As discussed above, buttons are not "hyperlinks." Therefore, this process does not allow the user to "selectively select successive hyperlinks." Similarly, the New Data Mining Run Allegation, which uses a "Create Run" button instead of the "Back" button, also uses buttons rather than hyperlinks. The New Report Allegation also does not create a fact question as to this claim requirement because when the user clicks an icon next to a report for a different level of the MedDRA hierarchy, a pop-up menu appears and the user must click "run" to generate a new report. As discussed above, however, the Court finds that an icon that opens a pop-up menu also is not a "hyperlink."

The Court also finds that Oracle is entitled to summary judgment that Empirica Signal does not meet this claim limitation based on DrugLogic's Modified Report Allegation. Beyond expressing the opinion that the analysis can be redone by clicking on the "Edit Definition" hyperlink, DrugLogic's experts fail to explain the process by which this would be accomplished. Although DrugLogic states in its Opposition brief that the details can be found in the Empirica Signal manual, it cites generally over thirty pages of the manual. Because DrugLogic did not include sufficient information regarding this theory, the opinions offered by its experts do not demonstrate the existence of a fact question as to whether Empirica Signal meets this claim requirement.

### 4. Whether Empirica Signal Comprises "A Last One Of The Hyperlinks in the Up and Down Hierarchy Linking To a Previously-Stored Case"

#### a. Background

As discussed above, the '091 patent requires "a last one of the hyperlinks in the up and down hierarchy linking to a previously stored case." DrugLogic's expert, Dr. Nelson, opines that Empirica Signal satisfies this element because the "hyperlinks" in Column "N" link to stored case data. KJM Decl., Ex. 5 (Nelson Report, Ex. 3 at 5); *id.*, Ex. 13 (Nelson Supp. Report) at 10.

Oracle asserts this claim term is not met by Empirica Signal for the same reason it is not satisfied by Argus Perceptive, namely, because the "N" numbers do not link directly to stored case

64

data.  Summary Judgment Motion at 26-27.  Rather, Oracle asserts, clicking on the numbers in the "N" Column brings up a pop-up menu that requires a further selection to bring up case details.  *Id.* (citing KJM Decl., Ex. 2 (Jolley Rpt.) ¶ 178).  In addition, Oracle argues, this theory fails because the numbers in the "N" Column are not hyperlinks.  *Id.*  According to Oracle, instead of taking the user to a different place, clicking on the numbers simply generates a pop-up menu and therefore, the numbers are not "hyperlinks."  *Id.*

As discussed above, DrugLogic contends the claim language may be satisfied by an "indirect" link or alternatively, that the link between the case list and the case details satisfies this requirement.  Summary Judgment Opposition at 24-26.  In support of this contention, DrugLogic points to figures in the '091 patent that it contends illustrate the same process.  *Id.*

### b.   Analysis

The Court finds that Empirica Signal does not meet this claim requirement.  First, for the reasons stated above, the Court rejects DrugLogic's assertion that this claim limitation may be satisfied by "indirect" links, notwithstanding the fact that the '091 patent includes figures illustrating such a process.  Second, as discussed above, the Court concludes that to the extent the numbers in the "N" Column only generate pop-up boxes when clicked, they are not hyperlinks within the meaning of the '091 patent.  Accordingly, Oracle is entitled to summary judgment that Empirica Signal does not satisfy this claim requirement.

### 5.   Whether Empirica Signal Satisfies the "Wherein" Clause

### a.   Background

In its summary judgment motion, Oracle contends DrugLogic's theory of infringement as to Empirica Signal, like its theory as to Argus Perceptive, relies on inconsistent definitions of the word "hyperlinks" in the Wherein Clause.  Summary Judgment Motion at 27.  Thus, Oracle contends, while Drs. Nelson and Kahn opine that the first part of the Wherein Clause ("wherein the step of permitting the at least one remote user to analyze comprises associating respective hyperlinks with a plurality of portions of such data and analysis") requires that the results of the statistical analysis are hyperlinked and that the result of clicking those hyperlinks is to take the user to a different web page or to a different place on the same web page, *id.* (citing KJM Decl.,

United States District Court
Northern District of California

Ex. 6 (Nelson Dep.) at 75:23-76:9; *id.*, Ex. 8 (Kahn Dep.) at 96:16-97:2), they take the position that the second half of the Wherein Clause ("the plurality of hyperlinks respectively corresponding to places in an up and down hierarchy") does not refer to those hyperlinks but instead can be *any* hyperlinks that are "associated with the MedDRA hierarchy." *Id.* (citing KJM Decl., Ex. 6 (Nelson Dep.) at 74:17-85:25; *id.*, Ex. 8 (Kahn Dep.) at 67:5-13). For the reasons discussed in connection with Argus Perceptive, Oracle contends the references to "hyperlinks" in the Wherein Clause are all to the same set of hyperlinks and therefore, that DrugLogic has failed to show that Empirica Signal meets this claim requirement. *Id.* at 26-27.

DrugLogic disagrees for the reasons discussed above.

### b.    Analysis

As discussed above, the Court concludes that the Wherein Clause requires a single set of hyperlinks. Because DrugLogic's infringement theory as to Empirica Signal, like its theory as to Argus Perceptive, relies on an interpretation of the Wherein Clause in which the "hyperlinks" in the first half of the Wherein Clause are different from the "hyperlinks" in the second half of the Wherein Clause, the Court rejects the opinions of DrugLogic's experts that Empirica Signal satisfies the requirements of the Wherein Clause. Accordingly, Oracle is entitled to summary judgment that Empirica Signal does not satisfy the requirements of the Wherein Clause.

### D.    Whether Summary Judgment Should be Granted as to Infringement under the Doctrine of Equivalents or Indirect Infringement

Oracle contends it is entitled to summary judgment of non-infringement not only as to direct infringement but also as to indirect infringement and infringement under the doctrine of equivalents because DrugLogic's experts have offered no opinions that Oracle's products infringe under these theories. Summary Judgment Motion at 28. Oracle further contends DrugLogic cannot rely on the doctrine of equivalents because the patent applicant amended Claims 1 and 8 of the '091 patent during prosecution in order to narrow those claims. *Id.* (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002)).

DrugLogic did not respond to Oracle's argument or cite to any evidence that Argus Perceptive or Empirica Signal infringes under either of these doctrines. Accordingly, the Court

United States District Court
Northern District of California

66

finds that Oracle is entitled to summary judgment of non-infringement based on indirect infringement and under the doctrine of equivalents.

## V.   CONCLUSION

For the reasons stated above, Oracle's motion is GRANTED.  The Court enters summary judgment that Oracle's Argus Perceptive and Empirica Signal products do not infringe the '091 patent.   A Case Management Conference is set for Friday, November 1, 2013 at 1:30 p.m.  The parties are requested to file a joint case management statement by October 29, 2013.

**IT IS SO ORDERED**

Dated:  October 16, 2013

_____
Joseph C. Spero
United States Magistrate Judge